*12*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JUN 0 6 2003

Michael N. Milby
Clerk of Court

COLIN KELLY KAUFMAN

V.

*12*

USDC NO. B-03-CV-~~75~~

CHALES B. FELDMAN

MIKE BOUDLOCHE, TRUSTEE

## APPELLEE 'S MOTION TO STAY APPEAL
## AND ALTERNATIVELY TO EXTEND BRIEFING DEADLINE

TO THE HONORABLE U.S. DISTRICT JUDGE:

Appellee, Mike Boudloche, Successor Chapter 11 Bankruptcy Trustee ("Trustee")

files this Motion to Stay Appeal and Alternatively to Extend Briefing Deadline and would

show as follows:

### Background

1.      This is an appeal by Colin Kaufman from an Order of the United States

Bankruptcy Court Approving Settlement between the Debtor and the Trustee.

2.      Kaufman has filed his brief with this Court and the Trustee's responsive

brief is due June 16, 2003.

### Kaufman's Assertions of Disqualification

3.      Kaufman has now asserted in the Bankruptcy Court that the undersigned

attorney for the Trustee ("Schmidt") is in violation of § 327 of the Bankruptcy Code and

the Texas Code of Professional Responsibility § 106 by common representation of the

Trustee in this Feldman Case and other bankruptcy cases. Kaufman assets that Schmidt is

therefore disqualified to act as attorney for the Trustee. See Debtor's Amended Response

attached.  Furthermore, Kaufman has filed a Complaint with the Hon. George Kazen

making these same assertions of disqualification. See the attached Letter.  Schmidt has

filed a Supplemental Disclosure in the Bankruptcy Court regarding Kaufman's assertions

and has requested a hearing thereon.  See the Attached Supplemental Disclosure.

Pending resolution of this matter, the Trustee is requesting a stay of this appeal.

      4.      The Trustee requests this Court issue an order staying this Appeal

pending resolution of the assertions of disqualification made by Kaufman.  Alternatively,

the Trustee requests an extension of time in which to file his responsive brief pending

resolution of the assertion that Schmidt is disqualified to represent the Trustee.

      Wherefore, Appellee prays:

      A.      That this Court order stay this Appeal; alternatively extend the

            Trustee's time in which to file his responsive brief; and,

      B.      That the Trustee have such other and further relief at law and at

            equity to which he may justly be entitled.


      Respectfully Submitted,

      Law Offices Of Michael B. Schmidt


      By:_____

            Michael B. Schmidt
            555 N. Carancahua, Suite 1550
            Corpus Christi, TX 78478
            E-mail: mbsatty@swbell.net (for court use only)
            Office: 361/884-9949
            Fax:    361/884-6000
            TBN: 17775200, FBN 10260
            ATTORNEY FOR TRUSTEE

2

## CERTIFICATE OF CONFERENCE

I certify that I have conferenced with the Appellant regarding the filing of this Motion. He is opposed to the stay of this Appeal, but expressed that he was unopposed to the granting of more time for the Trustee to file a brief. This Motion should therefore be considered to be opposed.

_____
Michael B. Schmidt

## CERTIFICATE OF SERVICE

I do hereby certify that a true and correct copy of the above and foregoing legal document was mailed, regular U.S. Mail, on this 5 day of June, 2003 to the persons listed below:

_____
Michael B. Schmidt

Colin Kaufman
1106 Third Street
Corpus Christi, TX 78404

Charles B. Feldman
Charles Feldman Investments
P. O. Box 3266
Harlingen, TX 78551

Mike Boudloche
555 N. Carancahua, Ste. 1550
Corpus Christi, TX 78478

Barbara Jue
Office of the US Trustee
606 N. Carancahua, Ste. 1107
Corpus Christi, TX 78476

Nancy Holley
Office of the US Trustee
515 Rusk, Ste. 3516
Houston, TX 77002

Ronald A. Simank
615 North Upper Broadway, Ste. 200
Corpus Christi, TX 78477

James P. Moon
1660 N. Hampton Rd., Ste. 202
DeSoto, TX 75115

Steven A. Ditto
CKS Asset Management
P. O. Box 541472
Dallas, TX 75354

Matthew Rosenstein
420 American Bank Plaza
Corpus Christi, TX 78475

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| In re Charles B. FELDMAN, dba Feldman Investments, Debtor | Case # 90-01254-B-11 \| In Chapter 11 |

United States Courts
Southern District of Texas
FILED

MAY 2 7 2003

Michael N. Milby, Clerk of Court

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | |
|---|---|
| IN RE: | |
| Sharon Kaye KAUFMAN, Debtor | Case # 03-20306-C-13 |
| Colin Kelly KAUFMAN, Debtor | Case # 03-20394-C-13 |
| | Administratively Consolidated |

Font: Korinna

**DEBTORS' AMENDED RESPONSE TO REQUEST FOR POST-HEARING MEMORANDUM OF AUTHORITIES, AND EXPLANATION WHY THE AUTOMATIC STAY WAS VIOLATED, AND SANCTIONS ARE MANDATORY, AND MIKE BOUDLOCHE HAS NO STANDING**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

NOW COME Sharon K. and Colin K. Kaufman, and for their Amended Response to Request for Post-Hearing Memorandum of Authorities, and Explanation Why the Automatic Stay Was Violated, and Sanctions Are Mandatory, and Mike Boudloche Has No Standing, respectfully show the Court as follows:

1. Can Another Court Lift Stay? The Court asked if a court not the bankruptcy court may lift stay. Debtors found no case saying that. It seems only the court where bankruptcy is pending may lift the stay.[1]  Normally, no other courts get jurisdiction over a

_____

[1] See, Chao, Sec. of Labor v. Hospital Staffing Services, Inc., 270 F.3d 374 (6th Cir. 2001), where the bankruptcy was pending in Florida, and the Secretary of Labor, alleging employees had gone unpaid, filed a "hot goods" complaint in federal district court in Tennessee. "The trustee claims that the vesting of jurisdiction over the debtor's property in the bankruptcy court was to the exclusion of all other courts." *** "Unlike the trustee's policy arguments, his point concerning the jurisdiction of the bankruptcy court is well taken. But it only controls to the extent that the Bankruptcy Code forbids, through the automatic stay, proceedings that involve the debtor or his estate. That is, the bankruptcy court has exclusive jurisdiction over the debtor only to the extent the Code makes its jurisdiction exclusive. *See infra*,

-1-

EX 1

bankruptcy case, and that means they lack jurisdiction to lift the automatic stay.
Jurisdiction to lift stay is exclusive in the court where the bankruptcy is pending. Although
Judge Schmidt sits in both Brownsville and Corpus Christi, the Feldman case still was
pending in a different (Brownsville) court than the one where debtors' cases were pending
(Corpus Christi). So the Court lacked jurisdiction to lift the stay in an action pending in
Brownsville.

      a. <u>District Court Involvement</u>. District courts get involved by *sua sponte*
withdrawing the reference, thus gaining power to lift stay. But to do that, they still must
announce good cause. If they don't, mandamus will lie to give review (only mandamus,
since appeal to the circuit courts is barred).[2] Even here, only the one district court can

---

Part II.B. The automatic stay provision protects the bankruptcy court's exclusive
jurisdiction by forbidding the commencement or prosecution of most actions
against the debtor or its property, but the automatic stay has exceptions. *See infra*,
Part II.A. The police power exception would normally permit FLSA "hot goods"
actions to proceed. *See infra*, Part II.C. The peculiar circumstances of this case,
however, reveal that the secretary has undertaken this enforcement action, not in
furtherance of public policy, but primarily to assert and protect the private rights
of certain individuals. Accordingly, the police power exception does not apply,
the automatic stay governs, and the district court therefore had no jurisdiction to
entertain the Secretary's suit." P. 381-82

[2] In re Canter, 299 F.3d 1150 (9th Cir. 2002), following In re Pruitt (Pruitt v. Landmark
Savs. Assn.), 910 F.2d 1160, 1166-67 (3d Cir. 1990), at 299 F.3d p. 1154-55, and also citing the
Supreme Court decision in Quackenbush. In re Parklane/Atlanta Joint Venture (Parklane
Hosiery Co. v. Parklane/Atlanta Jt. Venture), 927 F.2d 532 (11th Cir. 1991) gave a different kind
of review, holding that it would review an alleged violation of Marathon by letting a bankruptcy
court make a non-reviewable ruling instead of having an Article III court make the same, even if
Congress had provided for no review of withdrawal of reference cases. Other withdrawal of
reference cases include In re Hall Bavoutree Assocs., Ltd., 939 F.2d 802 (9th Cir. 1991) ("even if
withdrawal [of reference] may be found by implication, there still must be some 'cause shown'
for the withdrawal. 28 U.S.C. § 157(d). The district court did not declare any cause for a
withdrawal of the reference in this case.") *And see*, In re Simmons, 200 F.3d 738 (11th Cir. 2000)
("The law of this circuit states that: 'Once a bankruptcy court has assumed jurisdiction * * * a

-2-

withdraw the reference, not just any district court.

    2. <u>Special Community</u>. The other question asked by the Court was whether the

"special community" doctrine might alter the situation. Well, it might, if it could be applied.

The law is clear that "special community" property is not liable for the claims of the other

spouse.[3] But the only two common situations of "special community" are where a spouse

earns wages, and where a spouse's separate property creates community income.[4] Here

_____

district court may withdraw reference only for cause shown.'")

    [1] <u>Patel v. Kuciemba</u>, 82 S.W.3d 589, 596 (Tex. App. Corpus Christi 2002) holding that "Special community property is that portion of the community that is under one spouse's exclusive control and is not liable for the other spouse's debts." Of interest in this case is the court's other holding, p. 595, "<u>Cockerham v. Cockerham</u>, 527 S.W.2d 162 (Tex. 1975), cited by appellees to support the findings of agency and ratification, is distinguishable because in that case the husband and wife were both clearly active in the wife's dress shop, whereas in this case Ilaben did not have an actual involvement in Manu's businesses * * *." It would seem clear beyond all doubt that Sharon Kaufman is at least as involved in running his law office as Colin Kaufman is, and that the "special community" rule cannot thereby apply. The proffer of Mr. Kaufman's evidence notes that all funds from the law practice go into the Kaufman's joint checking account, so no reason exists to hold that Mr. Kaufman has exclusive control.

    [4] <u>Valdez v. Ramirez</u>, 574 S.W.2d 748, 750-51 (Tex. 1978) (two leading forms of special community are wages and income from separate property; and wages includes retirement benefits); <u>Texas Commerce Bank v. Tripp</u>, 516 S.W.2d 256, 259 (Tex. App. Fort Worth 1974) (interest earned on separate property accounts was special community income, and also not subject to garnishment or attachment by creditors of owner's spouse); <u>U.S. Fidelity & Guaranty Co. v. Milk Producers Assn.</u>, 383 S.W.2d 181 (Tex. Civ. App. 1964) ("However, the personal earnings of the wife and revenues from her separate property are special community property and not subject to the claims of her husband's creditors"); <u>Moss v. Gibbs</u>, 370 S.W.2d 452 (Tex. 1963) (burden to show "special community" is on the party asserting it, as presumption is that property is general community property); <u>Smith v. Smith</u>, 733 S.W.2d 915 (Tex. App. Houston 1st 1937), holding that wages are "special community" income and so are the retirement benefits provided by the employer of a spouse, citing <u>Medenko, Inc. v. Myklebust</u>, 615 S.W.2d 187, 189 (Tex. 1981); <u>Cleaver v. George Staton Co.</u>, 908 S.W.2d 468 (Tex. App. Tyler 1995), holding that a wife's income from a spendthrift trust is separate property, citing <u>In re Long</u>, 542 S.W.2d 712, 717-18 (Tex. App. Texarkana 1976, no writ); but if it were community, it would still be "special community" income, citing Sec. 5.22(a)(2) of the Family Code.

the Kaufmans are both involved in the same business and help earn the same money and when they earn it, put their money in the same joint checking account. That's general community, no way around it. And there was no evidence offered tending to show a special community, so it would not be possible to hold that way, even if the facts supported it, which they don't.

3. <u>Mr. Boudloche's Suggestion</u>. Mr. Boudloche's suggestion (in Mike Schmidt's oral argument on May 19) that he had sovereign and judicial immunity cannot work in this case. In the first place, he is not a duly appointed bankruptcy trustee. He may be a sovereign in many instances; but he clearly is only a "plan trustee" here, which means he is trustee by CONTRACT with the creditors in the Feldman case,[5] and thus not an official representative of the federal government.[6] The order by which he was appointed says he was made plan trustee by an amendment to the plan. So it was by contract. But even if he had been a real trustee, instead of a mere contract trustee, he still would not be immune. The law does not give immunity to intentional wrongs. A court order cannot authorize illegal conduct.[7] So

---

[5] In re Stratford of Texas, Inc. (Official Creditors Committee v. Stratford of Texas, Inc.), 635 F.2d 365 (5th Cir. 1981) (plan must be treated as a contract with the creditors).

[6] Say he were. Congress waived sovereign immunity for the federal government, see Sec. 106(a), for a large number of sections of the Code; and Sec. 106(b) further waives all sovereign immunity of anyone to the extent that the sovereign has filed a proof of claim. In re Bryant, 116 B.R. 272 (Bkcy., D Kan. 1990). If Mr. Boudloche were a sovereign, which he isn't in this case, even so he has definitely filed a proof of claim.

[7] See cases in the two footnotes following. Early caselaw gave little guidance as to how much "immunity" a bankruptcy trustee has. Barton v. Barbour, 104 U.S. 126, 129, just invented, back in 1881, a rule that receivers and trustees had an immunity to being sued IN ANOTHER COURT without the appointing court's permission. That did not stop actions in the appointing court to correct abuses. And note, the Kaufmans filed their action

-4-

there is no defense, whether the plan trustee relies on trustee status under the law, or

asserts the protection of the court order itself, or both.[8] Other courts say that any judicial

immunity created by obtaining a court order is lost if at the hearing on the order, there is

not full disclosure to the court of any potential problems.[9] So, this was not a real

---

against Mr. Boudloche IN THE APPOINTING COURT, i.e., in the Brownsville division case. The leading case on bankruptcy trustees' immunity is Mosser v. Darrow, 341 U.S. 267, 271, 274 (1951), which makes the trustee always liable for intentional wrongs, and according to a majority of circuits, also liable for mere negligence. See, In re Mailman Steam Carpet Cleaning Corp. (LeBlanc v. Salem, Trustee), 196 F.3d 1, 7-8 (1st Cir. 1999), counting up which circuits take which view about negligence liability of bankruptcy trustees. The plan says that the plan trustee will be liable for intentional wrongs — bad faith or gross negligence. The motion seeks actual and punitive damages for intentional wrongs. So liability lies under Mosser v. Darrow, in every circuit.

[8] A good explanation of this view, that a trustee may not use judicial immunity as a defense to violating the law, comes in United States v. Hemmen, 51 F.3d 883 (9th Cir. 1995), at p. 891, saying:

> "Hemmen also argues that he is shielded from personal liability under the doctrine of quasi-judicial immunity because his final distribution was made pursuant to court order. As a general rule bankruptcy trustees enjoy broad immunity from suit while acting within the scope of their authority and pursuant to court order. Bennett v. Williams, 892 F.2d 822, 823 (9th Cir. 1989). Trustees are not immune, however, for intentional or negligent violation of duties imposed by law. Id. We have determined that Hemmen was under a legal duty to honor the Service's levy.

In the same way, the plan trustee here was under a legal duty to honor the automatic stay. So a trustee may not defend against a deliberate act violating a statute by saying, "Well, but the bankruptcy court ORDERED me to take the debtors' children into captivity and sell their first born son into slavery!" If a law is ordered to be broken, the bankruptcy trustee may not do it, ordered or not

[9] See e.g., In re San Juan Hotel Corp., 847 F.2d 931 (1st Cir. 1988), where the court said:

> Rodriguez also claims that he is immune from liability for the pay
> raises because the stipulation he negotiated was approved by the bankruptcy

-5-

bankruptcy trustee case, only a plan trustee case; but the relevant authorities indicate that Mr. Boudloche would not have been permitted to violate the automatic stay with impunity had the facts been otherwise.

4. <u>Judge Schmidt Did Not Lift Stay</u>. When a sanctions motion was filed, Mr. Boudloche alleged excuses for his stay violation. When an amended sanctions motion was filed, negating excuses, Mr. Boudloche claimed that Judge Schmidt had lifted the stay when he signed the order. Numerous (at least eight) good reasons exist why this could not possibly have been true.

(i). Motion for the order was filed before Sharon's bankruptcy. You cannot file a motion to lift stay before a bankruptcy exists.

(ii). Motion not noticed to Sharon. Not noticed to her bankruptcy counsel. Motions to lift stay have a distinct service requirement, and Mr. Boudloche made no attempt to comply with them.

(iii). Not noticed to the other claimants to the property. The order tried to give the bank's property to the receiver, without the bank ever being noticed of any

---

court. As a general matter, as we have already discussed in the context of the <u>Mosser</u> case, we agree with Rodriguez that a trustee, acting with the explicit approval of the bankruptcy court, is entitled to derived judicial immunity. *See* p. 940, *supra; see also* <u>Lonneker Farms, Inc. v. Klobucher</u>, 804 F.2d 1096 (9th Cir. 1986). But as we have also said, such judicial immunity is contingent on "candid disclosure" to the court and the creditors of the relevant circumstances surrounding the proposed action. *See* <u>Mosser</u>, 341 U.S. at 274, 71 S.Ct. at 683. Only after full disclosure has been made, and the court is aware of the pertinent facts, does judicial approval become meaningful.

In this case, the docket shows no hearing at all, so there was no "candid disclosure."

"motion for relief from stay" or anything else. Motions to lift stay have a distinct service

requirement, and Mr. Boudloche made no attempt to comply with them.

(iv). Local rules forbid combining a motion to lift stay with a request

for any other relief. So it was illegal to make a motion to lift stay at the same time in the

same writing as asking for a receiver.

(v). Writings do not say so. Neither the application for a receiver, not

the order granting a receiver ever mentions the existence of a bankruptcy at all, much less

states the order is lifting stay in one. Assuming a court has and is exercising its jurisdiction

to do something, it still has to say something giving a hint that this is what it is doing. You

cannot lift a stay in a bankruptcy without reciting that the bankruptcy exists.

(vi). No hearing was noticed on an automatic stay motion. For a

court to lift stay, it has to hold a hearing. No notice of hearing was sent out after Sharon's

bankruptcy was filed. The docket does not indicate that another hearing was had.

(vii). Lifting stay to give a party a preference would be illegal.

(viii). Due process would have been violated if the stay had been lifted

with the total lack of notice in this case. Normally it is improper to interpret the actions of a

court as being in violation of due process, where some other interpretation is possible.

5. Remedies. The usual and customary remedy for such stay violations is to cancel

the claim, including secured claims. In re Ceparo, 226 B.R. 595 (Bkcy., SD Ohio 1998)

(cancel secured claim is usual form of punitive damages given for intentional stay violation

by secured party)); In re Latanovich, 207 B.R. 326 (Bkcy., D Mass. 1997) (cancellation of

secured claim proper remedy for stay violation); cf., In re Keyworth, 47 B.R. 966 (Bkcy., D

Colo. 1985) (cancellation of claim proper remedy for any bad faith action in connection with same). *See also,* In re Aiello, 231 B.R. 684, 689-90 (Bkcy., ND Ill. 1999) (cancellation of claim proper remedy for stay violation), citing In re Carrington, 109 B.R. 167 (Bkcy., WD N.C. 1989) (same). *Cf.,* In re Brown (Brown v. Town & Country Sales & Servs., Inc.), 237 B.R. 316 (Bkcy., ED Va. 1999) (proper to cancel UCC security interest for stay violation); In re Carrigan, 109 B.R. 167 (Bkcy., WD No. Car. 1989) (same). And some other cases discuss the usualness of this remedy also. *See e.g.,* In re Just Brakes Corp. Systems, Inc., 108 F.3d 881 (8th Cir.), cert. denied 522 U.S. 947 (1997), explained in, In re Just Brakes Corp. Systems, Inc., 293 F.3d 1069 (8th Cir. 2002) (can't just cancel claim as usual, in a corporate bankruptcy, because Sec. 362[h] only provides for punitive damages for individuals, not corporations).

         a. Individual Bankruptcies. In other words, in bankruptcies of individuals, rather than a corporation, the claimant loses both claim and security – any lien it might have had – for violating the stay by an intentional act.

         b. Not Adequate. Claim cancellation is not an entirely adequate or satisfactory remedy in this case, however; for at least three reasons.

         (i). First, because the claim is already at risk for entire cancellation because of the appeal of the claim to the Fifth Circuit. Cancellation in bankruptcy court might not add anything to what debtors might already get.

         (ii). Second, Mr. Boudloche might try to use cancellation as a ground to claim that the appeal to the Fifth Circuit is moot, which further reduces the value to the Kaufmans of a cancellation. It would not be moot, because the Kaufmans' claim to

allowance of additional fees would survive; and what the Kaufmans would get from being put back into status quo ante would be much more than the amount of the claim being asserted. But Mr. Boudloche might try to claim it to be moot.

(iii). And third, cancellation of the claim might be alleged to liberate Mr. Boudloche and Mr. Schmidt from having to resign their positions in the Raymond Bruni and David Kirk cases; which, if sustained, enormously reduces the cost to them by giving them offsetting income. What's the point of punitive damages, if no punishment occurs? So debtors think cancellation alone would be inadequate; and treble damages would be a much more effective punitive award in this situation.

b. Attorneys Fees. Reasonable attorneys fees should be awarded under Sec 362(h) even if no other compensable harm occurs. *See, e.g.,* In re Watkins, 240 B.R. 668, 680 (Bkcy., ED N.Y. 1999), adopting this rule for violation of discharge injunction cases by analogy to automatic stay cases, and citing three automatic stay cases, *viz.,* In re Robinson 228 B.R. 75, 85 (Bkcy. ED N.Y.1998);  In re Sumpter, 171 B.R. 835, 845 (Bkcy. ND 1994); In re Baker (Bank of Boston v. Baker), 140 B.R. 88, 90 (D Vt. 1992). See also Solfanelli, infra.

c. Punitive Damages. Punitive damages should be awarded only for intentional acts which violate the automatic stay. Intention to violate the stay is not required, and a desire not to violate it is no defense. Solfanelli v. Corestates Bank, NA, 203 F.3d 197, 203 (3d Cir. 2000). You just have to know of the stay, and intend to act. You assume the risk of violation, if you do not lift the stay when you know of its existence.

(1). Normally, treble punitive damages are considered routine, and

not excessive. *See, e.g.,* In re Wills (Wills v. Heritage Bank), 226 B.R. 369 (Bkcy., ED Va. 1998) (Bostetter, Ch. Bkcy. J.) which held, at p. 375, citing In re Eads (Hawkins v. Eads), 135 B.R. 380, 384 (Bkcy., ED Cal. 1991) and In re Wood (First Natl. Bk. & Tr. Co. v. Flatau), 643 F.2d 188, 191 (5th Cir. 1980) that punitive damages under Sec. 362(h) do not abate on plaintiff's death because they are like federal "treble" damage statutes in trying to compensate for the intangible kinds of harms caused by the statutory violation. *See also,* In re Watkins, 240 B.R. 668 (Bkcy., ED N.Y. 1999), holding at p. 681 that while any future punitive damage awards ought obviously to be higher, three times actual damages would be appropriate in the case before the Court which was the first time that the possibility of such an award had been raised in the local area.

(2). Caselaw also supports trebling the amount of the creditor's claim as punitive damages; *see,* In re Brown (Brown v. Foley), 213 B.R. 317, 31 B.C.D. 652 (Bkcy., WD Ky. 1997) (Stosberg, Bkcy. J.) (held, where creditor's criminal complaint caused debtor to be arrested and post $500 bond; Court would award treble the amount sought to be collected by filing the complaint (treble $2100 or $6300) instead of treble the [smaller] actual damages.) *Cf., e.g.,* Cohen v. de la Cruz, 523 U.S. 213, 118 S.Ct. 1212, 1214, 140 L.Ed.2d 341 (1998) (9-0) (O'Connor, J.) (held, treble damages for fraud are non-dischargeable under appropriate section of the Bankruptcy Code just as single damages for fraud are.)

a. <u>Conflicts of Interest: No Clean Hands.</u> Mr. Boudloche and Mr. Schmidt made a conflict of interest by trying to bring in $330,000 in new claims to compete with the Feldman estate's alleged claim against Mr. Kaufman. And note, the debtors have filed five

-10-

claims objections and a revised plan and schedules.[10]  Mr. Boudloche and Mr. Schmidt

could not represent the Feldman estate and two of its competitors for payment at the same

time (while also shopping around to bring in Mr. Anthony, as a third competitor!).  They had

to stop representing Bruni and David Kirk's estates, if they kept representing Feldman's

estate.  They knew David Kirk was a conflict, because he appeared on Sharon's schedules

and they offered them into evidence and went through those at the February 21, 2003

hearing in front of Karen Brown.  So they should have known not to take David Kirk's case.

Even if they had forgotten, they had to quit as soon as they discovered the conflict.  But

because they didn't stop, they violated federal law and Mr. Schmidt violated the state bar

Canon of Ethics.  Both of them are thus required to give up their fees in all three cases,

Bruni, David Kirk and Feldman.  Also, they both lack the clean hands necessary for a

plaintiff to seek relief from a court of equity.[11]

---

[10] These objections ask the Court to disallow the $224,000 claim filed by Mr. Boudloche for the Feldman estate, the $285,000 claim filed for Mr. Anthony for the Arthur Wilson Carothers Trust, the $5,000 claim filed by Mr. Schmidt for the Raymond Bruni estate the $39,000 claim filed by Mr. Boudloche for the David Kirk estate, and $40,000 of the IRS's claim.  The objections show that the claims could not be good as a matter of law, and furthermore, the claims were not good ones even without the matter of law.  Debtors also intend to object to the Montgomery Ward proof of claim. and the Esquire proof of claim. and are already litigating with the *ad valorem* taxing authorities

[11] In re Little Creek Dev. Co. (Little Creek Dev. Co. v. Commonwealth Mtge. Co.), 779 F.2d 1068, at p. 1076 (5th Cir. 1989) (both debtors and creditors must have clean hands to get relief in bankruptcy); In re Christopher (Sequa Corp. v. Christopher), 28 F.3d 512, 520 (5th Cir. 1994) (whether hands are clean is normally a question of fact); In re Occidental Fincl. Grp., Inc. (Law Offices of Ivan W. Halperin v. Occidental Fincl. Grp., Inc.), 40 F.3d 1059. 1063 (9th Cir. 1994) (attorney lost his attorneys fees because of lack of clean hands in failing to disclose other links between him and debtor's control group); In re Eisen (Moneymaker v. CoBen), 31 F.3d 1447 (9th Cir. 1994) (held, alleged dirty hands of Chapter 11 trustee was not relevant to question of what court should do about claim of Chapter 7

-11-

b. **No Voluntary or Involuntary Transfer of Client's Claim vs. Lawyers.** State court and federal court precedents agree that claims against lawyers for misperformance or nonperformance for clients are malpractice claims, whatever title or label someone may try to place on them. These precedents say legal malpractice claims do not transfer to trustees, voluntarily nor involuntarily. Britton v. Seale, 81 F.3d 602, 603-04, 605 (5th Cir. 1996), et al.. Mr. Boudloche, Mr. Schmidt, and Mr. Gonzalez's client, Mr. Anthony, had no claims to file, because no transfer occurred to them.[12]

c. **No Privity.** Mr. Boudloche, Mr. Schmidt and Mr. Gonzalez's client did not have any privity of contract with Mr. Kaufman. Therefore they had no right to make any

---

trustee); Patel v. Kuciemba, 82 S.W.3d 589, 599 (Tex. App. Corpus Christi 2002) (party need not show injury from inequitable conduct of other side to bar it from relief under the "clean hands" doctrine).

[12] Mr. Anthony also seems to be in a position of dirty hands, too. He claimed only $22,000 was left of the POD ("payable on death" accounts), while Mr. Kaufman pointed out that in reality, the $22,000 was only one account, and that the T. Rowe Price, the USAA, the Bank of America, and such "payable on death" accounts had never had a nickel spent out of them, and they amounted to $225,000 in addition, for a total of $247,000 of POD money left in the accounts. And that did not even mention the circa $250,000 left in the trust account (which again, goes up and down with the stock market.) So he tried to leave the impression that only $22,000 was left to him, when he well knew he is presiding over half a million dollars plus in assets. But he admitted on the stand that he got seven boxes of documents from Mr. Kaufman's law office, and an accounting from Andy Huffmeyer. In these, he got the account statements, and should have been able to know that it was highly misleading to imply that he only got $22,000 in assets when he got half a million dollars. Besides this failure to communicate, Mr. Anthony claimed on the stand that he didn't know that the attorneys had been paid by Mr. Huffmeyer for their attorneys fees – when the proof of claim he filed just the week before EXPRESSLY STATED that the basis of the claim was overpayment of attorneys fees. That factual evidence was conveniently forgotten when it was pointed out to him that he had violated the automatic stay; and he was anxious to find some other theory of recovery that he might make a colorable case of not violating the automatic stay, and came up with his "I was only asking for the trust funds" theory. Yeah, right. And his changed story does not cure his automatic stay violation, anyway.

-12-

claim against him, and therefore their proofs of claim are invalid.  <u>Barcelo v. Elliott</u>, 923 S.W.2d 575, 577 (Tex. 1996).

6.  <u>Eligibility</u>.  Because the foregoing analysis eliminates $330,000 worth of claims, and because Mike Boudloche's claim had to be reduced to zero for set-offs and counterclaims, eliminating another $224,000 worth of claims, for a subtotal of $554,000 in claims eliminated (not to mention some thousands more eliminated by the amended joint schedules, Colin Kaufman's case was easily within the statutory limit when he filed, whatever might be said about eligibility for Chapter 13 before, in Sharon's case.  In any case, since the IRS is now asserting another $40,000 less in claims than before, reducing Mr. Boudloche's alleged claims by $594,000, and Viviana Cavada's $6500 claim is post-petition, not pre-petition, and DOES NOT COUNT for eligibility purposes, knocking off over $600,500 from the alleged unsecured claims on Mr. Boudloche's list;  there could be no excessive unsecured debt load anyway.  So conversion to Chapter 7 or Chapter 11 is not required.  And if it were required to happen, then it would be another element of damages for which Mr. Boudloche and Mr. Schmidt will owe to pay Mr. Kaufman, since the law is clear that the additional loss of control over one's assets that one suffers by being in a Chapter 7 is a "redressable wrong" which must be paid for.  <u>In re Alvarez</u>, 224 F.3d 1273 (11th Cir. 2000), criticizing and refusing to follow <u>Collins v. Federal Land Bank of Omaha</u>, 421 N.W.2d 136 (Iowa 1988) <i>contra</i>.

7.  <u>Another 600+ Instances of Conflicts and Illegality</u>?  The bid sheet made an exhibit hereto shows that Mr. Boudloche sold David Kirk's practice; most of the Corpus Christi office caseload consisting of cases being administered by Cindy Boudloche.  There

-13-

were more than 600 cases sold with the Corpus Christi practice.  Although the bid sheet

purports to be selling "accounts;" it is not true, because only lawyers were allowed to bid,

and the terms require the lawyers to assume the duty of representing the client, if further

legal representation was needed.  *See e.g.*, the discussion of UCC rules on sale of accounts

in paragraph 4-D below.

A.  Conflicts.  What Michael Boudloche sold for, and to whom, might well

have been influenced by whether Cindy Boudloche was going to keep making her ten

percent on each client's payments.  That was 600 cases of conflicts.

B.  Illegality.  And the cases of illegality were many more than that, because it

was just as illegal to sell the San Antonio practice as it was to sell all the Corpus Christi

practice.   So that would make over 1600 cases of illegality.

8.  Kinds of Illegality.  Why was it illegal to sell Mr. Kirk's practice?  Mr. Boudloche

thought he could sell Mr. Kirk's law practice.  But it is well-known that the effect of a

contract being "personal" may be that it is too personal to pass to the trustee in

bankruptcy.[13]  In such cases, the usual rule is that the contract with the client does not

---

[13] *See e.g.*, Masterson v. Sine, 68 Cal.2d 222, 436 P. 2d 561 (1968) (Traynor, C.J.)
(option given brother-in-law was too "personal" to pass to brother-in-law's trustee in
bankruptcy) (case found in several 1st-year contracts course casebooks); In re Computer
Communications, Inc. (Computer Communications, Inc. v. Codex Corp.), 824 F.2d 725 (9
Cir. 1987) (contract may be too personal to be "assumed" under Sec. 365[c], but still it
could not be cancelled by the creditor until it lifted the automatic stay under Sec. 362); In re
Pioneer Ford Sales, Inc., 729 F.2d 27 (1st Cir. 1984) (Ford may be forced to accept a new
franchise under its contract with bankrupt dealer, but that doesn't mean it has to accept a
competitor whose chief business is selling Toyotas); In re Southern Cal. Sound Systems,
Inc., 69 B.R. 893 (Bkcy., SD Cal. 1987) (held, if licensing agreement was too personal to be
assigned under Sec. 365, still that would not prevent the debtor from REJECTING it); In re
Taylor, 913 F.2d 102 (3d Cir. 1990) (singer James Taylor's recording contract may be too

-14-

itself pass to the trustee, but the money is divided. The bankruptcy court will let the trustee collect that part of the fees under the contract that had already been earned on the day bankruptcy was filed, and let the debtor keep the funds that are earned after bankruptcy.[14]

9. Statutes Forbidding Conflicts. § 327, Bankruptcy Code forbids a trustee or his attorney to represent conflicting interests. Rule 1.06 (a) & (b), Texas Canons of Ethics,

---

"personal" to be assumed or assigned by trustee, but that would not keep Taylor from rejecting it as onerous); In re Superior Toy & Mfg. Co. (Appeal of Steege, Trustee), 78 F.3d 1169 (7th Cir. 1996) (held, even if deal would have been too preferential to survive such an attack on its own, still by structuring deal as an executory contract, and getting court approval to assume it, debtor immunized deal against preference attack by other creditors, and later trustee).

[14] *See e.g.*, In re Watts (Watts v. Williams), 154 B.R. 56 (SD Tex. 1993) (Hittner, Dist. J.) (where Williams, an attorney, filed Chapter 7, he was entitled to his post-petition earnings; and even though his cases were contingent fee cases, still partly earned pre-petition, and only the post-petition portion would belong to debtor, and it was possible to allocate income between post-petition and trustee's pre-petition income, and proposed settlement between trustee and debtor, giving 1/8 of Watts' fees to the trustee would have been okay, but case would have to be reversed since Judge Wheless erred in rejecting the deal on the objection of the leading creditor and ordering ALL the funds to go to the bankruptcy trustee); In re Clark, 891 F.2d 111 (5th Cir 1989) (held, debtor's contract to pay football for the New Orleans Saints for $575,000 for current season was not to be treated as fully earned when debtor filed Chapter 7, but it would be treated as earned $36,000 a game, since that was the performance football team was expecting to get in return for it); In re Cooley (First City Nat'l. Bk. of Houston v. Cooley), 88 B.R. 788 (Bkcy., SD Tex. 1988) (Mahoney, Bkcy. J.) (Cooley, famous heart surgeon, could terminate Cardiovascular Associates, and set up new entity to do open heart surgeries post-petition, as long as used no estate assets, and money belonged to Cooley, and not to his Chapter 7 bankruptcy trustee); In re Herberman, 122 B.R. 273 (Bkcy., WD Tex. 1990) (Leif Clark, Bkcy. J.), In re Jess, 215 B.R. 619 (9th Cir. BAP1997); In re Lundeen, 207 B.R. 604 (Bkcy., SD Ind. 1997) (podiatrist, following Cooley, but refusing to follow Herberman); In re Tomer, 128 B.R. 746 (Bkcy., SD Ill. 1991) (if insurance agent's relationship with customers too personal to pass to trustee in bankruptcy, still the amounts earned prior to bankruptcy belonged to the trustee, and agent could only keep post-petition earnings). On the authority of Watts, and the Fifth Circuit opinion in Clark, it would seem that the trustee could not have kept all of the income from David Kirk's law practice here.

forbids an attorney to accept employment where there are conflicting interests.[15]

10. <u>Legality</u>. Several considerations apply in determining legality of a contract to sell a practice.

A. <u>Personal Services Contracts</u>. Contracts for an attorney to represent a client are well-known examples of "personal services" contracts. Personal services contracts are "personal" to the party who is bargaining for services of a particular person, and that person may not be made to accept the services of anyone else. Sec. 365(c) of the Bankruptcy Code codifies the usual rule against assumption or assignment of personal services contracts.[16]

---

[15] Rule 1.06. **Conflict of Interest: General Rule.**

        (a) A lawyer shall not represent opposing parties to the same litigation.
        (b) In other situations and except to the extent permitted by paragraph (c), a lawyer shall not represent a person if the representation of that person:
        (1) involves a substantially related matter in which that person's interests are materially and directly adverse to the interests of another client of the lawyer or the lawyer's firm, or
        (2) reasonably appears to be or become adversely limited by the lawyer's or law firm's responsibilities to another client or to a third person or by the lawyer's or law firm's own interests

[16] *See, e.g.,* In re Yarn Processing Patent Validity Litigation, 530 F.2d 83, 90 (5th Cir 1976), *rehearing denied,* 536 F.2d 1025 (held, assignment of the patents did not assign attorney Irons along with them to defend them, as the attorney-client contract is personal and non-assignable without the consent of all parties, citing Sec. 868 of Corbin on Contracts); *and see also,* In re Taylor, 913 F.2d 102 (3d Cir. 1990) (singer James Taylor's recording contract may be too personal to be assumed or assigned, but that did not mean it could not be REJECTED where it was onerous to debtor Taylor); duPont de-Bie v. Vredenburgh, 490 F.2d 1057, 1060 (4th Cir. 1974) (*per curiam*); Munchak Corp. v. Cunningham, 457 F.2d 721, 726 (4th Cir. 1972) (NBA star Billy Cunningham jumps from NBA Philadelphia '76ers to ABA Charlotte Cougars, and then wants to go back; held no

B. <u>Assignability of Attorney-Client Contracts under State Law</u>. We saw above in this Memorandum that only the client may sue the attorney,[17] and the attorney does not deal with anyone in regard to his contract of employment but the client he signed with.[18] In the past, other jurisdictions have taken rules like these, and inferred that clients cannot be sold. Privity of contract is required for anyone to get relief under the attorney-client relationship. So any attempt to sell the relationship would be *ultra vires* and invalid.

C. <u>Canons of Ethics Forbid It</u>. However, the rules have evolved more recently to the point that some sales of practices are permitted. But that does not mean all are. There are established limits. Even if Mr. Boudloche might ever have met these limits, it is not shown here that he in fact did actually meet them. Several ways exist by which this kind of sale of an attorney's practice may also be outside the limits of permission given for such sales by the Canons of Ethics.[19]

_____

violation of personal services contract rules for old owner of Charlotte Cougars to assign his contract to new owner Munchak Corp., since Cunningham still playing for Charlotte Cougars both before and after assignment).

[17] <u>Britton v. Seale</u>. 81 F.3d 602, 603-04, 605 (5th Cir. 1996), *et al.*.

[18] <u>Barcelo v. Elliott</u>. 923 S.W.2d 575, 577 (Tex 1996).

[19] Originally there was some doubt about the legality of ANY sale of a law practice. Today, it is clear that some sales of law practices are illegal. Since 1990, ABA Model Rule 1.17 allows them, but also sets out the applicable rules and limitations. Quite a bit exists to comply with – for example, the seller has to stop doing business in the applicable area. The Kaufmans do not understand that Mr. Kirk agreed to stop practicing law. Perhaps this Court can stop him from practicing bankruptcy law in Corpus Christi, but it cannot even do that for other places, such as in San Antonio, for example. Also, Model Rule 1.17 only provides for a lawyer or law firm to sell, not a bankruptcy trustee. And this bankruptcy trustee is not a lawyer or law firm. Also, clients must get notices. The Kaufmans do not know whether clients got the required notice and disclosures here, etc. Clients have to get 90 days opportunity to object; and this sale took place less than 90 days after filing of the bankruptcy. And there may be other difficulties

(i). <u>Keeping Secrets</u>. Assume that the requisite notices have been sent out, and the required time limit for notice was met, and consents get returned, and other conditions imposed by law are met. Then a practice may be sold. But other terms in the Canons may not be violated. The Canons contemplate that an attorney will keep his client's affairs private. Here the bid sheet shows that the purchaser of the "accounts receivable" will receive the original David Kirk files along with the "accounts." Texas Rule 1.05(a) defines the information that is to stay confidential, and 1.05(b)(ii) forbids revealing that information to "anyone else" without the express consent of the client. Handing over the clients' files to high bidders is not among the exceptions listed in the Texas Rule. The client's signature needs to come first, to do this. And no indication exists that this was a requirement in the transaction as it went forward.

(ii). <u>Fee Splitting</u>. Normally, you try to set up sales of practices in such a way that nobody has to split fees on the cases -- because it is much harder to make a legal sale if you do have to split fees. The Canons contemplate that an attorney will not engage in fee splitting except in the three instances set out in Texas Rule 1.04(f), which means that a writing would be required here, since the "joint responsibility" provision is the only subsection of (f)(1) which fits.[20] So Mr. Boudioche would have been well advised not to

here.

[20] Rule 1.04(f) reads as follows:

(f) A division or agreement for division of a fee between lawyers who are not in the same firm shall not be made unless:

(1) the division is

-18-

do it the way he did.  The written consent of the client not having been solicited nor

obtained for the 1600+ cases, the assignment of fees to the high bidding new lawyer was a

violation of the Canons of Ethics, not just by Mr. Schmidt, but also by the buyer.  Also, it is

often said federal law bans fee splitting in bankruptcy, regardless of state law, though the

court's approval no doubt greatly reduces the risk of criminal prosecution from the

transaction.[21]

      D.  Not a UCC Transaction.  The Uniform Commercial Code permits a holder

of accounts receivable to borrow money against them.  And it also lets the holder sell them

outright.  UCC filing requirements apply to such transactions.  But this is not that kind of

transaction.  The kind of transaction the UCC is talking about is only the assignment of the

right to payment, before or after the payment has been earned.  The UCC does not even

apply to the kind of sales which the duty of performing the legal work will also be

transferred, along with the right to payment.[22]

    11.  Clean Hands.  Mr. Boudloche and Mr. Schmidt both lack the clean hands

---

      (i) in proportion to the professional services performed by each lawyer;
      (ii) made with a forwarding lawyer; or
      (iii) made, by written agreement with the client, with a lawyer who
assumes joint responsibility for the representation;
      (2) the client is advised of, and does not object to, the participation of all the
lawyers involved; and
      (3) the aggregate fee does not violate paragraph (a).

   [21] See 18 U.S.C. Sec. 155 entitled, "Fee agreements in cases under title 11 and
receiverships".

   [22] Sec. 9.109(d)(6), Tex. Bus. & Commerce Code (2001).  The bid sheet shows that
the duty to perform any necessary services on existing accounts will be imposed on the
account buyer, not just a right to buy the payments.  See also, Sec. 9.109(d)(4) (UCC does
not apply to sale of account which is part of a sale of business, either).

necessary for a plaintiff to seek relief from a court of equity. So they are barred from any claim herein.[23]

.12. Appraisers. Mr. Boudloche has asked for appraisals on three days notice. He is not the trustee of this case. He has no standing to ask for anything, due to his conflicts in Feldman and David Kirk's cases, and Mike Schmidt's conflicts in Feldman, David Kirk, and Raymond Bruni. He has no standing because he has violated the automatic stay and lacks clean hands necessary to ask for relief. He has no standing because the debtors have proposed a 100% plan. Harlin Womble admitted on the stand he had never seen appraisals in a Chapter 13. The Kaufmans have never seen appraisals in a Chapter 13. What extraordinary justifications do Michael Boudloche & Mike Schmidt offer to justify taking an extraordinary step? They want to do it. That's it. No grounds. No claim of concealment. Mr. Kaufman wears his jewelry to court every week. No claim of fleeing jurisdiction. No preliminary showing of probability of excess value (the debtors schedules show they still have over a THIRD of their $60,000 exemptions left over and unused -- they didn't have

---

[23] In re Little Creek Devt. Co. (Little Creek Devt. Co. v. Commonwealth Mtge. Co.), 779 F.2d 1068, at p. 1076 (5th Cir. 1989) (both debtors and creditors must have clean hands to get relief in bankruptcy); In re Christopher (Sequa Corp. v. Christopher), 28 F.3d 512, 520 (5th Cir. 1994) (whether hands are clean is normally a question of fact); In re Occidental Fincl. Grp., Inc. (Law Offices of Ivan W. Halperin v. Occidental Fincl. Grp., Inc.), 40 F.3d 1059, 1053 (9th Cir. 1994) (attorney lost his attorneys fees because of lack of clean hands in failing to disclose other links between him and debtor's control group); In re Eisen (Moneymaker v. CoBen), 31 F.3d 1447 (9th Cir. 1994) (held, alleged dirty hands of Chapter 11 trustee was not relevant to question of what court should do about claim of Chapter 7 trustee); Patel v. Kuciemba, 82 S.W.3d 589, 599 (Tex. App. Corpus Christi 2002) (party need not show injury from inequitable conduct of other side to bar it from relief under the "clean hands" doctrine); Munchak Corp. v. Cunningham, 457 F.2d 721, 726 (4th Cir. 1972) (lack of clean hands is an absolute bar to relief in court of equity).

enough property value to get CLOSE to the maximum allowed). And appraisals are really pretty useless here. They never establish value conclusively; but are merely some evidence at best, because the test is what one gets on an actual offer to sell the property. Mr. Boudloche is trying to waste time and money on a path that is calculated to lead nowhere and gain nothing. This is just more attempted harassment, and more reason why punitive damages need to be awarded in addition to the $250,000 actual damages.

       a. Dirty Hands -- Conflicts. He cannot get any relief from the court unless he has clean hands. He doesn't because of his conflicts of interest.

       b. Dirty Hands -- Stay Violations. He cannot get any relief from the court unless he has clean hands. He doesn't because of his violations of the automatic stay.

       c. Mr. Peake is Chapter 13 Trustee. Mr. Boudloche is not the Chapter 13 trustee. The job he is trying to take over here is the Chapter 13 trustee's job. If Mr. Peake wants appraisals, he has to ask for them, not Mr. Boudloche. And he would have to show good cause to ignore the usual and customary rules that apply in Chapter 13, too.[24]

    13  Timeline: Analysis of Unsecured Claims. For the Court's convenience, this pleading has a timeline of events, and this pleading analyzes the unsecured claims to show the errors in Mr. Boudloche's Exhibit A.

---

[24] The debtors also have concern from the fact that John Vardeman was representing David Peake at the last docket call. Mr. Vardeman is a nice guy, and the Kaufmans have nothing against him. But he works in Mike Schmidt's office. And he does a lot work for Mike & Cindy Boudloche — he has done work in Feldman specifically, and been paid for it. So he would be conflicted out of any representation of David Peake in this matter. That should be known in advance; and we are saying so right now. This goes back to the point we have made previously that standing trusteeships create a monopoly situation. Today, people have a choice of telephone companies, of electric power companies, et al., but no choice in trustees. That creates dangers.

14. <u>Timeline</u>.

Violation of stay is indicated by use of bold type; violation of rules against conflicts of interest is indicated by use of italics.

| Date | Case & Location | Action |
|---|---|---|
| December, 2002 | Feldman Brownsville | Mike Boudloche files pleading asking for a receiver. Mr. Kaufman filed a response objecting to same. |
| January 9, 2003 | Feldman Brownsville | Notice of filing of sealed report (Exhibit F to Proffer). |
| January 9, 2003 | Feldman Brownsville | FAX to Mike Schmidt re: Zulema Rubio's case is pro bono. |
| January 13, 2003 | Feldman Brownsville | Hearing. Court sets January 27 as deadline for further briefing. |
| January 13, 2003 | Feldman | FAX of recorded deed of trust showing Charter Bank was assigned all rights to payments under recorded contract for deed to Janet & Hector Vasquez (Exhibit E to Proffer). |
| January 23, 2003 | Sharon Houston | Chapter 13 case filed. *Schedules show conflict with David Kirk case for Mike Schmidt & Michael Boudloche* |
| January 27, 2003 | Sharon Houston | Suggestion of Bankruptcy filed & served on Mike Schmidt (Exhibit J to Mike Schmidt's exhibits). |
| January 27, 2003 | Feldman Brownsville | Mike Schmidt files draft order granting receivership allegedly without realizing he has both a **faxed and hand delivered in court suggestion of bankruptcy already.** Caselaw shows he and his client Michael Boudloche had a duty to withdraw draft order, and that failure to do so is an intentional wrong. |
| February 19, 2003 | Bruni Laredo | *Court order issued showing actual conflict between this case and Feldman for Mike Schmidt (potential conflict dates back to December 19, 2002 hearing date).* |
| February 21, 2003 | Sharon | Hearing on three motions. *Michael Boudloche & Mike* |

-22-

| | | |
|---|---|---|
| | Houston | *Schmidt offer into evidence Sharon's schedules showing potential claim of David Kirk.* Order transferring venue; order lifting co-debtor stay as to Colin Kaufman; order denying dismissal of case. |
| March 6, 2003 | Feldman Brownsville | Order for Receiver against Kaufman signed by Judge Schmidt (also violates representations to Judge Brown made by Mr. Schmidt, as shown by the transcript of hearing of 2-21) (Exhibit L to Proffer).  Caselaw shows Mr. Boudloche and Mr. Schmidt had a duty to ask court to vacate order, and notify receiver of this vacation, or else an intentional violation of the automatic stay. |
| March 11, 2003 | Feldman Brownsville | Harlin Womble's letter to CKK demanding turnover of accounts, etc. |
| March 11, 2003 | Feldman Brownsville | Harlin Womble's letter to Viviana Cavada re: turnover of all funds owed to CKK, and including order. |
| March 12, 2003 | Feldman Brownsville | Harlin Womble's letter to Hector Vasquez telling him not to pay Charter Bank any more, but to pay him instead, and enclosing order, though neither he nor bank ever got any notice that someone trying to invalidate the recorded writings entitling Charter Bank to the money. |
| March 12, 2003 | Feldman Brownsville | Harlin Womble's letter to Mark Weycer demanding Mr. Kaufman's money in Zulema Lucio Rubio (known to Mike Schmidt to be a pro bono case) (Exhibit I to Proffer). |
| March 12, 2003 | Ortiz McAllen | Harlin Womble files notice of appearance as receiver. |
| March 12, 2003 | Ingram Corpus | Harlin Womble files notice of appearance as receiver. |
| March 12, 2003 | Colin Corpus | Chapter 13 filed; notice FAXed to Harlin Womble & Mike Schmidt |
| April, 2003 | Colin & Sharon Corpus | *Michael Boudloche and Mike Schmidt begin working on David Kirk case, in violation of rules forbidding conflicts by fiduciary to Feldman bankruptcy estate – over 600 conflicts between Mike & Cindy Boudloche along with* |

-23-

| | | |
|---|---|---|
| | | *Schmidt offer into evidence Sharon's schedules showing potential claim of David Kirk.* Order transferring venue; order lifting co-debtor stay as to Colin Kaufman; order denying dismissal of case. |
| | Houston | |
| March 6, 2003 | Feldman Brownsville | Order for Receiver against Kaufman signed by Judge Schmidt (also violates representations to Judge Brown made by Mr. Schmidt, as shown by the transcript of hearing of 2-21) (Exhibit L to Proffer).  Caselaw shows Mr. Boudloche and Mr. Schmidt had a duty to ask court to vacate order, and notify receiver of this vacation, or else an intentional violation of the automatic stay. |
| March 11, 2003 | Feldman Brownsville | Harlin Womble's letter to CKK demanding turnover of accounts, etc. |
| March 11, 2003 | Feldman Brownsville | Harlin Womble's letter to Viviana Cavada re: turnover of all funds owed to CKK, and including order. |
| March 12, 2003 | Feldman Brownsville | Harlin Womble's letter to Hector Vasquez telling him not to pay Charter Bank any more, but to pay him instead, and enclosing order, though neither he nor bank ever got any notice that someone trying to invalidate the recorded writings entitling Charter Bank to the money. |
| March 12, 2003 | Feldman Brownsville | Harlin Womble's letter to Mark Weycer demanding Mr. Kaufman's money in Zulema Lucio Rubio (known to Mike Schmidt to be a pro bono case) (Exhibit I to Proffer). |
| March 12, 2003 | Ortiz McAllen | Harlin Womble files notice of appearance as receiver. |
| March 12, 2003 | Ingram Corpus | Harlin Womble files notice of appearance as receiver. |
| March 12, 2003 | Colin Corpus | Chapter 13 filed; notice FAXed to Harlin Womble & Mike Schmidt |
| March 21, 2003 | Colin & Sharon Corpus | *Michael Boudloche and Mike Schmidt begin working on David Kirk case, in violation of rules forbidding conflicts by fiduciary to Feldman bankruptcy estate – over 600 conflicts between Mike & Cindy Boudloche along with* |

-23-

|  |  | *the conflicts with the Feldman and Kaufman cases; over 1600 illegal sales of contract of employment between attorney and clients.* |
|---|---|---|
| May 8, 2003 | Colin Corpus | Hector Rene Gonzalez files proof of claim for Eric Anthony as Trustee of Arthur Wilson Carothers Trust, with libelous letter of transmittal to bankruptcy court. |
| May 8, 2003 | Colin Corpus | Hector Rene Gonzalez breaches automatic stay by sending a demand letter for Eric Anthony as Trustee of Arthur Wilson Carothers Trust. |
| May 9, 2003 | Colin Corpus | *Michael Boudloche proof of claim for David Kirk bkcy. estate is filed.* |
| May 9, 2003 | Colin Corpus | *Mike Schmidt proof of claim for Raymond Bruni bkcy. estate is filed.* |
| May 9, 2003 | Colin Corpus | *Michael Boudloche proof of claim for Feldman bkcy. estate is filed.* |
| May 12, 2003 | Colin Corpus | Unopposed order to consolidate cases is submitted and signed; hearing is postponed one week because of illness of Viviana Cavada. |
| May 19, 2003 | Consol. Corpus | Hearing. Proffer of evidence and oral testimony supporting damages to the Kaufmans. objections made to claims filed by Mike Schmidt and Mike Boudloche for themselves and Eric Anthony, receiver opposed for lack of standing, stay violation, lack of clean hands, 100% plan, David Peake has not made the request, etc.; *appraisals requested by Michael Boudloche & Mike Schmidt.* |
| May 20, 2003 | Consol. Corpus | Objections to claims of Hector Rene Gonzalez for Eric Anthony for Arthur Wilson Carothers Trust, of Michael Boudloche for David Kirk estate, of Mike Schmidt for Raymond Bruni estate, of Michael Boudloche for Charles Feldman estate. |

15. Corrections to Exhibit A of Mr. Boudloche ("Summary of Kaufman Unsecured Debt-Chapter 13") Showing Proper Analysis of Claims.

| Unsecured | Amount | Why Doesn't Count vs. Limit |
|---|---|---|
| Cavada | $6500 | Is postpetition debt, not prepetition |
| IRS | $163,056 | $40,000 is for unfiled returns; Debtors are objecting to this amount, because returns were filed. |
| Feldman | $165,550 | Claim lost for violation of automatic stay, violations of rules against conflicts, lack of clean hands |
| David Kirk | $39,000 | Claim could not pass to trustee; and anyway Mr. Kirk only paid half what was billed. And Mr. Kaufman's strategy won. |
| Bruni | $5,000 | Claim could not pass to trustee under Texas law. |
| Carothers | $285,000 | Claim could not pass to trustee; and anyway Mr. Kaufman got a lot less than he billed. |
| Chase | $8,500 | NA |
| Esquire | $1,500 | Disputed: limitations ran when they did not cash check, and it went stale. |
| Montgomery Ward | $3,468 | Montgomery Ward sold a "lifetime" guarantee against loss of stones on jewelry; when stone was lost, it did not honor guarantee (because it went bankrupt). |
| Thomson West | $9,257 | NA |
| TOTAL UNSECURED DEBT: | $140,813 | |
| TOTAL UNSECURED DEBT TO BE ELEGIBLE FOR CH. 13 | $290,525 | |

WHEREFORE, PREMISES CONSIDERED, the Movants and Debtors respectfully ask the Court to grant their amended motion for sanctions, and deny Mr. Boudloche's motion to convert, and his motion for appraisers, and give them such other and further relief as may be fair or just, and let them go hence without day.

Respectfully submitted for the Movants,

Colin Kelly Kaufman, Lead Counsel on the
Mike Boudloche-Mike Schmidt Litigation
State Bar of Texas # 11113000
So. Dist. Federal ID # 9242

Address of Counsel:

Colin Kelly Kaufman, Attorney at Law
1106 Third St. 78404-2312
P.O. Box 1662
Corpus Christi, TX. 78403-1662

Telephone (361) 888-8865
Telecopier (361) 888-8172

### Certificate of Service

I certify I had someone at this law office send the foregoing writing by U.S. mail, first class postage prepaid, to counsel for parties appearing in court at the hearing on May 19, 2003 – i.e., Michael Boudloche's attorney, Michael Schmidt, this 27th day of May, 2003.

Colin Kelly Kaufman

-26-

Office of the
# United States Chapter 7 Trustee
Mike Boudloche, Trustee

555 N. Carancahua, Ste. 600
Corpus Christi, Texas 78478

Telephone (361) 883-5786
Fax (361) 883-4331

March 24, 2003

TO:  All Prospective Bidders

Attached are bid sheets for the San Antonio and Corpus Christi offices of David W. Kirk, P.C.   We anticipate that the auction will be held in the Bankruptcy Court in Corpus Christi on Monday, March 31, 2003.   The balances on the accounts receivables will be updated as they change from disbursements so that by Monday you should have accurate figures.

Please contact my office to arrange for additional information or to do due diligence in Mr. Kirk's office.

Sincerely,

Mike Boudloche
Trustee

**Bid Sheet for**

DAVID W. KIRK, PC
CASE #03-20422-C-7

LOCATION:

606 N. Carancahua, Suite 102
CORPUS CHRISTI, TEXAS


Purchase of A/R's from Chapter 13 Trustee:
(Based on data as of March 21, 2003)
Confirmed cases                          $   38,413.00

Unconfirmed cases                        $  106,555.00

Approximately 600+/- cases

IOLTA Account                            $   15,452.00
(To be turned over to buyer)

Hard Assets:
Office furniture, fixtures and equipment:
Approximate/Summary of inventory taken by Trustee staff
a.   8 desks with executive or secretarial chair
b.   8 "U" shaped desk w/ executive or secretarial chair
c.   4 fax machine
d.   38-40 side chairs
e.   12 computers with printers
f.   1 couch
g.   Miscellaneous items
     -inoperable equipment - 8 monitors,
     -operable equipment- 3 (New) PC's with keyboards
     printers, 2 monitors,5 keyboards.
     -5 bookcases, 4 credenzas, 3 lateral file cabinets
     -1 refrigerator, phone system

Xerox 5665 is leased equipment and delinquent $13,926.00. Current
lease expires January, 2004.

The right to use the license for the TEAM SOFTWARE used by Kirk's
office.

Responsible for all old files that have been closed.

**Financial Statements:**
August 2002 through December 2002(part of August)*
January 2003 through March 2003(part of March)*
* These financials are provided but are **UNAUDITED**.


Sell the rights to the phone number and the yellow page ads but buyer will be responsible for the change over to the new owner's name. Will need to obtain "Transfer of Service Agreement". Phone bill is currently paid and the yellow page ad is paid delinquent in the amount of $30,520.83.

Only attorneys are eligible to bid on this package.


Mike Boudloche, Chapter 7 Trustee, will pay all salaries of employees through the end of March, 2003.


Lease agreements with landlords.
    Wilson Plaza - CC
        owes $39,232.29
        current rent $4373.88


David W. Kirk will be available as a consultant to assist in the software and the files if desired by the buyer.

03/21/03

## CC Operating
## P&L Year-to-Date Comparison
### March 1 - 21, 2003

| | Mar 1 - 21, '03 | Jan 1 - Mar 21, '03 |
|---|---|---|
| **Income** | | |
| **INCOME** | | |
| Attorney Fees | 2,525.00 | 25,742.25 |
| Chapter 13 Trustee | 22.50 | 49,586.31 |
| Refunds-Client & Trustee | -250.00 | -250.00 |
| **Total INCOME** | 2,297.50 | 75,078.56 |
| | | |
| **Total Income** | 2,297.50 | 75,078.56 |
| **Expense** | | |
| **RENT** | | |
| Office rent | 0.00 | 5,829.36 |
| Storage | 0.00 | 150.00 |
| **Total RENT** | 0.00 | 5,979.36 |
| | | |
| **PAYROLL** | | |
| Transfer to Payroll Account | 0.00 | 20,500.00 |
| Contract Labor | 0.00 | 290.00 |
| PAYROLL - Other | 0.00 | 2,700.00 |
| **Total PAYROLL** | 0.00 | 23,490.00 |
| | | |
| **ADVERTISING** | | |
| TV & Radio | 0.00 | 2,301.35 |
| **Total ADVERTISING** | 0.00 | 2,301.35 |
| | | |
| **OPERATING EXPENSES** | | |
| Bank Charges | 0.00 | 139.41 |
| Client Filing Fees & Expenses | 15.00 | 15.00 |
| Computer Expenses | | |
| Computer Hareware | 0.00 | 256.72 |
| Internet & Online Services | 0.00 | 122.08 |
| Computer Expenses - Other | 1,342.99 | 1,892.99 |
| **Total Computer Expenses** | 1,342.99 | 2,271.79 |
| | | |
| Copier Lease & Expense | 0.00 | 102.71 |
| Employee Expenses | | |
| Firm Meetings andLunches | 0.00 | 165.00 |
| Travel & Entertainment | 367.06 | 404.39 |
| **Total Employee Expenses** | 367.06 | 569.39 |
| | | |
| Frost Loan | 0.00 | 1,253.02 |
| Insurance | | |
| Auto Insurance | 0.00 | 556.50 |
| Employee Medical Insurance | 0.00 | 1,368.00 |
| **Total Insurance** | 0.00 | 1,924.50 |
| | | |
| Office Supplies | 0.00 | 588.47 |
| Postage & Delivery | 274.00 | 1,122.79 |
| Professional Fees | | |
| Legal Fees | 0.00 | 14,900.00 |
| Other | 0.00 | 457.18 |
| **Total Professional Fees** | 0.00 | 15,367.18 |
| | | |
| Telephone | | |
| Regular Telephone Charges | 923.65 | 2,770.41 |
| Long Distance Charges | 0.00 | 879.02 |
| Maintnance & Repairs | 0.00 | 539.00 |
| Telephone - Other | 0.00 | 339.69 |
| **Total Telephone** | 923.65 | 4,528.12 |
| | | |
| **Total OPERATING EXPENSES** | 2,922.70 | 27,852.33 |
| | | |
| **Total Expense** | 2,922.70 | 59,653.09 |
| | | |
| **Net Income** | -625.20 | 15,425.47 |

Page 1

03/21/03

## CC Operating
## P&L Year-to-Date Comparison
### August through December 2002

| | Aug - Dec '02 | Jan - Dec '02 |
|---|---|---|
| **Income** | | |
| **INCOME** | | |
| Attorney Fees | 35,580.50 | 35,580.50 |
| Chapter 13 Trustee | 96,869.53 | 96,869.53 |
| Refunds-Client & Trustee | -700.00 | -700.00 |
| Non-Income Dep. | 116.11 | 116.11 |
| **Total INCOME** | 131,866.14 | 131,866.14 |
| | | |
| **Total Income** | 131,866.14 | 131,866.14 |
| | | |
| **Expense** | | |
| **RENT** | | |
| Office rent | 11,549.19 | 11,549.19 |
| **Total RENT** | 11,549.19 | 11,549.19 |
| | | |
| **PAYROLL** | | |
| Transfer to Payroll Account | 70,700.00 | 70,700.00 |
| Employee Advances and Loans | 705.00 | 705.00 |
| Bonuses | 1,000.00 | 1,000.00 |
| Other Payroll Expenses | 250.00 | 250.00 |
| PAYROLL - Other | 10,500.00 | 10,500.00 |
| **Total PAYROLL** | 83,155.00 | 83,155.00 |
| | | |
| **ADVERTISING** | | |
| TV & Radio | 1,020.00 | 1,020.00 |
| Other Advertising Expense | 270.68 | 270.68 |
| **Total ADVERTISING** | 1,290.68 | 1,290.68 |
| | | |
| **OPERATING EXPENSES** | | |
| Bank Charges | 864.57 | 864.57 |
| Computer Expenses | | |
| Computer Hardware | 1,853.72 | 1,853.72 |
| Internet & Online Services | 258.75 | 258.75 |
| Maintenance & Other Expenses | 339.63 | 339.63 |
| Computer Expenses - Other | 237.04 | 237.04 |
| **Total Computer Expenses** | 2,689.14 | 2,689.14 |
| | | |
| Copier Lease & Expense | 724.43 | 724.43 |
| Employee Expenses | | |
| Attorney-CLE | 745.00 | 745.00 |
| Firm Meetings andLunches | 175.00 | 175.00 |
| Travel & Entertainment | 4,821.68 | 4,821.68 |
| Gifts and Expenses | 379.50 | 379.50 |
| **Total Employee Expenses** | 6,121.18 | 6,121.18 |
| | | |
| Frost Loan | 2,506.04 | 2,506.04 |
| Insurance | | |
| Auto Insurance | 553.50 | 553.50 |
| Employee Medical Insurance | -321.81 | -321.81 |
| Insurance - Other | 1,129.03 | 1,129.03 |
| **Total Insurance** | 1,360.72 | 1,360.72 |
| | | |
| Office Supplies | 1,456.15 | 1,456.15 |
| Postage & Delivery | 2,273.98 | 2,273.98 |
| Professional Fees | | |
| Accounting | 2,000.00 | 2,000.00 |
| Legal Fees | 5,690.18 | 5,690.18 |
| Other | 272.25 | 272.25 |
| **Total Professional Fees** | 7,962.43 | 7,962.43 |

**CC Operating**
# P&L Year-to-Date Comparison
### August through December 2002

03/21/03

| | Aug - Dec '02 | Jan - Dec '02 |
|---|---|---|
| **Taxes** | | |
| Franchise tax | 276.70 | 276.70 |
| Property | 306.49 | 306.49 |
| TWC | 392.32 | 392.32 |
| Uemployment | 215.39 | 215.39 |
| **Total Taxes** | 1,192.90 | 1,192.90 |
| **Telephone** | | |
| Regular Telephone Charges | 3,462.30 | 3,462.30 |
| Long Distance Charges | 3,818.79 | 3,818.79 |
| Maintnance & Repairs | 269.50 | 269.50 |
| Telephone - Other | 1,403.07 | 1,403.07 |
| **Total Telephone** | 8,953.66 | 8,953.66 |
| **Miscellaneous** | 465.21 | 465.21 |
| **Total OPERATING EXPENSES** | 36,570.41 | 36,570.41 |
| **Uncategorized Expenses** | 0.00 | 0.00 |
| **Total Expense** | 132,565.28 | 132,565.28 |
| **Net Income** | -699.14 | -699.14 |

Responsible for all old files that have been closed.

Financial Statements:
    August 2002 through December 2002(part of August)*
    January 2003 through March 2003(part of March)*
    * These financials are provided but are **UNAUDITED**.

Sell the rights to the phone number and the yellow page ads but buyer will be responsible for the change over to the new owner's name. Will need to obtain "Transfer of Service Agreement". Phone bill is currently paid and the yellow page ad is paid through October 31, 2003.

Only attorneys are eligible to bid on this package.

Mike Boudloche, Chapter 7 Trustee, will pay all salaries of employees through the end of March, 2003.

Lease agreement with landlord.
    Alamo Towers
        assumable-lease expires 7-31-04
        owes $49,954.52 in delinquent rent
        current rent $5889.34
        new rent eff 8-1-03 $6,050.00

David W. Kirk will be available as a consultant to assist in the software and the files at the option of the buyer.

03/21/03

**SA Operating**
# P&L Year-to-Date Comparison
### March 1 - 21, 2003

| | Mar 1 - 21, '03 | Jan 1 - Mar 21, '03 |
|---|---|---|
| **Income** | | |
| **INCOME** | | |
| Attorney Fees | 1,471.00 | 23,880.38 |
| Chapter 13 Trustee | -50.00 | 66,485.33 |
| Refunds - Clients & Trustee | 0.00 | -116.00 |
| **Total INCOME** | 1,421.00 | 90,249.71 |
| **Total Income** | 1,421.00 | 90,249.71 |
| **Expense** | | |
| **RENT** | | |
| Storage | 136.00 | 204.00 |
| Office rent | 0.00 | 6,497.46 |
| **Total RENT** | 136.00 | 6,701.46 |
| **PAYROLL** | | |
| Transfer to Payroll Account | 0.00 | 66,000.00 |
| Bonuses | 0.00 | 66.95 |
| PAYROLL - Other | 0.00 | 500.00 |
| **Total PAYROLL** | 0.00 | 66,566.95 |
| **ADVERTISING** | | |
| Newspapers | 0.00 | 100.00 |
| **Total ADVERTISING** | 0.00 | 100.00 |
| **OPERATING** | | |
| Bank Charges | 0.00 | 132.64 |
| **Computer Expenses** | | |
| Computer Hardware | 1,500.00 | 2,100.00 |
| Internet & Online Services | 0.00 | 161.42 |
| Maintenance & Other Expenses | 609.33 | 2,259.33 |
| **Total Computer Expenses** | 2,109.33 | 4,520.75 |
| **Employee Expenses** | | |
| Travel & Entertainment | 7.04 | 772.84 |
| **Total Employee Expenses** | 7.04 | 772.84 |
| Office Supplies | 0.00 | 1,352.11 |
| Postage and Delivery | 254.00 | 2,680.00 |
| **Professional Fees** | | |
| Legal Fees | 0.00 | 5,100.00 |
| **Total Professional Fees** | 0.00 | 5,100.00 |
| **Telephone** | | |
| Regular Telephone Charges | 0.00 | 3,969.68 |
| Long Distance Charges | 0.00 | 396.10 |
| Cellular Phone | 0.00 | 198.10 |
| **Total Telephone** | 0.00 | 4,563.88 |
| Utilities | 0.00 | 48.87 |
| **Total OPERATING** | 2,370.37 | 19,171.09 |
| Uncategorized Expenses | 0.00 | 0.00 |
| **Total Expense** | 2,506.37 | 92,539.50 |
| **Net Income** | -1,085.37 | -2,289.79 |

03/21/03

## SA Operating
## Profit and Loss
### August through December 2002

|  | Aug - Dec '02 |
|---|---|
| **Income** | |
| **INCOME** | |
| Attorney Fees | 53,627.78 |
| Chapter 13 Trustee | 155,830.63 |
| Refunds - Clients & Trustee | -1,706.18 |
| **Total INCOME** | 207,752.23 |
| | |
| **Total Income** | 207,752.23 |
| | |
| **Expense** | |
| **RENT** | |
| Storage | 338.25 |
| Office rent | 6,000.00 |
| **Total RENT** | 6,338.25 |
| | |
| **PAYROLL** | |
| Transfer to Payroll Account | 150,200.06 |
| Payroll taxes | 353.20 |
| **Total PAYROLL** | 150,553.26 |
| | |
| **ADVERTISING** | |
| TV & Radio | 4,864.75 |
| ADVERTISING - Other | 225.80 |
| **Total ADVERTISING** | 5,090.55 |
| | |
| **OPERATING** | |
| Bank Charges | 234.27 |
| Computer Expenses | |
| Computer Hardware | 3,223.35 |
| Computer Software & Supplies | 399.18 |
| Internet & Online Services | 153.79 |
| Maintenance & Other Expenses | 5,041.69 |
| **Total Computer Expenses** | 8,818.01 |
| | |
| Copier Lease & Expense | 532.44 |
| Employee Expenses | |
| Attorney-CLE | 820.00 |
| Firm Meetings and Lunches | 68.74 |
| Travel & Entertainment | 1,960.71 |
| Gifts & Expenses | 443.80 |
| **Total Employee Expenses** | 3,293.25 |
| | |
| Office Supplies | 3,361.68 |
| Postage and Delivery | 6,050.11 |
| Professional Fees | |
| Accounting | 4,000.00 |
| Legal Fees | 10,500.00 |
| **Total Professional Fees** | 14,500.00 |
| | |
| Telephone | |
| Regular Telephone Charges | 7,440.54 |
| Long Distance Charges | 2,262.86 |
| Cellular Phone | 1,141.20 |
| Maintenance & Repairs | 1,686.00 |
| **Total Telephone** | 12,530.60 |
| | |
| Utilities | 227.43 |
| Miscellaneous | 161.88 |
| OPERATING - Other | 34.99 |
| **Total OPERATING** | 49,744.66 |
| | |
| **Uncategorized Expenses** | 0.00 |
| | |
| **Total Expense** | 211,726.72 |
| | |
| **Net Income** | -3,974.49 |

Page 1

03/21/03

**SA Operating**
**Balance Sheet**
**As of December 31, 2002**

|  | Dec 31, '02 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| SA-FROST OPERATING ACCOUNT | 3,782.02 |
| **Total Checking/Savings** | 3,782.02 |
| **Total Current Assets** | 3,782.02 |
| **TOTAL ASSETS** | 3,782.02 |
| **LIABILITIES & EQUITY** | |
| **Equity** | |
| Net Income | -3,974.49 |
| **EQUITY ACCOUNTS** | |
| Opening Bal Equity | 7,756.51 |
| **Total EQUITY ACCOUNTS** | 7,756.51 |
| **Total Equity** | 3,782.02 |
| **TOTAL LIABILITIES & EQUITY** | 3,782.02 |

# COLIN KELLY KAUFMAN
## ATTORNEY AT LAW
P. O. Box 1662
Corpus Christi, TX. 78403-1662
Telephone (361) 888-8865 - FAX (361) 888-8172

Board Certified, Business & Consumer Bankruptcy Law, Texas Board of Legal Specialization

May 29, 2003

Hon. George P. Kazen, Esq.
Chief United States District Judge
United States Courthouse
1300 Matamoros, Rm. 319
Laredo, TX. 78040

RE:　Complaint re: Service as Plan Trustee Charles B.
Feldman, Bankruptcy No. # 90-01254

Dear Judge Kazen:

Enclosed is a document filed in court on May 27. It discusses over 1600 cases of illegality, and over 600 cases of conflicts of interest arising out of sale of the practice in the David Kirk bankruptcy case. You will recall that in our May 26 letter we mentioned that Michael Boudloche and Mike Schmidt have a conflicts problem in representing both the Feldman estate and also the David Kirk case against us. That discussion remains in this amended response, but it also discusses a much larger problem.

The first problem with Mike Boudloche selling the practice in David Kirk's case is that the contract of representation does not pass to the bankruptcy trustee. He couldn't legally sell the contracts of David Kirk's clients, because they never passed to him.

The second problem is that the sale of a practice was illegal until 1990; and no attempt was made to follow the rules in the Canons of Ethics which limit when such a sale may be made. No 90 days prior notice to the client, with an opportunity to choose to pick up their files rather than have their cases sold. No requirement that the attorney retire or leave the jurisdiction or otherwise not practice again.

Third is the conflict of interest problem between Michael and Cindy Boudloche. Almost all the cases sold were Chapter 13s. Cindy Boudloche was the Chapter 13 trustee. She made 10% on each Chapter 13. So Mike Boudloche had a strong incentive to sell to someone who would still generate Cindy Boudloche's 10%, even if that might not

-1-

EX 2

necessarily best please the David Kirk client or David Kirk creditors.  I do not even rely here on the fact that Cindy Boudloche's unnoticed, un-due-process-ed changes in her methods of paying attorneys may well have caused the failure of David Kirk's business in the first place. (We heard that two other local bankruptcy attorneys would have gone under, had not Cindy Boudloche rescinded her changes in payment methods.)  But what is the likelihood that Michael Boudloche is going to be interested in giving a neutral evaluation of the benefits of suing his wife, if that turns out to be true?  But anyway, this evidence seems to show that the Boudloches and Mike Schmidt are in the business of putting bankruptcy lawyers out of business (it's what was happening, whether they intended to do it or not).  And in every case where they put a lawyer out of business, they have to try to disbar the lawyer, because otherwise they cannot legally sell the practice.

Our prior comments, that this works like a shell game, continue to apply.  Cindy Boudloche gets 10% out of the money paid by the clients.  Mike Boudloche gets a percent (out of money paid by the same clients).  Mike Schmidt gets whatever attorneys fees he bills.  Mike Schmidt still takes Feldman work (where he won't be paid any more) and at the same time bills it as Bruni and David Kirk work (where he hopes he will be paid).  But Mike Schmidt gets to bill David Kirk creditors for representing Mike Boudloche, as well bill as for representing Cindy Boudloche.  These conflicts still lessen what creditors get in Bruni and David Kirk, but still increases what Michael & Cindy Boudloche and Mike Schmidt are paid.  It is still not appropriate conduct for trustees and attorneys; and still exactly within the scope of what Sec. 327 of the Bankruptcy Code and Rule 1.06(a) & (b) of the Canons of Ethics try to stop.

The illegal transfers of David Kirk's practice also included an illegal division of fees in violation of the Canons of Ethics, Rule 1.04(f).

The Amended Response has a more complete analysis.  Thanks very much for your time.

Sincerely,

Colin Kelly Kaufman

CKK:jv
Enclosure

Copy:        Hon. Keith P. Ellison, Esq., United States District Judge, U.S. Courthouse
             Annex, 904 Juarez St., Laredo, TX. 78040

-2-

Matthew A. Rosenstein, Esq. (without enclosures), 711 N. Carancahua #420
American Bk. Plaza, Corpus Christi, TX. 78401

Paul Homburg, Esq., State Bar of Texas, 425 Soledad Ste. 300, San Antonio,
TX. 78205

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
### CORPUS CHRISTI, BROWNSVILLE AND LAREDO DIVISIONS

IN RE:

| | | |
|---|---|---|
| CHARLES FELDMAN,<br>Debtor | § | Case No. 90-01254-B-11<br>Chapter 11 |
| DAVID W. KIRK, PC<br>Debtor | § | Case No. 03-20422-C-7<br>Chapter 7 |
| DAVID W. KIRK<br>Debtor | § | Case No. 03-20370-C-7<br>Chapter 7 |
| COLIN AND SHARON KAUFMAN<br>Debtor | § | Case No. 03-20306<br>Chapter 13 |
| RAYMOND A. BRUNI<br>Debtor | § | Case No. 02-504190L2-11<br>Chapter 11 |

## TRUSTEE ATTORNEY'S SUPPLEMENTAL DISCLOSURE REGARDING EMPLOYMENT

COMES NOW, Michael B. Schmidt and the Law Office of Michael B. Schmidt duly appointed attorney and files this his Supplemental Disclosure regarding he and his Law Firms' employment as attorney for the Bankruptcy Estate of Charles Feldman, David Kirk P.C., David Kirk and Raymond Bruni, and would show the Court as follows:

1.    By Amended Response to Request for Post -Hearing Memorandum filed May 27, 2003 in their Bankruptcy Case, Sharon and Colin Kaufman ("Kaufman") are asserting that Michael B. Schmidt and his Law Firm (hereafter "Schmidt") could not and can not simultaneously represent the Feldman, Kirk and Bruni Bankruptcy Estates as this violates Rule 1.06 (a) and (b) of the Code of Professional Responsibility and § 327 of the Bankruptcy Code. See Exhibit 1 hereto.

2.    By Letter dated May 29, 2003, addressed to the Hon. George P. Kazen, Chief U.S. District Judge, Kaufman makes the same assertions as contained in the Amended Response but by way of a Complaint. See Exhibit 2 hereto.

3.    Under oath, Schmidt hereby supplements his previous Affidavits provided in connection with his employment in each Bankruptcy Case as follows:

1

*EX 3*

a.    Mike Boudloche Trustee for the Feldman and both Kirk Bankruptcy Estates was given full disclosure of the existence, nature, implications and possible adverse consequences of the common representation by Schmidt of his Bankruptcy Estates, as well as the Bruni Bankruptcy Estate, and the advantages involved. After such disclosure was given, he consented to such common representation.   See Exhibit 3 hereto.

b.    Kaufman's debt to the Bruni Bankruptcy Estate arose pursuant to Judge Steen's Order entered February 19, 2003, which was prior to the appointment of Schmidt (March 3, 2003) as the Chapter 11 Trustee.  Around April 19, 2003, Tony Ramos, attorney for Bruni advised Schmidt that Kaufman owed $5,000 to the Bruni Estate for unearned fees as a result of Judge Steen's Order disallowing his fee application. I then reviewed the docket and found Judge Steen's Order and filed a proof of claim in Kaufman's Bankruptcy Case as Trustee of the Bruni Estate.  See the attached Proof of Claim.  As soon I learned about this debt, I discussed all of these matters with Mr. Boudloche and he advised that he consented to my continued representation.  See Exhibit 3 hereto.

c.    As Trustee of the Bruni Estate, I was aware of the circumstances and consented to the representation of my Law Firm in common with representation of the Feldman and Kirk Bankruptcy Estates in Kaufman's Bankruptcy Case.

d.    As the lawyer for the Feldman, both Kirk and Bruni Bankruptcy Estates I do not believe my representation of each Estate will be materially affected by common representation in the Kaufman Bankruptcy Case, in fact I believe there are significant advantages to all Estates because of this common representation. I reasonably believe that my independent judgment on behalf of any Trustee to recommend or carry out a course of action will not be adversely affected by my representation of the other Estates, nor will I be called upon to espouse adverse positions in the same matter.

e.    I and my Law Firm are disinterested and do not represent or hold an interest adverse to the interest of these Estates.

Respectfully submitted:

LAW OFFICES FOR MICHAEL B. SCHMIDT

By:_____
          Michael B. Schmidt
          555 N. Carancahua, Ste. 1550
          Corpus Christi, Texas 78478
          Office: 361/884-9949
          Fax:   361/884-6000
          TBN: 17775200 FBN 10260
          ATTORNEY FOR TRUSTEES

2

## VERIFICATION

Before me the undersigned authority, personally appeared Michael B. Schmidt, who, after being duly sworn, deposed and said that he is competent to testify, and that he has personal knowledge of the matters and statements set forth in the foregoing pleading and that they are all true and correct.

_____
Michael B. Schmidt

SWORN TO AND SUBSCRIBED this 3RD day of June, 2003 to certify which witness my hand and seal of office.

_____
Notary Public for State of Texas

SHARON YARNELL
Notary Public, State of Texas
My Commission Expires
06-02-2005

## CERTIFICATE OF SERVICE

I do hereby certify that a true and correct copy of the above and foregoing legal document was mailed this 3RD day of June, 2003 by regular U.S. mail, to the persons listed.

Colin & Sharon Kaufman
P. O. Box 1662
Corpus Christi, TX 78403

David Peake, Chapter 13 Trustee
9660 Hillcroft # 430
Houston TX  77096-0000

Mike Boudloche, Trustee
555 N. Carancahua, St. 600
Corpus Christi, TX 78478

Barbara Jue
Office of US Trustee
606 N. Carancahua, Ste. 1107
Corpus Christi, TX 78476

Hector Duran
Office of US Trustee
515 Rusk, Ste. 3516
Houston, TX 77002

_____
Michael B. Schmidt

3

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI, BROWNSVILLE AND LAREDO DIVISIONS

IN RE:

| | | |
|---|---|---|
| CHARLES FELDMAN,<br>Debtor | § | Case No.  90-01254-B-11<br>Chapter 11 |
| DAVID W. KIRK, PC<br>Debtor | § | Case No. 03-20422-C-7<br>Chapter 7 |
| DAVID W. KIRK<br>Debtor | § | Case No.  03-20370-C-7<br>Chapter 7 |
| COLIN AND SHARON  KAUFMAN<br>Debtor | § | Case No. 03-20306<br>Chapter 13 |
| RAYMOND A. BRUNI<br>Debtor | § | Case No. 02-504190L2-11<br>Chapter 11 |

## SUMMARY OF EXHIBITS

Exhibit 1:    Kaufman Amended Response to Request for Post-Hearing Memorandum – Docket No. (NOT ENTERED) in the Feldman Bankruptcy and Docket No. 54 in the Kaufman Bankruptcy

Exhibit 2:    Letter dated May 29, 2003 from Kaufman to Hon. George P. Kazen, Chief U.S. District Judge

Exhibit 3:    Letter dated June 3, 2003 from Mike Boudloche, Trustee to Michael B. Schmidt and Proof of Claim filed May 9, 2003 in the Colin Kaufman Bankruptcy No. 03-20394– Claim No. 7

4