IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHER DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JUL 1 4 2003

Michael N. Milby
Clerk of Court

---

CIVIL ACTION B-03-072

---

IN RE:  CHARLES B. FELDMAN
DEBTOR

---

Appeal from the United States Bankruptcy Court
for the Southern District of Texas
Brownsville Division
(Bankruptcy Case No. 90-01254-B-11)

---

**RESPONSE BRIEF OF APPELLEE MIKE BOUDLOCHE, TRUSTEE
TO THE ORIGINAL BRIEF OF APPELLANT COLIN KAUFMAN
ON APPEAL OF COMPROMISE AND SETTLEMENT OF ADVERSARY**

Michael B. Schmidt
555 N. Carancahua, Ste. 1550
Corpus Christi, TX 78478
SBN 17775200 FBN 10260
361.884.9949
361.884.6000 fax
ATTORNEY FOR MIKE BOUDLOCHE,
SUCCESSOR TRUSTEE

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons have an interest in the outcome of this case. These representations are made in order that the Judges of this Court may evaluate possible disqualification or recusal.

1.  CKS Asset Management, Inc., Creditor
    Attorney:     Matthew A. Rosenstein
                  420 American Bank Plaza
                  Corpus Christi, TX 78475

                  Richard Grant
                  3102 Oak Lawn #700
                  Dallas, TX 75219

2.  Parkwell Investments, Inc., Creditor
    Attorney:     Ron Simank
                  Schauer & Simank
                  615 N. Upper Broadway, Ste. 2000
                  Corpus Christi, TX 78476

3.  Mike Boudloche, Plan Trustee
    Attorney:     Michael B. Schmidt
                  555 N. Carancahua, Ste. 1550
                  Corpus Christi, TX 78478

4.  Colin Kelly Kaufman, Applicant/former Plan Trustee
    Attorney:     Colin Kaufman
                  P. O. Box 1662
                  Corpus Christi, TX 78403

5.  Charles B. Feldman/Charles Feldman Investments, Debtor/Appellee
    Attorney:     James P. Moon
                  1600 N. Hampton Rd., Ste. 202
                  DeSoto, TX 75115

Respectfully submitted,

By:_____
        Michael B. Schmidt

ATTORNEY FOR APPELLEE

ii

# TABLE OF CONTENTS

Certificate of Interested Persons ................................................................................ ii

Table of Contents ..................................................................................................... iii

Authorities and Statutes ........................................................................................... iv

Exhibits .................................................................................................................... v

Statement of Jurisdiction .......................................................................................... 1

Statement of Issues .................................................................................................. 1

Standard of Review .................................................................................................. 2

Factual Background .................................................................................................. 2

Argument and Authority ........................................................................................... 4

    Standard of Review ............................................................................................. 4

    Standing to Oppose Court Approval of Settlement .............................................. 4

    But What if Disgorgement is Reversed ............................................................... 5

    Evidence Before the Bankruptcy Court on Best Interest ..................................... 6

    Maybe a *Sub Rosa* Argument ........................................................................... 7

Conclusion .............................................................................................................. 7

## AUTHORITIES AND STATUTES

*Henderson v. Casciato-Northrup*, 2001 U.S. Dist. LEXIS 23637 (DC WD Tex 2001) ............. 4

*In re Joe Alvin Andrews, Sr.*, 239 F.3d 708, 710 (5th Cir. 2001) .................................................. 5

*In re Andrews* at page 713, citing *In re Vahlsing*, 829 F 2d. 565 (5th Cir. 1987) ....................... 5

*In re Cajun Electric Power*, 119 F. 3d 349, 355-56 (5th Cir 1997) ......................................... 6

*In re Cajun Electric Power*, 119 F. 3d 349, 354-55 (5th Cir 1997) ......................................... 7

*In Re Lil' Things, Inc.* 243 B.R. 278, 280 (ND TX. 2000) ........................................................ 4

*Matter of Haber Oil*, 12 F.3d. 426, 434 (5th Cir. 1994) ........................................................ 2,4

*Matter of Oxford Management*, 4 F.3d. 1329, 133 (5th Cir. 1993) ............................................. 2

*Protective Committee v. Anderson*, 88 S. Ct. 1157 (1988) ...................................................... 6

*Sequa Corp. V. Christopher*, 28 F.3d. 512, 514 (5th Cir. 1994) .................................................. 4

28 U.S.C. § 158(a) ........................................................................................................... 1

Rule 8001 FRBP ............................................................................................................. 1

Rule 9019(a) FRBP ......................................................................................................... 4

Bankruptcy Code § 101 (28) & (29) ................................................................................... 5

## **EXHIBITS**

Exhibit A - Order of CA B-02-073 entered December 27, 2002 .................................................... 3

Exhibit B - Order Approving Settlement Agreement entered January 14, 2003 ........................... 4

Exhibit C - Proffer of Michael Boudloche with attachments........................................................ 7

Exhibit D - Colin Kelly Kaufman's Proffer of Evidence at Mike Boudloche's Motion to
Approve Compromise and Settlement entered January 6, 2003 ...................................................... 7

v

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

IN RE:
CHARLES B. FELDMAN                    §
    DEBTOR                              §

---

COLIN KELLY KAUFMAN                   §
    APPELLANT                           §          CA NO. B-03-072

V.                                    §

MIKE BOUDLOCHE, TRUSTEE               §
    APPELLEE                            §

## RESPONSE BRIEF OF APPELLEE MIKE BOUDLOCHE, TRUSTEE TO THE ORIGINAL BRIEF ON APPEAL OF APPELLANT COLIN KAUFMAN APPEAL OF COMPROMISE AND SETTLEMENT OF ADVERSARY

### STATEMENT OF JURISDICTION

This Court has jurisdiction pursuant to **28 U.S.C. § 158(a)** and **Rule 8001 FRBP**.

### STATEMENT OF ISSUES

Were the Bankruptcy Court's findings that Kaufman was not a claimant and therefore lack standing to object to the settlement erroneous?

Was the Bankruptcy Court's finding that the settlement was fair and in the best interest of the Estate, clearly erroneous?

## STANDARD OF REVIEW

The standard of review for appeal from a bankruptcy court decision is to review findings of fact for clear error. A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a firm and definite conviction that a mistake has been committed. *Matter of Haber Oil*, 12 F.3d. 426, 434 (5th Cir. 1994). The Court reviews conclusions of law de novo. *Matter of Oxford Management*, 4 F.3d. 1329, 133 (5th Cir. 1993).

## FACTUAL BACKGROUND

Debtor filed for Bankruptcy under Chapter 11 in 1990. In 1992 a plan was confirmed naming Harlingen National Bank as Trustee. In 1992, the Plan was modified to substitute Mr. Kaufman as Trustee in the place of the Bank. On June 29, 2001, the Bankruptcy Court entered an Order removing Mr. Kaufman as Trustee. By Order entered August 21, 2001, Mike Boudloche was appointed successor trustee. By Order entered January 29, 2002, a deadline was set for Mr. Kaufman to file his Final Fee Application, which he filed February 8, 2002 and hearing held thereon February 22, 2002.

By Memorandum Opinion and Order entered March 7, 2002, docket No. 469 (the "Memorandum Opinion and Order"), the Bankruptcy Court found that Mr. Kaufman as Trustee for the Feldman Bankruptcy Estate breached his fiduciary duties and denied his fee application of $451,926.11 in fees and expenses, but approved a lesser fee of $50,000 plus expenses. The Bankruptcy Court found specific breaches by Mr. Kaufman of his fiduciary duty and determined that $50,000 was a reasonable and necessary fee for Mr. Kaufman's services. Mr. Kaufman was ordered to disgorge the balance of the funds he had paid to himself and pay it over to Mike

2

Boudloche, Trustee. A Final Judgment, (Docket No. 470), was entered March 12, 2002, (the "Final Judgment") against Mr. Kaufman in favor of Boudloche, as Trustee for $214,871.89, plus interest at the federal judgment rate. This Court affirmed the Bankruptcy Court's Memorandum Opinion and Order by its Order entered December 27, 2002. **See Exhibit A** - Order entered December 27, 2002 in Civil Action No. B-02-073.

Just prior to his removal by the Bankruptcy Court as Trustee, Kaufman filed Adversary No. 01-2090 against the Debtor and members of his family. After his removal Mr. Kaufman filed a Proposed Final Report that discussed his basis for the suit against the Debtor and his family. Mike Boudloche, Successor Trustee ("Boudloche") and his counsel reviewed the Complaint in Adversary No. 01-2090, and Kaufman's Proposed Final Report. They then met with Kaufman to discuss the Complaint and Proposed Final Report. Neither Boudloche or his counsel were able to understand Kaufman's reasoning or calculations as set forth in the Complaint, Proposed Final Report or as explained by Kaufman. Boudloche performed an independent review that resulted in his determination that the Debtor was only obligated to the Estate for $14,800 and not the $1 million claimed by Kaufman. Boudloche also reviewed this Court's Opinion in Civil Action No. B-02-073 and Judge Steen's Order in his 1999 Opinion in the *Cantu* Case and concluded in association with their review, that the claims made by Kaufman in the Adversary were unsubstantiated.

Thereafter Boudloche and his counsel attended mediation with the Debtor and after arms-length negotiations reached a settlement, in which Debtor paid this Estate $25,000. Boudloche then sought and after an evidentiary hearing obtained Bankruptcy Court approval of this settlement as fair and in the best interest of this Estate and that since Kaufman was not a claimant

3

against this Estate lacked standing to object to the settlement.

This is an appeal by Mr. Kaufman from the Bankruptcy Court's Order Approving that Settlement Agreement.  **See Exhibit B** - Order Approving Settlement Agreement entered January 14, 2003.

### ARGUMENT AND AUTHORITY

#### Standard of Review

1.      The standard of review for appeal from a bankruptcy court decision is to review findings of fact for clear error.   A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a firm and definite conviction that a mistake has been committed. ***Matter of Haber Oil*, 12 F.3d. 426, 434 (5th Cir. 1994).** The U.S. District Court functions as an appellate court in appeals of Bankruptcy Court decisions. ***In Re Lil' Things, Inc.* 243 B.R. 278, 280 (ND TX. 2000).**  A District Court may not, however, make independent factual findings and is not to set aside the Bankruptcy Court's findings of fact unless they are clearly erroneous. ***Sequa Corp. V. Christopher*, 28 F.3d. 512, 514 (5th Cir. 1994; *In Re Lil' Things, Inc.* 243 B.R. 278, 280 (ND TX. 2000).**  The Court reviews conclusions of law de novo. ***Matter of Oxford Management*, 4 F.3d. 1329, 133 (5th Cir. 1993).**

#### Standing to Oppose Court Approval of Settlement

2.      The court derives its authority to approve a compromise and settlement involving bankruptcy estates from **Rule 9019(a) FRBP. *Henderson v. Casciato-Northrup*, 2001 U.S. Dist. LEXIS 23637 (DC WD Tex. 2001).  Under Rule 9019(a)** only certain entities have standing to challenge a trustee's motion for approval of a compromise and settlement.  These certain entities are creditors, United States trustee, the debtor, and indentured trustees.  Kaufman is not one of these

4

enumerated entities. Kaufman is obviously not a United States trustee, the debtor or an indentured trustee. An *indentured trustee* is defined in **Bankruptcy Code § 101 (28) & (29)** as a trustee under a mortgage, deed of trust or indenture under which there is outstanding a security. Further, Kaufman is not a creditor. The Bankruptcy Code defines a *creditor* as an entity that has a claim against the debtor that arose at the time of or before the filing of bankruptcy. A claim is defined as a right to payment. One has standing, therefore, as a creditor, if it has a claim against the debtor, that is to say, if he has a right to payment from the debtor. *In re Joe Alvin Andrews, Sr.,* **239 F.3d 708, 710 (5th Cir. 2001).** Kaufman has no right to payment from this Estate. In fact Kaufman owes a debt to this Estate, namely $215,000 in fees he overpaid himself while Trustee and which he has been ordered to disgorge.

<u>**But What if Disgorgement is Reversed**</u>

3.        Kaufman argues that if he is successful in reversing the Bankruptcy Court's Memorandum Opinion and Order and Final Judgment disgorging the excessive fees paid to himself, he will be a creditor. Therefore, he argues, he has standing to object to the settlement. *In re Andrews,* cited above, addresses this issue. On page 712-13, the Court discussed the effect of a turnover order as not accomplishing a complete divesting of all of ownership of the claim. A restriction on an entities ability to pursue collection of his judgment does not eliminate his claim and he has standing because of that. In contrast to this, the Court goes on to say, however, "**dismissal of a claim precludes any possibility of collecting any money,**" thereby eliminating standing. *In re Andrews* **at page 713, citing** *In re Vahlsing,* **829 F 2d. 565 (5th Cir. 1987).** Kaufman's claim has been completely dismissed. His administrative claim has been adjudicated fully satisfied and he owes money back in accordance with the Bankruptcy Court's Memorandum

Opinion and Order and Final Judgment. This complete dismissal has been affirmed by this Court. Kaufman lacks standing.

### Evidence Before the Bankruptcy Court on Best Interest

4.      The testimony of Boudloche admitted at trial and set forth in his Proffer and Exhibits attached thereto support the findings of fairness and best interest factors required for approval of compromises. *Protective Committee v. Anderson,* **88 S. Ct. 1157 (1988).** In determining whether or not a settlement of litigation is fair and equitable, a bankruptcy judge must compare the terms of the settlement with the likely rewards of litigation. In particular the judge must evaluate:

        a.      The probability of success in the litigation, with due consideration for the uncertainty in fact and law,

        b.      The complexity and likely duration of the litigation and any attendant expense, inconvenience and delay, and

        c.      All other factors bearing on the wisdom of the compromise.

*In re Cajun Electric Power,* **119 F. 3d 349, 355-56 (5th Cir 1997).**

5.      The Court made this comparison based on the evidence. Boudloche's evidence established the probability of success as very low, in that his independent review determined only $14,800 owed instead of the $ 1million claimed by Kaufman. The evidence further shows that Kaufman's complaints were difficult, if not impossible to comprehend. Boudloche's visits with Kaufman failed to gain any better understanding of the theories or proof needed to be successful in the litigation. All of this, coupled with prior judicial determinations by this Court and by Judge Steen of Kaufman's prior filing of unsubstantiated complaints, lead to the conclusion that

the complaints against Debtor are likely impossible to prove or substantiate and it would be wise to settle this litigation. **See Exhibit C** - Proffer of Michael Boudloche.

6.      Relying on the foregoing credible evidence, the Bankruptcy Court found that all of the fairness and best interest factors had been established to its satisfaction and approved the compromise and settlement. Mr. Kaufman offered no credible evidence to show that the probability of success in this litigation was other than extremely low. Mr. Kaufman's evidence consisted of his Proffer wherein he attempts to explain his actions in the *Cantu* case before Judge Steen and argue why he believes this Court's Order affirming the Bankruptcy Court's Memorandum Opinion and Order and Final Judgment are wrong. Consequently, Kaufman has failed to provide evidence to support an argument that these fact-findings were *clearly erroneous*, and his appeal must therefore be denied. **See Exhibit D** - Proffer of Evidence at Mike Boudloche's Motion to Approve Compromise and Settlement.

### Maybe a *Sub Rosa* Argument

7.      Kaufman in one breath argues *Sub Rosa* and then in the next breath admits that a confirmed plan is in place. The *Sub Rosa* doctrine is inapplicable here as the plan was confirmed in 1992. *In re Cajun Electric Power*, **119 F. 3d 349, 354-55 (5th Cir 1997).** The Court should note that under this confirmed plan Kaufman was charged with receiving and dispersing money paid by the Debtor to creditors. Instead, Kaufman thwarted the confirmed plan by improperly paying the money due creditors to himself.

### CONCLUSION

Appellant has wholly failed to present any credible evidence or argument that the Bankruptcy Court's findings are clearly erroneous or that it abused its discretion in determining the

7

compromise and settlement was fair and equitable and in the best interest of the Estate. Further Mr.

Kaufman's lacks standing to object and to prosecute this appeal. The Bankruptcy Court's Order

Approving Settlement Agreement should be affirmed.

Respectfully submitted,

Michael B. Schmidt
555 N. Carancahua, Suite 1550
Corpus Christi, TX 78478
SBN 17775200 FBN 10260
361.884.9949
361.884.6000 fax
mbsatty@swbell.net - court use only
Attorney for Mike Boudloche, Successor Trustee

## CERTIFICATE OF SERVICE

I do hereby certify that a true and correct copy of the above and foregoing legal document was mailed, regular U.S. Mail, on this ___/ᴑ___ day of July, 2003 to the persons listed below:

Mike Boudloche
555 N. Carancahua, Suite 600
Corpus Christi, TX 78478

Matthew Rosenstein
420 American Bank Plaza
Corpus Christi, TX 78475

Colin Kaufman
1106 Third St.
Corpus Christi, TX 78404-2312

James Moon
1600 N. Hampton Rd., Ste. 202
Desoto, TX 75115

Ron Simank
615 N. Upper Broadway, Ste 2000
Corpus Christi, TX 78476

Michael B. Schmidt

8

## TABLE OF AUTHORITIES

*Henderson v. Casciato-Northrup*, 2001 U.S. Dist. LEXIS 23637 (DC WD Tex 2001) ............ 4

*In re Joe Alvin Andrews, Sr.*, 239 F.3d 708, 710 (5th Cir. 2001)................................... 5

*In re Andrews* at page 713, citing *In re Vahlsing*, 829 F 2d. 565 (5th Cir. 1987)...................... 5

*In re Cajun Electric Power*, 119 F. 3d 349, 355-56 (5th Cir 1997) .......................... 6

*In re Cajun Electric Power*, 119 F. 3d 349, 354-55 (5th Cir 1997) .......................... 7

*In Re Lil' Things, Inc.* 243 B.R. 278, 280 (ND TX. 2000) ............................... 4

*Matter of Haber Oil*, 12 F.3d. 426, 434 (5th Cir. 1994)................................... 2,4

*Matter of Oxford Management*, 4 F.3d. 1329, 133 (5th Cir. 1993) .......................... 2

*Protective Committee v. Anderson*, 88 S. Ct. 1157 (1988) ........................ 6

*Sequa Corp. V. Christopher*, 28 F.3d. 512, 514 (5th Cir. 1994)................................... 4

9

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHER DISTRICT OF TEXAS
BROWNSVILLE DIVISION

---

CIVIL ACTION B-03-072

---

IN RE:  CHARLES B. FELDMAN
DEBTOR

---

Appeal from the United States Bankruptcy Court
for the Southern District of Texas
Brownsville Division
(Bankruptcy Case No. 90-01254-B-11)

---

## RECORD EXCERPTS TO THE RESPONSE BRIEF
## OF APPELLEE MIKE BOUDLOCHE, TRUSTEE

Michael B. Schmidt
555 N. Carancahua, Ste. 1550
Corpus Christi, TX 78478
SBN 17775200 FBN 10260
361.884.9949
361.884.6000 fax
ATTORNEY FOR MIKE BOUDLOCHE,
SUCCESSOR TRUSTEE

TABLE OF CONTENTS

EXHIBITS:

Exhibit A - Order of CA B-02-073 entered December 27, 2002

Exhibit B - Order Approving Settlement Agreement entered January 14, 2003

Exhibit C - Proffer of Michael Boudloche with attachments

Exhibit D - Colin Kelly Kaufman's Proffer of Evidence at Mike Boudloche's Motion to Approve Compromise and Settlement entered January 6, 2003

Case 1:03-cv-00072    Document 17    Filed in TXSD on 07/14/2003    Page 17 of 84



United States District Court
Southern District of Texas
FILED

DEC 2 7 2002

Michael N. Milby
Clerk of Court

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| IN RE:  CHARLES E. FELDMAN D/B/A | § | CIVIL ACTION NO. B-02-073 |
| CHARLES FELDMAN INVESTMENTS | § | |

<u>ORDER</u>

BE IT REMEMBERED that on December 27, 2002, the Court **AFFIRMED** the Memorandum Opinion And Order On Colin Kelly Kaufman's Final Fee Application [Bankr. Dkt. No. 469] and **AFFIRMED** the Final Judgment On Final Fee Application Of Colin Kelly Kaufman [Bankr. Dkt. No. 470]. Furthermore, the Court **GRANTED** Appellant's Motion For The Court To Take Judicial Notice [Dkt. No. 12]; **DENIED** Appellant's Motion For The Court To Prevent Mooting Of The Appeal [Dkt. No. 20]; and **DENIED AS MOOT** Trustee's Motion To Dismiss For Failure To State A Claim [Dkt. No. 22].

I.     Standard of Review

In reviewing a bankruptcy court decision, a district court functions as an appellate court and applies the standards of review generally applied in federal courts of appeal. *See In re Webb*, 954 F.2d 1102, 1103-04 (5th Cir. 1992). This Court will not set aside a bankruptcy court's findings of fact unless they are clearly erroneous. FED. R. BANKR. P. 8013; *In re McDaniel*, 70 F.3d 841, 842-43 (5th Cir. 1995). A finding of fact is clearly erroneous if, after review of all the evidence, the Court is left with a firm and definite conviction that the bankruptcy court erred. *See In re McDaniel*, 70 F.3d at 843. This court reviews legal conclusions de novo. *See id.*; *In re Herby's Foods, Inc.*, 2 F.3d 128, 130 (5th Cir. 1993). "The bankruptcy court's determination of attorneys' fees is reviewed for abuse of discretion, and its specific findings of fact supporting the award are reviewed for clear error." *In re Fender*, 12 F.3d 480, 487 (5th Cir. 1994). "[T]he amount awarded lies in the judge's discretion and is recalculated only if the judge abuses that discretion." *Id.* (citing *Longden v. Sunderman*, 979 F.2d 1095, 1100 (5th Cir. 1992))



II.    **Issues Presented**

This appeal presents two issues for the Court to decide. Were the bankruptcy court's findings that Kaufman ("Appellant") breached fiduciary duties owed to the Feldman Bankruptcy Estate clearly erroneous? Second, was the bankruptcy court's finding that Kaufman was entitled to a reasonable and necessary fee of $50,000 plus expenses clearly erroneous or an abuse of discretion?

III.    **Factual Background**

In 1990 Charles B. Feldman d/b/a Charles Feldman Investments, filed for Chapter 11 bankruptcy. A bankruptcy plan (the "Plan") was confirmed in 1992 and named Harlingen National Bank as Trustee. In Section 7.3, the Plan clearly states that the Trustee is to "have the powers, duties and responsibilities as set forth in the Texas Trust Act." In Section 15.1(k) of the Plan, the bankruptcy court retained jurisdiction to determine among other things applications for compensation and expenses. The Plan further provided that the Debtor was to pay funds from the sale of Debtor's assets and net income received from Debtor's businesses over to the Plan Trustee who in turn was to make an accounting and distribution to creditors every six month. The main, if not sole, function of the Trustee was to receive funds from the debtor, distribute those funds to the creditors, and provide accountings to the bankruptcy court, creditors, and debtors.

In 1992, Kaufman was substituted as Trustee. As Trustee, Kaufman hired himself to serve as an attorney for the bankruptcy estate. The Modification To First Amended Plan Of Reorganization Of Charles B. Feldman D/B/A Charles B. Feldman Investments ("Modified Plan") signed by the parties and Kaufman was implemented to substitute Kaufman as Trustee. Under the Modified Plan, Kaufman was required to "submit his accounts to the bankruptcy court for approval." Moreover, the Modified Plan stated that "[t]he Plan Trustee shall submit his accounts to the Bankruptcy Court for approval. The Plan Trustee shall also submit a final accounting at the end of the Plan Term Years to the Bankruptcy Court for its approval."

Kaufman collected $354,066.92 during his tenure as Trustee. Kaufman paid himself $278,631.50 in fees from the corpus of the estate. Between June 1999 and

2

March 2001, Kaufman also paid himself $49,428.95 from the corpus of the estate for work which he had not yet done. After payment of other court-approved fees and expenses and payment of Kaufman's fees there remained a trust corpus of $600. Kaufman paid himself these fees without filing periodic attorneys' fee applications; rather, he filed a fee application only after the bankruptcy court ordered him to file a Final Fee Application.  By the time Kaufman filed a Final Fee Application, almost the entire corpus of the estate had been disbursed for fees and expenses.

Kaufman paid himself at the rate he charges for legal work and never distinguished between his work as the Trustee and his work as an attorney for the Feldman Bankruptcy Estate.  The accountings indicate that Kaufman paid himself at the hourly rate he charges for attorney services, $400 per hour, regardless of whether he was performing legal services or trustee services.  Apparently Kaufman negotiated this fee and the parties agreed to pay the same hourly fee regardless of the type of services rendered.

CKS Asset Management, Inc. ("CKS"), the largest creditor of the bankruptcy estate, began requesting accountings in 1995 and received seven documents labeled "Accounting."  None of the documents revealed that the expenses of the trust might exceed the corpus.  In his deposition, Kaufman admitted that he never furnished accountings containing all of the expenditures because he did not want to tell the Debtor that the estate had no funds.  As a consequence the creditors were not informed of the assets remaining in the estate or the true liabilities of the estate.

Moreover, Kaufman never made a semi-annual distribution to the creditors as required by the Plan.  There are no receipts or entries in any of the accountings delivered which indicate that a semi-annual payment was made to the creditors, and Kaufman admits that he never made the semi-annual payments as required.  However, the amount of the semi-annual payments was never fixed by the bankruptcy court.

CKS filed a motion in the bankruptcy court to remove Kaufman as Trustee, and on June 28, 2001, the bankruptcy judge held an evidentiary hearing and removed Kaufman as Trustee.  On June 29, 2001, the bankruptcy court entered an order removing Kaufman as Trustee.  On August 21, 2001, the bankruptcy court ordered

3

Mike Boudloche ("Appellee") to succeed Kaufman as Trustee.

Finally on January 29, 2002, the bankruptcy court ordered Kaufman to enter a Final Fee Application, which he filed on February 8, 2002. The Court held a hearing on February 22, 2002, to consider Kaufman's fee application. On March 7, 2002, the bankruptcy court entered a Memorandum Opinion And Order On Colin Kelly Kaufman's Final Fee Application [Bankr. Dkt. No. 469] finding that Kaufman as Trustee breached his fiduciary duties. The bankruptcy court also denied Kaufman's fee application of $451,926.11. In its discretion, the bankruptcy court awarded a fee of $50,000 plus expenses and ordered Kaufman to disgorge the remainder of the fees he had paid himself. The Final Judgment On Final Fee Application Of Colin Kelly Kaufman [Bankr. Dkt. No. 470] was entered against Kaufman on August 12, 2002, and ordered him to pay the Trustee $214,871.89 plus interest at the federal judgment rate. Kaufman appealed the findings and rulings in Bankr. Dkt. Nos. 469 and 470.

IV.    Analysis

   A.    Appellant's Motion For The Court To Take Judicial Notice

Appellant requests the Court to take judicial notice of the grievance CKS filed against him in the United States District Court for the Southern District of Texas, part of which is still pending. CKS complained that disciplinary action should be taken against Appellant on four separate bases. Upon the investigating judge's recommendation, Appellant was informed that (1) disciplinary action will not be taken on three of the four allegations in the grievance and (2) further disciplinary action on the charge of violating Texas Disciplinary Rules of Professional Conduct 1.14(a) is deferred pending the outcome of this appeal and the proceedings of the State Bar of Texas. The Court GRANTS Appellant's request and hereby takes judicial notice of the filing of the grievance against Appellant and the current status of that proceeding.

   B.    Breaches of Fiduciary Duties

The Plan specifically states that the "Plan Trustee shall have the powers, duties,

4

and responsibilities as set forth in the Texas Trust Act."[1] [Plan at 7.3] The bankruptcy court found the Texas Trust Code created fiduciary duties which Appellant breached. Appellant agrees that the Plan adopts the powers, duties, and responsibilities of a Trustee set forth in the code.[2] Appellee functionally argues that the Plan adopts the Texas Trust Code in its entirety – obligations, rights, duties, and remedies. The question before the Court is whether the bankruptcy court's findings that Appellant breached fiduciary duties owed to the Feldman Bankruptcy Estate were clearly erroneous.

As an initial matter, Appellant owed fiduciary duties to the estate regardless of whether he was serving in his capacity as a Trustee or lawyer for the estate. A lawyer hired by a trustee in bankruptcy to do legal work for the estate, like the trustee himself, is a fiduciary of the estate. *In re Evangeline Refining Co.*, 890 F.2d 1312, 1323 (5th Cir. 1989); *In re Imperial "400" National, Inc.*, 456 F.2d 926, 929 (3d Cir.1972); *In re Consupak, Inc.*, 87 B.R. 529, 548 (Bankr.N D.Ill.1988).

The Texas Trust Act, as adopted in the Plan, specifically requires the Trustee to perform certain obligations. First, the Trustee was obligated to provide accountings at the request of any beneficiary.

> (a) A beneficiary by written demand may request the trustee to deliver to each beneficiary of the trust a written statement of accounts covering all transactions since the last accounting or since the creation of the trust, whichever is later. If the trustee fails or refuses to deliver the statement within a reasonable time after the demand is made, any beneficiary of the trust may file suit to compel the trustee to deliver the statement to all beneficiaries of the trust. The court may require the trustee to deliver a written statement of account to all beneficiaries on finding that the nature of the beneficiary's interest in the trust or the effect of the administration of the trust on the beneficiary's interest is sufficient to require an accounting by the trustee. However, the trustee is not obligated or required to account to the beneficiaries of a trust more frequently than once every 12 months

---

[1]    The Texas Trust Act is codified in the Texas Trust Code found in the Texas Property Code.

[2]    However, Appellant argues that only the obligations, not the remedies, outlined in the Texas Trust Code were adopted by the Plan.

5

unless a more frequent accounting is required by the court.

TEXAS PROPERTY CODE §113.151 (Vernon's 2002). Although the creditors demanded accountings, Appellant failed to provide accountings which would inform the parties of the true value of the assets of the estate. Mainly, Appellant failed to properly document the liabilities of the estate. Thus, Appellant failed to cover all transactions between accountings as required by the code.

Next, the bankruptcy court found Appellant breached fiduciary duties by loaning himself funds from the estate. The TEXAS PROPERTY CODE §113.052(a)(1) (Vernon's 2002), states in relevant part that "(a) Except as provided by Subsection (b) of this section, a trustee may not lend trust funds to: (1) the trustee or an affiliate . . . ." The evidence before the bankruptcy court showed that Appellant had paid himself $49,428.95 more than his records indicated he was owed. The bankruptcy court construed the payment as an advance or a loan. The bankruptcy court considered and rejected the possibility that Appellant may have paid himself a retainer. Considering Appellant's negotiated fee structure in conjunction with Appellant's billing practices, the bankruptcy court's conclusion was not clearly erroneous.

Finally, the bankruptcy court found Kaufman breached his fiduciary duties by failing to make semi-annual distributions to the creditors as required under the terms of the Plan. (See Bankr. Dkt. No. 469 at p.5). The undisputed evidence before the bankruptcy court was that Appellant had not made the semi-annual distributions as required by the Plan. In the nine years Appellant served as Trustee, he did not make one payment to the creditors. The bankruptcy court's finding, therefore, is not clearly erroneous.

Considering the record on appeal, including the hearing transcripts, the transcript of Appellant's deposition, and the exhibits introduced into the record below, the Court is convinced that the bankruptcy court's findings of fact are not clearly erroneous. Therefore, the Court **AFFIRMS** the findings of the bankruptcy court that Appellant breached fiduciary duties owed to the estate.

6

### C.    Reasonable and Necessary Fees and Disgorgement

"Absent extraordinary circumstances, bankruptcy estates should not be consumed by the fees and expenses of court-appointed professionals." *In re Toney*, 171 B.R. 414, 415 (Bankr. S.D. Fla 1994). The fact that only $600 remain in the bankruptcy estate valued at more than $350,000 after Appellant received over $275,000 in fees and paid expenses immediately calls into doubt the reasonableness and necessity of the fees charged by and paid to Appellant.

Both the Texas Property Code and bankruptcy law authorize the bankruptcy court to deny a fee application of the Trustee and to require disgorgement of fees already paid if the Trustee has breached fiduciary duties. *See* TEXAS PROPERTY CODE §114.061 (Vernon's 2002); *Matter of Taxman Clothing Co.*, 49 F.3d 310 (7th Cir. 1995). The fact that fees have been paid under a court order is irrelevant. The law is clear that all interim awards of attorneys' fees in bankruptcy cases are tentative. *See in re Evangeline Refining Co.*, 890 F.2d at 1321; *In re Stable Mews Assocs*, 778 F.2d 121, 123 n.3 (2d Cir.1985).

The Texas Property Code makes clear that a trustee who commits a breach of fiduciary duties may be denied compensation.

> (a) Unless the terms of the trust provide otherwise and except as provided in Subsection (b) of this section, the trustee is entitled to reasonable compensation from the trust for acting as trustee.
> (b) If the trustee commits a breach of trust, the court may in its discretion deny him all or part of his compensation.

TEXAS PROPERTY CODE §114.061 (Vernon's 2002). Thus, the bankruptcy court's finding that Appellant breached fiduciary duties was a sufficient basis for its denial of Appellant's Final Fee Application and order of disgorgement of fees already paid.

Alternatively, and contrary to Appellant's argument, *Taxman Clothing* is directly on point. The *Taxman Clothing* court held that "[f]ees obtained as a consequence of a breach of fiduciary obligation, even a nonwillful breach . . . , may be retained only if, by analogy to claims in quantum meruit. the fiduciary. notwithstanding his breach, conferred a benefit on his principal." 49 F.3d at 316. The *Taxman Clothing* court further held that "neither the trustee in bankruptcy nor the trustee's lawyer has a duty to

7

collect an asset of the debtor's estate if the cost of collection would exceed the value of the estate." *Id.* at 315. Much like in this case, in *Taxman Clothing*, "the debtor's estate, a meager $113,000 to begin with, [was] . . . entirely consumed by the fees and expenses charged by the lawyers for the estate." *Id.* at 311. The *Taxman Clothing* court ordered counsel to disgorge $65,000 of the $92,000 in fees he had received. *See Id.* at 316.

Moreover, the bankruptcy court has broad discretion in awarding fees and can order disgorgement as a sanction. *See Matter of Prudhomme*, 43 F.3d 1000, 1003 (5th Cir. 1995). For example, the bankruptcy court's broad discretion in awarding and denying fees paid in connection with bankruptcy proceedings empowers the bankruptcy court to order disgorgement as a sanction to debtors' counsel for nondisclosure. *See* 11 U.S.C. §§ 327, 1107(a) (requiring court approval before debtor-in-possession may employ counsel); *id.* § 330(a) (requiring court approval of professional fees); *Anderson v. Anderson (In re Anderson)*, 936 F.2d 199, 204 (5th Cir. 1991) (recognizing bankruptcy court's broad discretion as court of equity to grant or deny fees and noting that attorney has no absolute right to fee award absent compliance with Code and rules); *In re Key Largo Land, Inc.*, 158 B.R. 883, 884 (Bankr. S.D. Fla. 1993) (recognizing that any payment to debtor's attorney, regardless of the source, is reviewable by the bankruptcy court).

Applying *Taxman Clothing* to this case, it is clear that Appellant did not confer a benefit on the estate that would justify paying him fees which would absorb in essence the entire estate corpus. Appellant argues that the fees he received were for his work in developing a $1,000,000 claim on behalf of the estate against the Debtor. Appellant argues that under the holding of *Taxman Clothing* he would be justified in spending $275,000 in fees for the development of such a large potential case. What Appellant fails to consider and what *Taxman Clothing* clearly requires the Court to analyze is the cost of obtaining an actual judgment and the likelihood of success. It is not enough for Appellant to say that he was pursuing a $1,000,000 claim or that he preserved another $1,000,000 in going concern value. Appellant bears the burden of demonstrating the

8

...nefit his work produced for the estate.[3]  The record does not demonstrate that Appellant added $275,000 (amount paid to appellant in fees) much less $451,926.11 (amount requested in Final Fee Application) in value to the bankruptcy estate.

The Court, therefore, concludes that the bankruptcy court neither clearly erred nor abused its discretion in finding that Appellant was not entitled to the fees he charged and was entitled to a reasonable and necessary fee of $50,000 plus expenses.

## V.    Other Issues Raised By Appellant

### A.    Appellant Argues Bad Faith or Gross Negligence Is Required For Denial Of Fee Application or Disgorgement

Appellant argues that §7.5 of the Plan required the bankruptcy court find his conduct in bad faith or gross negligence before it could order disgorgement.  That section of the Plan does not override the bankruptcy court's power to award or deny fees.  Read in conjunction with the other terms of the Plan, it is clear that the bankruptcy court retained jurisdiction to determine fees.

### B.    Appellant Argues *Res Judicata* Precludes This Court From Affirming The Bankruptcy Court's Decisions

Appellant also argues that *res judicata* either prevented the bankruptcy court from entering its orders or would require this Court to reverse the bankruptcy court.  For *res judicata* to apply, there must be two lawsuits "the parties must be identical in both suits, the prior judgment must have been rendered by a court of competent jurisdiction, there must have been a final judgment on the merits and the same cause of action must be involved in both cases."  *Nilsen v. City of Moss Point, Miss.*, 701 F.2d 556, 559 (5th Cir. 1983) (en banc).

Appellant first argues that a 1997 order of the bankruptcy court "denied that Appellant should be required to do any more accountings." [Pet. at p.22]  That order

---

[3]    Considering a hypothetical $1,000,000 case with a 75% probability of recovery and a one-third contingency fee for the prosecuting attorney, the net recovery to the estate would be $525,000.  If the likelihood of success is reduced to 60%, the net recovery to the estate would only be $420,000.  No rational actor would pay $450,000 for a contingent recovery that would net approximately $450,000 when they can simply distribute the $450,000 already on hand.

9

simply denied CKS's motion seeking an accounting on the basis that the parties failed to appear for the hearing. [Bankr. Dkt. No. 312] It did not relieve Appellant from providing accountings to the beneficiaries upon their request. Appellant also argues that the bankruptcy court hired an accountant to prepare the accountings, relieving Appellant of that duty. [Bankr. Dkt. No. 315] To the contrary, that order simply granted Appellant's application to hire an accountant. It did not relieve Appellant of the fiduciary duty to provide accountings to the beneficiaries.

Lastly, Appellant argues that CKS's complaint about Appellant's accountings and has been heard and resolved against CKS. However, no order has been entered finding that Appellant provided adequate accountings to the beneficiaries. Rather, Appellant has been informed by letter that the United States District Court for the Southern District of Texas will not proceed with a disciplinary action against Appellant on a charge that Appellant failed to provide adequate accountings. None of these proffered bases for *res judicata* are a final adjudication on the same cause of action before the Court; therefore, *res judicata* is inapplicable and does not preclude the Court from affirming the bankruptcy court's orders

C.    Appellant Argues Equitable, Judicial, and Quasi Estoppel Precludes This Court From Affirming The Bankruptcy Court's Decisions

1.    Equitable Estoppel

The four traditional requirements for equitable estoppel are "(1) that the party to be stopped was aware of the facts and (2) intended his act or omission to be acted upon. (3) that the party asserting estoppel did not have knowledge of the facts[ ] and (4) reasonably relied on the conduct of the other to his injury." *Linkous v. United States*, 142 F.3d 271, 278 (5th Cir. 1998) (citing *United States v. Bloom*, 112 F.3d 200, 205 (5th Cir. 1997)) Appellant fails to explain how equitable estoppel applies to the facts in the record. However, it is clear that Appellee, as the party to be estopped, was not aware of any fact that the Appellant did not know. It seems the reverse is true, that is, Appellant knew that the accountings he provided were not complete and he did not disclose that fact. Appellant, therefore, fails to satisfy the first and third elements.

10

### 2.    Judicial Estoppel

The judicial estoppel doctrine prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding.   *See Ergo Science, Inc. v. Martin*, 73 F.3d 595, 598 (5th Cir.1996). Appellee never asserted contrary positions in this matter.  Appellant argues that Appellee first asserted he did too little work then asserted he did too much.  This mischaracterizes Appellee's arguments.  Appellee claims Appellant's accountings were insufficient and that Appellant overcharged for the work he actually did.  These arguments are not inconsistent.  Judicial estoppel, therefore, is inapplicable to this case.

### 3.    Quasi Estoppel

The doctrine of quasi-estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken.  The doctrine applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit.  *See Stinnett v. Colorado Interstate Gas Co.*, 227 F.3d 247, 255 (5th Cir. 2000).  The Fifth Circuit analyzed the basis of the estoppel doctrine under Texas law in *Long v. Turner*, 134 F.3d 312, 318 (5th Cir 1998).  The *Long* court noted that a precise description of the core basis of estoppel is that "one who retains benefits under a transaction cannot avoid its obligations and is stopped to take an inconsistent position."  *Id*  Quasi-estoppel is inapplicable where the conduct allegedly giving rise to the estoppel is not shown to have benefitted a party sought to be stopped."  *Id* at 318.

Appellant argues that the Appellee cannot complain that the accountings were inaccurate because it was the Appellee who requested the accountings.  However, Appellant fails to demonstrate that the accountings actually benefitted the Appellee.  To the contrary, Appellant testified in his deposition that the accountings never fully disclosed the liabilities of the estate or the true balance of the estate corpus.  Quasi-estoppel simply is inapplicable to the facts on the record.

### VI.    Appellant's Motion For The Court To Prevent Mooting Of The Appeal

Appellant has filed a motion seeking an "order that, until the appeal is decided and without express permission of this Court neither the court below nor the Appellee

11

shall take any further action which might tend to discourage Appellant from pursing the instant appeal, or might tend to hinder or delay Appellant from having a law practice pending the instant appeal, or tend to hinder or delay Appellant in receiving funds necessary to pay his obligations to his creditors or to carry out his obligations to his clients." The appeal having been decided, Appellant's motion is **DENIED**.

## VII.    Admonishment To Counsel

Appellant's pleadings have prevented this Court from efficiently reviewing this case. Appellant's pleadings to this point have suffered from some of the more typical problems found in legal writing — lack of organization, lack of sufficient background for the reader, lack of editing, overstatement of propositions of law, misapplication of law, embellishment, and use of inappropriate style. While Appellant's pleadings made the resolution of this case more difficult than necessary, the Court overlooked these deficiencies as stylistic and advocacy.

In the Motion For The Court To Prevent Mooting Of The Appeal [Dkt. No. 20], Appellant has gone beyond stylistic miscalculation and entered into the realm of the unprofessional, uncivil, and hostile harangue. From the 19 pages of unsupported accusations against the bankruptcy bar, the Trustee-Appellant in this matter, the Trustee-Appellant's wife, the Trustee-Appellant's counsel, and the federal judiciary, one passage exemplifies Appellant's vituperative style.

> But people who know how the clique system works also know that they
> might be the ones sliced and diced in the event that the clique lawyers
> target them for their next fee sources. Such clients want lawyers who will
> not sell clients out who will not pay bribes to win their cases; who will not
> succumb to blackmail, because they don't do the kinds of things people
> can be blackmailed about; and who will not succumb to extortion because
> they would rather not practice than be part of the problem. Instead of part
> of the solution. Clients who feel they have already suffered from
> corruption when they come to Appellant's law office find it to be a positive
> sign that someone will not bend his or her values to be "in" with a
> particular clique. They may have millions of dollars at stake, and they
> already know that if they pay the first corrupt bribe, then it will never stop,
> and they will have to pay again the next time, and the next time; and
> bogus cases will continue to surface against them until their money and
> property are all gone. So they need someone who will not offer to pay
> someone off to fix the case, but who will stand up to any potential

12

corruption, and fight for an end to it.

These thinly veiled and wholly unsupported allegations of ethical misconduct and illegal conduct have no place in Appellant's motion. They do not support his position in the least. If Appellant has information of misconduct, he should file grievances with the Texas State Bar or the appropriate judicial officer. Otherwise, Appellant should simply argue the merits of his position, refraining from making uncivil, unsupported and irrelevant accusations against his colleagues and the judiciary.

**VIII.    Conclusion**

For the foregoing reasons, the Court holds that the bankruptcy court's findings that Appellant breached fiduciary duties owed to the Feldman Bankruptcy Estate were not clearly erroneous and the bankruptcy court's finding that Appellant was entitled to a reasonable and necessary fee of $50,000 plus expenses was neither clearly erroneous nor an abuse of discretion. Therefore, the Court **AFFIRMS** the Memorandum Opinion And Order On Colin Kelly Kaufman's Final Fee Application [Bankr. Dkt. No. 469] and **AFFIRMS** the Final Judgment On Final Fee Application Of Colin Kelly Kaufman [Bankr. Dkt. No. 470]. Furthermore, the Court **GRANTED** Appellant's Motion For The Court To Take Judicial Notice [Dkt. No. 12]; **DENIED** Appellant's Motion For The Court To Prevent Mooting Of The Appeal [Dkt. No. 20]; and **DENIED AS MOOT** Trustee's Motion To Dismiss For Failure To State A Claim [Dkt. No. 22]

DONE in Brownsville this 27th day of December 2002.

Hilda G. Tagle
United States District Court



UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| CHARLES FELDMAN, | § | Case No. 90-01254 |
| DEBTOR(S) | § | |
| | § | Confirmed Chapter 11 |

---

| | | |
|---|---|---|
| MICHAEL BOUDLOCHE, | § | |
| Plaintiff | | |
| VS | § | Adversary No. 01-2090 |
| CHARLES FELDMAN, | | |
| Defendant | § | |

## ORDER APPROVING SETTLEMENT AGREEMENT

Before the Court for consideration is the Motion for Approval of Compromise and to Approve Settlement Agreement (the "Motion") between the Parties as follows:

Mike Boudloche, Plan Trustee of the above styled and numbered Bankruptcy Estate, ("Trustee"); and

Charles Feldman ("Feldman").

The Parties have entered into a Settlement Agreement (the "Settlement") as follows:

1. Feldman will pay Trustee a total of $25,000 to resolve all disputes between them;

2. The $25,000 shall be paid $15,000 when this Order becomes final and the $10,000 balance shall be paid no later than thirty (30) days thereafter;

3. Trustee shall dismiss the Adversary against all Defendants;

4. This Settlement shall be considered a full release of all claims that either party may have against the other party.



The Court, having considered the Motion, Mr. Colin Kaufman's Objection thereto, the evidence, and the Settlement Agreement, finds that the Settlement Agreement has been entered into in good faith, is in the best interest of the Estate and is the settlement of doubtful and disputed claims and meets the elements set forth in *Protective Committee* Case. The Court further finds that Mr. Kaufman lacks standing to object to this Settlement as he is not a claimant of this Estate, but owes a debt to this Estate as evidenced by the Final Judgment against him in favor of this Estate.

It is therefore, ORDERED that the Motion for Approval of Compromise and to Approve Settlement Agreement is hereby APPROVED, and the Trustee is authorized to execute same and take such other action as may be necessary to carry out the intents and purposes of same. Further, such Settlement Agreement and each of its terms and conditions are hereby APPROVED and shall become BINDING upon such Parties upon the execution of this Order.

DATED __JAN 1 4 2003__, 2003.

Honorable Richard Schmidt
United States Bankruptcy Judge

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| **CHARLES FELDMAN,** | § | **Case No. 90-01254** |
| **DEBTOR(S)** | § | |
| | § | **Chapter 11** |

## PROFFER OF MICHAEL BOUDLOCHE

1.      My name is Michael Boudloche, the duly appointed successor Chapter 11 Plan Trustee ("Trustee") for Charles Feldman ("Feldman" or "Debtor"), in the above referenced matter. I am a certified public accountant and have served as a Trustee in over five thousand (5,000) cases over the past ten years. As Trustee for Debtor, I am represented by duly appointed lawyers, Michael B. Schmidt and the Law Offices of Michael B. Schmidt.

2.      I am aware of the facts and circumstances surrounding the bankruptcy of Debtor and the litigation between Colin K. Kaufman, the former Plan Trustee removed for cause ("Kaufman") and Debtor and other members of his family in Adversary #01-2090 pending before this Court (the "Adversary"). Kaufman was removed as Plan Trustee by this Court for his breach of fiduciary duties and improper payments to himself. As a result, I am of the opinion that the settlement agreement between me as Trustee for this Estate and the Debtor, as reflected in the Motion for Approval of Compromise and to Approve Settlement Agreement ("Motion"), is fair, equitable and in the best interest of this Estate and its creditors. I understand the following to be true.

3.      I have reviewed Kaufman's Proposed Final Report and his Original Complaint filed in the Adversary. I have also met with Kaufman and his wife Sharon and listened to their explanation of their reasoning and calculations behind the suit filed by Kaufman in the Adversary. I had my lawyers also attend these meetings with Kaufman and his wife and review the same documents I reviewed. I have been unable to understand and my lawyers cannot explain to me Kaufman's reasoning or calculations behind this suit. My review reflects and the Debtor and his accountant confirmed that around $14,800 too much was withheld for income taxes. With my lawyers, I attended full day mediation with the Debtor and his counsel and after extended negotiations reached an agreement to settle for $25,000. My lawyers have advised me that it appears that there is a significant likelihood that prosecution of the Adversary would result in an adverse ruling against this Estate.

4.      By Order of December 27, 2002, U.S. District Judge Tagle has affirmed this Court's ruling in this Case, that Kaufman paid himself $49,428.95 from the corpus of this Estate for work which he had not yet done and that by the time Kaufman filed his Final Fee Application, almost the entire corpus of this Estate had been disbursed for fees and expenses. Judge Tagle has also affirmed this Court's finding that Kaufman breached his fiduciary duties as Trustee in this Case and the order for Kaufman to disgorge the $214,871.89 overpayment to himself. Judge Tagle also affirmed this Court's entry of a Final Judgment in favor of Mike Boudloche, Trustee against Kaufman for $214,871.89 plus interest at the federal judgment

*EXC.  523*

rate. Kaufman is therefore not a creditor or party in interest in this case, but rather a judgment debtor, who owes a debt to this Estate. Kaufman has no financial stake in the outcome of this settlement. A true and correct copy of Judge Tagle's Order is attached hereto as Exhibit 1.

5.    Judge Tagle in her Order of December 27, 2002 admonished Kaufman for his "unprofessional, uncivil and hostile harangue" and for filing "19 pages of unsupported accusations". Judge Steen in 1999 opinion in the *Cantu* Case also admonished Kaufman for making frivolous or unsubstantiated claims. I have concluded that the claims made by Kaufman in the Adversary are also unsubstantiated. A true and correct copy of Judge Steen's opinion in the *Cantu* Case is attached hereto as Exhibit 2.

6.    The terms of the settlement are the result of an arms length agreement between the Debtor and me. There are no side agreements between the parties that are not reflected in the documents presently before the Court. And there are no agreements for the personal benefit of myself, my attorney or any individual affiliated with the Debtor.

7.    After consulting with my attorney, reviewing the terms of the settlement with the Debtor, considering the probability of conducting a successful prosecution of the litigation, the complexity of the litigation, the funds to be received by the Debtor in exchange for the settlement, the interests of the creditors, the nature of the releases to be exchanged and the reasonableness of the settlement amount, I believe that this settlement is fair, equitable and in the best interest of this Estate and its creditors and ask that the court approve this settlement.

Michael Boudloche
Chapter 11 Plan Trustee for Charles Feldman

2

United States District Court
Southern District of Texas
FILED

DEC 2 7 2002

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

IN RE:  CHARLES B. FELDMAN D/B/A      §    CIVIL ACTION NO. B-02-073
CHARLES FELDMAN INVESTMENTS      §

### ORDER

BE IT REMEMBERED that on December 27, 2002, the Court AFFIRMED the Memorandum Opinion And Order On Colin Kelly Kaufman's Final Fee Application [Bankr. Dkt. No. 469] and AFFIRMED the Final Judgment On Final Fee Application Of Colin Kelly Kaufman [Bankr. Dkt. No. 470]. Furthermore, the Court GRANTED Appellant's Motion For The Court To Take Judicial Notice [Dkt. No. 12]; DENIED Appellant's Motion For The Court To Prevent Mooting Of The Appeal [Dkt. No. 20]; and DENIED AS MOOT Trustee's Motion To Dismiss For Failure To State A Claim [Dkt. No. 22].

I.      Standard of Review

In reviewing a bankruptcy court decision, a district court functions as an appellate court and applies the standards of review generally applied in federal courts of appeal. See In re Webb, 954 F.2d 1102, 1103-04 (5th Cir.1992). This Court will not set aside a bankruptcy court's findings of fact unless they are clearly erroneous. FED. R. BANKR. P. 8013. In re McDaniel, 70 F.3d 841, 842-43 (5th Cir.1995). A finding of fact is clearly erroneous if, after review of all the evidence, the Court is left with a firm and definite conviction that the bankruptcy court erred. See In re McDaniel, 70 F.3d at 843. This court reviews legal conclusions de novo. See id ; In re Herby's Foods, Inc., 2 F.3d 128, 130 (5th Cir. 1993). "The bankruptcy court's determination of attorneys' fees is reviewed for abuse of discretion, and its specific findings of fact supporting the award are reviewed for clear error." In re Fender, 12 F.3d 480, 487 (5th Cir. 1994). "[T]he amount awarded lies in the judge's discretion and is recalculated only if the judge abuses that discretion." Id. (citing Longden v. Sunderman, 979 F.2d 1095, 1100 (5th Cir. 1992)).



EXHIBIT "1"

## II.    Issues Presented

This appeal presents two issues for the Court to decide. Were the bankruptcy court's findings that Kaufman ("Appellant") breached fiduciary duties owed to the Feldman Bankruptcy Estate clearly erroneous? Second, was the bankruptcy court's finding that Kaufman was entitled to a reasonable and necessary fee of $50,000 plus expenses clearly erroneous or an abuse of discretion?

## III.    Factual Background

In 1990 Charles B. Feldman d/b/a Charles Feldman Investments, filed for Chapter 11 bankruptcy. A bankruptcy plan (the "Plan") was confirmed in 1992 and named Harlingen National Bank as Trustee. In Section 7.3, the Plan clearly states that the Trustee is to "have the powers, duties and responsibilities as set forth in the Texas Trust Act." In Section 15.1(k) of the Plan, the bankruptcy court retained jurisdiction to determine among other things applications for compensation and expenses. The Plan further provided that the Debtor was to pay funds from the sale of Debtor's assets and net income received from Debtor's businesses over to the Plan Trustee who in turn was to make an accounting and distribution to creditors every six month. The main, if not sole, function of the Trustee was to receive funds from the debtor, distribute those funds to the creditors, and provide accountings to the bankruptcy court, creditors, and debtors.

In 1992, Kaufman was substituted as Trustee. As Trustee, Kaufman hired himself to serve as an attorney for the bankruptcy estate. The Modification To First Amended Plan Of Reorganization Of Charles B. Feldman D/B/A Charles B. Feldman Investments ("Modified Plan") signed by the parties and Kaufman, was implemented to substitute Kaufman as Trustee. Under the Modified Plan, Kaufman was required to "submit his accounts to the bankruptcy court for approval." Moreover, the Modified Plan stated that "[t]he Plan Trustee shall submit his accounts to the Bankruptcy Court for approval. The Plan Trustee shall also submit a final accounting at the end of the Plan Term Years to the Bankruptcy Court for its approval."

Kaufman collected $354,066.92 during his tenure as Trustee. Kaufman paid himself $278,631.50 in fees from the corpus of the estate. Between June 1999 and

March 2001. Kaufman also paid himself $49,428.95 from the corpus of the estate for work which he had not yet done. After payment of other court-approved fees and expenses and payment of Kaufman's fees there remained a trust corpus of $600. Kaufman paid himself these fees without filing periodic attorneys' fee applications; rather, he filed a fee application only after the bankruptcy court ordered him to file a Final Fee Application. By the time Kaufman filed a Final Fee Application, almost the entire corpus of the estate had been disbursed for fees and expenses.

Kaufman paid himself at the rate he charges for legal work and never distinguished between his work as the Trustee and his work as an attorney for the Feldman Bankruptcy Estate. The accountings indicate that Kaufman paid himself at the hourly rate he charges for attorney services, $400 per hour, regardless of whether he was performing legal services or trustee services. Apparently Kaufman negotiated this fee and the parties agreed to pay the same hourly fee regardless of the type of services rendered.

CKS Asset Management, Inc. ("CKS"), the largest creditor of the bankruptcy estate, began requesting accountings in 1995 and received seven documents labeled "Accounting." None of the documents revealed that the expenses of the trust might exceed the corpus. In his deposition, Kaufman admitted that he never furnished accountings containing all of the expenditures because he did not want to tell the Debtor that the estate had no funds. As a consequence the creditors were not informed of the assets remaining in the estate or the true liabilities of the estate.

Moreover, Kaufman never made a semi-annual distribution to the creditors as required by the Plan. There are no receipts or entries in any of the accountings delivered which indicate that a semi-annual payment was made to the creditors, and Kaufman admits that he never made the semi-annual payments as required. However, the amount of the semi-annual payments was never fixed by the bankruptcy court.

CKS filed a motion in the bankruptcy court to remove Kaufman as Trustee, and on June 28, 2001, the bankruptcy judge held an evidentiary hearing and removed Kaufman as Trustee. On June 29, 2001, the bankruptcy court entered an order removing Kaufman as Trustee. On August 21, 2001, the bankruptcy court ordered

3

Mike Boudloche ("Appellee") to succeed Kaufman as Trustee.

Finally on January 29, 2002, the bankruptcy court ordered Kaufman to enter a Final Fee Application, which he filed on February 8, 2002. The Court held a hearing on February 22, 2002, to consider Kaufman's fee application. On March 7, 2002, the bankruptcy court entered a Memorandum Opinion And Order On Colin Kelly Kaufman's Final Fee Application [Bankr. Dkt. No. 469] finding that Kaufman as Trustee breached his fiduciary duties. The bankruptcy court also denied Kaufman's fee application of $451,926.11. In its discretion, the bankruptcy court awarded a fee of $50,000 plus expenses and ordered Kaufman to disgorge the remainder of the fees he had paid himself. The Final Judgment On Final Fee Application Of Colin Kelly Kaufman [Bankr. Dkt. No. 470] was entered against Kaufman on August 12, 2002, and ordered him to pay the Trustee $214,871.89 plus interest at the federal judgment rate. Kaufman appealed the findings and rulings in Bankr. Dkt. Nos. 469 and 470.

**IV.    Analysis**

**A.    Appellant's Motion For The Court To Take Judicial Notice**

Appellant requests the Court to take judicial notice of the grievance CKS filed against him in the United States District Court for the Southern District of Texas, part of which is still pending. CKS complained that disciplinary action should be taken against Appellant on four separate bases. Upon the investigating judge's recommendation, Appellant was informed that (1) disciplinary action will not be taken on three of the four allegations in the grievance and (2) further disciplinary action on the charge of violating Texas Disciplinary Rules of Professional Conduct 1.14(a) is deferred pending the outcome of this appeal and the proceedings of the State Bar of Texas. The Court GRANTS Appellant's request and hereby takes judicial notice of the filing of the grievance against Appellant and the current status of that proceeding.

**B.    Breaches of Fiduciary Duties**

The Plan specifically states that the "Plan Trustee shall have the powers, duties,

and responsibilities as set forth in the Texas Trust Act."[1] [Plan at 7.3]  The bankruptcy court found the Texas Trust Code created fiduciary duties which Appellant breached. Appellant agrees that the Plan adopts the powers, duties, and responsibilities of a Trustee set forth in the code.[2]  Appellee functionally argues that the Plan adopts the Texas Trust Code in its entirety – obligations, rights, duties, and remedies.  The question before the Court is whether the bankruptcy court's findings that Appellant breached fiduciary duties owed to the Feldman Bankruptcy Estate were clearly erroneous.

As an initial matter, Appellant owed fiduciary duties to the estate regardless of whether he was serving in his capacity as a Trustee or lawyer for the estate.  A lawyer hired by a trustee in bankruptcy to do legal work for the estate, like the trustee himself, is a fiduciary of the estate.  *In re Evangeline Refining Co.*, 890 F.2d 1312, 1323 (5th Cir. 1989); *In re Imperial "400" National, Inc.*, 456 F.2d 926, 929 (3d Cir.1972); *In re Consupak, Inc.*, 87 B.R. 529, 548 (Bankr.N.D.Ill.1988).

The Texas Trust Act, as adopted in the Plan, specifically requires the Trustee to perform certain obligations.  First, the Trustee was obligated to provide accountings at the request of any beneficiary.

> (a) A beneficiary by written demand may request the trustee to deliver to each beneficiary of the trust a written statement of accounts covering all transactions since the last accounting or since the creation of the trust, whichever is later. If the trustee fails or refuses to deliver the statement within a reasonable time after the demand is made, any beneficiary of the trust may file suit to compel the trustee to deliver the statement to all beneficiaries of the trust. The court may require the trustee to deliver a written statement of account to all beneficiaries on finding that the nature of the beneficiary's interest in the trust or the effect of the administration of the trust on the beneficiary's interest is sufficient to require an accounting by the trustee. However, the trustee is not obligated or required to account to the beneficiaries of a trust more frequently than once every 12 months

---

[1]    The Texas Trust Act is codified in the Texas Trust Code found in the Texas Property Code.

[2]    However, Appellant argues that only the obligations, not the remedies, outlined in the Texas Trust Code were adopted by the Plan.

US DISTRICT COURT        Fax:9565452598        Dec 27 2002 15:22    P.06

unless a more frequent accounting is required by the court.

TEXAS PROPERTY CODE §113.151 (Vernon's 2002). Although the creditors demanded accountings, Appellant failed to provide accountings which would inform the parties of the true value of the assets of the estate. Mainly, Appellant failed to properly document the liabilities of the estate. Thus, Appellant failed to cover all transactions between accountings as required by the code.

Next, the bankruptcy court found Appellant breached fiduciary duties by loaning himself funds from the estate. The TEXAS PROPERTY CODE §113.052(a)(1) (Vernon's 2002), states in relevant part that "(a) Except as provided by Subsection (b) of this section, a trustee may not lend trust funds to: (1) the trustee or an affiliate . . . ." The evidence before the bankruptcy court showed that Appellant had paid himself $49,428.95 more than his records indicated he was owed. The bankruptcy court construed the payment as an advance or a loan. The bankruptcy court considered and rejected the possibility that Appellant may have paid himself a retainer. Considering Appellant's negotiated fee structure in conjunction with Appellant's billing practices, the bankruptcy court's conclusion was not clearly erroneous.

Finally, the bankruptcy court found Kaufman breached his fiduciary duties by failing to make semi-annual distributions to the creditors as required under the terms of the Plan. (See Bankr. Dkt. No. 469 at p.5). The undisputed evidence before the bankruptcy court was that Appellant had not made the semi-annual distributions as required by the Plan. In the nine years Appellant served as Trustee, he did not make one payment to the creditors. The bankruptcy court's finding, therefore, is not clearly erroneous.

Considering the record on appeal, including the hearing transcripts, the transcript of Appellant's deposition, and the exhibits introduced into the record below, the Court is convinced that the bankruptcy court's findings of fact are not clearly erroneous. Therefore, the Court **AFFIRMS** the findings of the bankruptcy court that Appellant breached fiduciary duties owed to the estate.

### C.    Reasonable and Necessary Fees and Disgorgement

"Absent extraordinary circumstances, bankruptcy estates should not be consumed by the fees and expenses of court-appointed professionals." *In re Toney*, 171 B.R. 414, 415 (Bankr. S.D. Fla 1994). The fact that only $600 remain in the bankruptcy estate valued at more than $350,000 after Appellant received over $275,000 in fees and paid expenses immediately calls into doubt the reasonableness and necessity of the fees charged by and paid to Appellant.

Both the Texas Property Code and bankruptcy law authorize the bankruptcy court to deny a fee application of the Trustee and to require disgorgement of fees already paid if the Trustee has breached fiduciary duties. *See* TEXAS PROPERTY CODE §114.061 (Vernon's 2002); *Matter of Taxman Clothing Co.*, 49 F.3d 310 (7th Cir. 1995). The fact that fees have been paid under a court order is irrelevant. The law is clear that all interim awards of attorneys' fees in bankruptcy cases are tentative. *See in re Evangeline Refining Co.*, 890 F.2d at 1321; *In re Stable Mews Assocs.*, 778 F.2d 121, 123 n.3 (2d Cir.1985).

The Texas Property Code makes clear that a trustee who commits a breach of fiduciary duties may be denied compensation.

> (a) Unless the terms of the trust provide otherwise and except as provided in Subsection (b) of this section, the trustee is entitled to reasonable compensation from the trust for acting as trustee.
> (b) If the trustee commits a breach of trust, the court may in its discretion deny him all or part of his compensation.

TEXAS PROPERTY CODE §114.061 (Vernon's 2002). Thus, the bankruptcy court's finding that Appellant breached fiduciary duties was a sufficient basis for its denial of Appellant's Final Fee Application and order of disgorgement of fees already paid.

Alternatively, and contrary to Appellant's argument, *Taxman Clothing* is directly on point. The *Taxman Clothing* court held that "[f]ees obtained as a consequence of a breach of fiduciary obligation, even a nonwillful breach . . . , may be retained only if, by analogy to claims in quantum meruit the fiduciary, notwithstanding his breach, conferred a benefit on his principal," 49 F.3d at 316. The *Taxman Clothing* court further held that "neither the trustee in bankruptcy nor the trustee's lawyer has a duty to

7

collect an asset of the debtor's estate if the cost of collection would exceed the value of the estate." *Id.* at 315.   Much like in this case, in *Taxman Clothing*, "the debtor's estate, a meager $113,000 to begin with, [was] . . . entirely consumed by the fees and expenses charged by the lawyers for the estate." *Id.* at 311.   The *Taxman Clothing* court ordered counsel to disgorge $65,000 of the $92,000 in fees he had received.   See *Id.* at 316.

Moreover, the bankruptcy court has broad discretion in awarding fees and can order disgorgement as a sanction.   See *Matter of Prudhomme*, 43 F.3d 1000, 1003 (5th Cir. 1995).   For example, the bankruptcy court's broad discretion in awarding and denying fees paid in connection with bankruptcy proceedings empowers the bankruptcy court to order disgorgement as a sanction to debtors' counsel for nondisclosure. See 11 U.S.C. §§ 327, 1107(a) (requiring court approval before debtor-in-possession may employ counsel); *id.* § 330(a) (requiring court approval of professional fees); *Anderson v. Anderson (In re Anderson)*, 936 F.2d 199, 204 (5th Cir. 1991) (recognizing bankruptcy court's broad discretion as court of equity to grant or deny fees and noting that attorney has no absolute right to fee award absent compliance with Code and rules); *In re Key Largo Land, Inc.*, 158 B.R. 883, 884 (Bankr. S.D. Fla. 1993) (recognizing that any payment to debtor's attorney, regardless of the source, is reviewable by the bankruptcy court).

Applying *Taxman Clothing* to this case, it is clear that Appellant did not confer a benefit on the estate that would justify paying him fees which would absorb in essence the entire estate corpus.   Appellant argues that the fees he received were for his work in developing a $1,000,000 claim on behalf of the estate against the Debtor.   Appellant argues that under the holding of *Taxman Clothing* he would be justified in spending $275,000 in fees for the development of such a large potential case.   What Appellant fails to consider and what *Taxman Clothing* clearly requires the Court to analyze is the cost of obtaining an actual judgment and the likelihood of success.   It is not enough for Appellant to say that he was pursuing a $1,000,000 claim or that he preserved another $1,000,000 in going concern value.   Appellant bears the burden of demonstrating the

8

benefit his work produced for the estate.[3] The record does not demonstrate that
Appellant added $275,000 (amount paid to appellant in fees) much less $451,926.11
(amount requested in Final Fee Application) in value to the bankruptcy estate.

The Court, therefore, concludes that the bankruptcy court neither clearly erred
nor abused its discretion in finding that Appellant was not entitled to the fees he
charged and was entitled to a reasonable and necessary fee of $50,000 plus expenses.

V.     Other Issues Raised By Appellant

    A.     Appellant Argues Bad Faith or Gross Negligence Is Required For
           Denial Of Fee Application or Disgorgement

Appellant argues that §7.5 of the Plan required the bankruptcy court find his
conduct in bad faith or gross negligence before it could order disgorgement. That
section of the Plan does not override the bankruptcy court's power to award or deny
fees. Read in conjunction with the other terms of the Plan. It is clear that the
bankruptcy court retained jurisdiction to determine fees.

    B.     Appellant Argues *Res Judicata* Precludes This Court From Affirming
           The Bankruptcy Court's Decisions

Appellant also argues that *res judicata* either prevented the bankruptcy court
from entering its orders or would require this Court to reverse the bankruptcy court. For
*res judicata* to apply, there must be two lawsuits "the parties must be identical in both
suits, the prior judgment must have been rendered by a court of competent jurisdiction,
there must have been a final judgment on the merits and the same cause of action
must be involved in both cases." *Nilsen v. City of Moss Point, Miss.*, 701 F.2d 556, 559
(5th Cir. 1983) (en banc).

Appellant first argues that a 1997 order of the bankruptcy court "denied that
Appellant should be required to do any more accountings." [Pet. at p.22] That order

---

[3]    Considering a hypothetical $1,000,000 case with a 75% probability of
recovery and a one-third contingency fee for the prosecuting attorney, the net recovery
to the estate would be $525,000. If the likelihood of success is reduced to 60%, the net
recovery to the estate would only be $420,000. No rational actor would pay $450,000
for a contingent recovery that would net approximately $450,000 when they can simply
distribute the $450,000 already on hand.

simply denied CKS's motion seeking an accounting on the basis that the parties failed to appear for the hearing. [Bankr. Dkt. No. 312] It did not relieve Appellant from providing accountings to the beneficiaries upon their request. Appellant also argues that the bankruptcy court hired an accountant to prepare the accountings, relieving Appellant of that duty. [Bankr. Dkt. No. 315] To the contrary, that order simply granted Appellant's application to hire an accountant. It did not relieve Appellant of the fiduciary duty to provide accountings to the beneficiaries.

Lastly, Appellant argues that CKS's complaint about Appellant's accountings and has been heard and resolved against CKS. However, no order has been entered finding that Appellant provided adequate accountings to the beneficiaries. Rather, Appellant has been informed by letter that the United States District Court for the Southern District of Texas will not proceed with a disciplinary action against Appellant on a charge that Appellant failed to provide adequate accountings. None of these proffered bases for *res judicata* are a final adjudication on the same cause of action before the Court; therefore, *res judicata* is inapplicable and does not preclude the Court from affirming the bankruptcy court's orders

C.    Appellant Argues Equitable, Judicial, and Quasi Estoppel Precludes This Court From Affirming The Bankruptcy Court's Decisions

1.    Equitable Estoppel

The four traditional requirements for equitable estoppel are "(1) that the party to be stopped was aware of the facts and (2) intended his act or omission to be acted upon; (3) that the party asserting estoppel did not have knowledge of the facts[ ] and (4) reasonably relied on the conduct of the other to his injury." *Linkous v. United States*, 142 F.3d 271, 278 (5th Cir. 1998) (citing *United States v. Bloom*, 112 F.3d 200, 205 (5th Cir. 1997)) Appellant fails to explain how equitable estoppel applies to the facts in the record  However, it is clear that Appellee, as the party to be estopped  was not aware of any fact that the Appellant did not know. It seems the reverse is true, that is, Appellant knew that the accountings he provided were not complete and he did not disclose that fact. Appellant, therefore, fails to satisfy the first and third elements.

### 2.    Judicial Estoppel

The judicial estoppel doctrine prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding.   *See Ergo Science, Inc. v. Martin*, 73 F.3d 595, 598 (5th Cir.1996). Appellee never asserted contrary positions in this matter.  Appellant argues that Appellee first asserted he did too little work then asserted he did too much.  This mischaracterizes Appellee's arguments.  Appellee claims Appellant's accountings were insufficient and that Appellant overcharged for the work he actually did.  These arguments are not inconsistent. Judicial estoppel, therefore, is inapplicable to this case.

### 3.    Quasi Estoppel

The doctrine of quasi-estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken  The doctrine applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit. *See Stinnett v. Colorado Interstate Gas Co.*, 227 F.3d 247, 255 (5th Cir. 2000).  The Fifth Circuit analyzed the basis of the estoppel doctrine under Texas law in *Long v. Turner*, 134 F.3d 312, 318 (5th Cir 1998).  The *Long* court noted that a precise description of the core basis of estoppel is that "one who retains benefits under a transaction cannot avoid its obligations and is stopped to take an inconsistent position."  *Id*  Quasi-estoppel is "inapplicable where the conduct allegedly giving rise to the estoppel is not shown to have benefitted a party sought to be stopped."  *Id.* at 318.

Appellant argues that the Appellee cannot complain that the accountings were inaccurate because it was the Appellee who requested the accountings.  However, Appellant fails to demonstrate that the accountings actually benefitted the Appellee.  To the contrary, Appellant testified in his deposition that the accountings never fully disclosed the liabilities of the estate or the true balance of the estate corpus.  Quasi-estoppel simply is inapplicable to the facts on the record.

### VI.    Appellant's Motion For The Court To Prevent Mooting Of The Appeal

Appellant has filed a motion seeking an "order that until the appeal is decided and without express permission of this Court neither the court below nor the Appellee

11

shall take any further action which might tend to discourage Appellant from pursing the instant appeal, or might tend to hinder or delay Appellant from having a law practice pending the instant appeal, or tend to hinder or delay Appellant in receiving funds necessary to pay his obligations to his creditors or to carry out his obligations to his clients." The appeal having been decided, Appellant's motion is **DENIED**.

### VII.    Admonishment To Counsel

Appellant's pleadings have prevented this Court from efficiently reviewing this case. Appellant's pleadings to this point have suffered from some of the more typical problems found in legal writing — lack of organization, lack of sufficient background for the reader, lack of editing, overstatement of propositions of law, misapplication of law, embellishment, and use of inappropriate style. While Appellant's pleadings made the resolution of this case more difficult than necessary, the Court overlooked these deficiencies as stylistic and advocacy.

In the Motion For The Court To Prevent Mooting Of The Appeal [Dkt. No. 20], Appellant has gone beyond stylistic miscalculation and entered into the realm of the unprofessional, uncivil, and hostile harangue. From the 19 pages of unsupported accusations against the bankruptcy bar, the Trustee-Appellant in this matter, the Trustee-Appellant's wife, the Trustee-Appellant's counsel, and the federal judiciary, one passage exemplifies Appellant's vituperative style.

> But people who know how the clique system works also know that they might be the ones sliced and diced in the event that the clique lawyers target them for their next fee sources. Such clients want lawyers who will not sell clients out; who will not pay bribes to win their cases; who will not succumb to blackmail, because they don't do the kinds of things people can be blackmailed about; and who will not succumb to extortion because they would rather not practice than be part of the problem, instead of part of the solution. Clients who feel they have already suffered from corruption when they come to Appellant's law office find it to be a positive sign that someone will not bend his or her values to be "in" with a particular clique. They may have millions of dollars at stake, and they already know that if they pay the first corrupt bribe, then it will never stop, and they will have to pay again the next time, and the next time; and bogus cases will continue to surface against them until their money and property are all gone. So they need someone who will not offer to pay someone off to fix the case, but who will stand up to any potential

12

corruption, and fight for an end to it.

These thinly veiled and wholly unsupported allegations of ethical misconduct and illegal conduct have no place in Appellant's motion. They do not support his position in the least. If Appellant has information of misconduct, he should file grievances with the Texas State Bar or the appropriate judicial officer. Otherwise, Appellant should simply argue the merits of his position, refraining from making uncivil, unsupported and irrelevant accusations against his colleagues and the judiciary.

### VIII.   Conclusion

For the foregoing reasons, the Court holds that the bankruptcy court's findings that Appellant breached fiduciary duties owed to the Feldman Bankruptcy Estate were not clearly erroneous and the bankruptcy court's finding that Appellant was entitled to a reasonable and necessary fee of $50,000 plus expenses was neither clearly erroneous nor an abuse of discretion. Therefore, the Court **AFFIRMS** the Memorandum Opinion And Order On Colin Kelly Kaufman's Final Fee Application [Bankr. Dkt. No. 469] and **AFFIRMS** the Final Judgment On Final Fee Application Of Colin Kelly Kaufman [Bankr. Dkt. No. 470]. Furthermore, the Court **GRANTED** Appellant's Motion For The Court To Take Judicial Notice [Dkt. No. 12]; **DENIED** Appellant's Motion For The Court To Prevent Mooting Of The Appeal [Dkt. No. 20]; and **DENIED AS MOOT** Trustee's Motion To Dismiss For Failure To State A Claim [Dkt No. 22]

DONE in Brownsville, this 27th day of December 2002.

Hilda G. Tagle
United States District Court

13

# UNITED STATES COURTS

# SOUTHERN DISTRICT OF TEXAS

# BROWNSVILLE DIVISION

### (956)548-2500
### FAX (956)548-2598



## TRANSMITTAL COVER SHEET

**TO:** _Colin Kaufman_

**FROM:** _O. Aldape_

**DESCRIPTION:** _Order CA B-02-73_

**NUMBER OF PAGES (INCLUDING THIS PAGE):** _14_

**DATE:** _12/27/02_

United States Bankruptcy Court
Southern District of Texas
ENTERED

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

MAR 2 5 1999

Michael N. Milby, Clerk of Court

| | | |
|---|---|---|
| IN RE: | § | |
| JESUS M. CANTU d/b/a CONTINENTAL | § | CASE NO. 95-22388-L2-7 |
| CHARTER BANK & TRUST, LTD. d/b/a | § | CASE NO. 95-22389-L2-7 |
| FIDELITY & TRUST, S.A. and d/b/a | § | CASE NO. 95-22390-L2-7 |
| FIDELITY & TRUST, Ltd., | § | |
| Debtors | § | |
| | § | |
| | § | |
| | § | RECEIVED |
| ANTHONY JUAREZ, Trustee | § | MAR 2 9 |
| Plaintiff, | § | P+O |
| | § | 356 001 |
| vs. | § | |
| | § | ADVERSARY NO. 97-2146 |
| REGINALDO RAMON SANCHEZ | § | |
| JESUS M. CANTU | § | |
| DEL RIO BANK AND TRUST COMPANY, | § | |
| Debtors. | § | |

FINDINGS OF FACT AND CONCLUSIONS OF LAW SUPPORTING
DISMISSAL OF COMPLAINT AS TO FALCON BANK AND DEL RIO BANK

The issue presented in these motions is whether a chapter 7 bankruptcy trustee may pursue civil RICO and related claims against two banks when (i) the bankruptcy Debtors (Plaintiffs) were the perpetrators of the alleged illegal activity, (ii) over four years have elapsed since the bankruptcy cases were filed and two years have elapsed since this adversary proceeding was filed without any material progress in prosecution of the case by the Trustee, (iii) the Trustee has no information or indication that the banks violated any law or duty to the bankruptcy estate, and (iv) the Trustee has no right to bring this action other than the fact that creditors of the estate were allegedly injured by the actions of the bankruptcy Debtors. For reasons set forth in more detail below, the Court concludes that the Trustee's complaint against the banks fails to state a claim on which relief can be granted.

### Summary

On September 19, 1995, three involuntary chapter 7 bankruptcy petitions were filed against Jesus Cantu, individually and in assumed names under which he allegedly operated. The cases were consolidated and on October 31, 1995, Anthony Juarez ("Trustee") was appointed as the bankruptcy



EXHIBIT

trustee of all three bankruptcy estates. For purposes of the pending motions in this adversary proceeding, it is undisputed that Cantu was operating a Ponzi scheme in which he obtained "deposits" from Mexican citizens. Cantu utilized assumed names which were deceptively similar to bank names: Continental Charter Bk. & Trust, Ltd., Fidelity & Trust, S.A., and Fidelity & Trust, Ltd. The Trustee informs the Court that Cantu ("Debtor") is now incarcerated in a federal institution, convicted of federal crimes related to these activities.

In 1997, two years after his appointment, the Trustee filed this adversary proceeding against the Debtor and his alleged accomplice Reginaldo Sanchez, who is allegedly a citizen and resident of Mexico. For over 10 months, there was no apparent progress in the prosecution of this case.

In October 1997, the undersigned judge was assigned responsibility for bankruptcy cases in the Laredo division of this Court. Soon thereafter, the Court undertook routine review of all cases in which there had not been significant progress in prosecution of the cases. On June 11, 1998, the Court issued an order to show cause why this adversary proceeding should not be dismissed for want of prosecution. A flurry of activity followed.

On July 1, 1998, the Trustee filed a First Supplemental Complaint and Application for Writs of Sequestration, Attachment, and Garnishment. After numerous revisions to meet the statutory requirements, the Court issued orders for attachment of funds belonging to the Debtors or Sanchez that might be on deposit in various banks. The attachment orders were not requested until three years after the filing of the bankruptcy case, however, and therefore it is not a surprise that no material amount of funds was still on deposit in the accounts.

In addition to seeking attachment of funds belonging to the Debtor and Sanchez, the First Supplemental Complaint added four banks as additional defendants. Although the Original Complaint and First Supplemental Complaint are very long,[1] only if one parses the allegations very carefully does it become clear that the allegations against the banks are minimal, at best. In fact, the length of the pleadings and their rambling, "Ernest Hemingway"[2] style hinder rather than help

---

[1]The Original Complaint and First Supplemental Complaint (with supplemental affidavits) are over 50 pages long. In addition, the Trustee has filed numerous briefs with supporting material which the Court has considered in determining whether the Trustee has stated a complaint on which relief can be granted. In total, the Court has carefully read over 70 pages of material in which the Trustee tries to set forth his complaint.

[2]When challenged on the style of his pleadings and his failure to limit his complaint to "a short and plain statement of the claim" (FED.R.CIV.P. 8(a), FED.R.BANKR.P. 7008), Trustee's counsel responded: "People do complain about counsel's pleadings sometimes . . . people complain of the style for different reasons: Being punchy. Short sentences. Repeated short sentences. Interjections – dashes. Exclamation points! Keeping the judge awake when he

one to understand the nature of the Trustee's allegations.⁵ Therefore, the Court has reviewed and analyzed the allegations carefully as they apply specifically to the banks, but the Court attaches that analysis as Exhibit A to this opinion rather than including it in the body of this opinion.

In this part of the opinion, the Court analyzes the Trustee's contentions on a macro level. In Exhibit A, the court analyzes the Trustee's specific contentions with respect to the banks. The essence of the Trustee's allegations are:

1.    **Original Complaint** (filed August 12, 1997)
   a.    Jesus CANTU ("Debtor") used several assumed names that deceived depositors into "investing" over $8 million. The assumed names implied that the businesses were banks, but they were not. The assumed names under which the Debtor operated are also "Debtors."
   b.    The transactions were part of a fraudulent Ponzi scheme operated by the Debtors.
   c.    Beginning in 1994, some of the money (which was held in Debtors' account at Falcon Bank) was transferred.
      i.    About $4.6 million was wire transferred on order of the Debtors from their account in Falcon Bank to Swiss Bank Corporation in New York, and credited to the account of Banca Serfin. These funds were allegedly transferred to the account of Banca Serfin in New York so that Sanchez "could put them in his Swiss bank account."
      ii.    About $1.8 million was wire transferred on order of the Debtors from their account in Falcon Bank to Del Rio Bank and credited to Sanchez's account at Del Rio Bank. The funds were transferred to Del Rio because Del Rio is a border town and therefore the transfer would facilitate "Sanchez's efforts

---

reads the stuff. Colorful similes. Clear pictures . . . counsel tries to write like Hemingway."

⁵The bank defendants in this case complained that the Trustee's Complaint and First Supplemental Complaint were so lengthy, but unfocused, that it was difficult to understand the Trustee's contentions, much less to formulate a concise motion to dismiss for failure to state a claim. The essence of the Trustee's response is that it is absurd to contend that his pleadings are both too prolix and at the same time to contend that they do not contain sufficient particulars. In this response the Trustee is clearly wrong; just because a document is long does not mean that it is sufficient. The Court of Appeals for the Fifth Circuit put it most succinctly: "A complaint can be long-winded, even prolix, without pleading with particularity. Indeed, such a garrulous style is not an uncommon mask for an absence of detail." *Williams v. WMX Technologies, Inc.*, 112 F.3d 175 (5ᵗʰ Cir. 1997).

to export them back to Mexico."[4] Sanchez later withdrew the funds from Del Rio Bank.

      iii.    The Trustee attached to his complaint copies of the applicable documents. Therefore it is obvious that the Trustee had copies of the applicable documents at least as early as August 12, 1997.

  d.    In the Original Complaint, the Trustee sought only a judgment to recover the funds from Sanchez and Cantu (who are the only defendants in the Original Complaint) as preferential transfers or fraudulent transfers.

  e.    The Trustee also alleges that Sanchez is "involved in the drug trade . . . for which he is a money man, laundering funds . . . Further demonstrating the nature of Defendant Sanchez's business, on information and belief, [the Trustee alleges that Sanchez's] brother washed up in the Rio Grande river . . . the body cut into pieces and put into plastic bags, the evident result of a gangland hit. Defendant Cantu accepted funds from Defendant Sanchez in cooperation with his intent to launder funds. The conduct of the two defendants constituted 'racketeering activity' . . .."

  f.    "The business of the debtors, as controlled by Mr. Cantu – or the business of the debtors with the other Defendant, Mr. Sanchez – was the racketeering enterprise . . . . Mr Sanchez controlled Mr. Cantu's actions on his behalf by express or implicit threats of physical violence, not mere battery, but extreme threats such as of death or serious bodily injury." The Trustee never really makes clear whether he is accusing the Debtors of laundering drug money or operating a Ponzi scheme or both. The Court's best understanding is that the Trustee is principally alleging a Ponzi scheme, with the drug allegations added for dramatic impact.

2.    <u>First Supplemental Complaint</u> (as noted, no progress was made in prosecution of this adversary proceeding for 10 months after the complaint was filed, until after June 11, 1998, when the Court issued an order that the case would be dismissed for want of prosecution unless Plaintiff took effective action to prosecute the case. After issuance of that order, the Trustee filed this First Supplemental Complaint on June 24, 1998). The material and relevant allegations of that First Supplemental Complaint are:

  a.    To add four banks as defendants: (Falcon National Bank, Banca Serfin, Swiss Bank Corporation, and Del Rio Bank);

  b.    To seek attachment and sequestration of any funds in the Defendant Banks that are held in accounts for the Debtors or Sanchez;

  c.    To allege that the Defendant Banks are liable to the Trustee in bankruptcy:

      i.    For assisting the Debtors in breaching their fiduciary duties to creditors of the bankruptcy estate;

      ii.    For breach of contract–(that by handling a transfer of funds from the Debtors

---

[4]There is no explanation of why proximity to Mexico assisted the expatriation of the money (with respect to Del Rio Bank) when Sanchez allegedly moved most of the money through Switzerland.

to Banca Serafin and Sanchez, Falcon Bank and Del Rio Bank warranted "to other persons interested in the transaction" that "the transfer was in fact rightful and that no claim or defense or any party was good as against them").

ii.    Then there is a curious allegation. Trustee alleges that "To the extent that Plaintiff achieves a recovery under civil RICO, as pled in the Original Complaint, the Banks owe for treble damages, or $19.632 million. Reasonable attorneys fees for this award should be another $19.632 million."

(1)    This allegation is curious because it does not say _why_ the banks would be liable under RICO. There is no allegation that the banks conspired with the Debtors in a racketeering enterprise. There is not even an allegation that the banks had any actual knowledge or notice that the Debtors were engaged in a Ponzi scheme or that Sanchez was involved in illegal drug activity.

(2)    However, after considering the entire complaint and all associated briefs and argument of counsel (which the court has reread twice from a transcript) the Court concludes that what Trustee's counsel is _trying_ to say is that the banks _should have known_ that the transfers were somehow related to illegal activity because:

(a)    The transactions involved large amounts of money;

(b)    Transfers of large amounts of money are inherently suspicious and ought to be investigated;

(c)    The banks _should have been suspicious_ because the Debtors were not wealthy enough to make large transfers;

(d)    The wire transfers did not contain clear information about who was the ultimate beneficiary

(3)    The essence of the complaint is that the banks _should have known_ that the Debtor and Sanchez were criminals, and therefore the banks are strictly liable for having made transfers of funds as directed by their depositor, the Debtors. Although this is not an allegation of conspiracy, for purposes of the present motions the Court will treat it as tantamount to an allegation of conspiracy.

Del Rio Bank and Falcon Bank (the "Moving Banks") filed motions to dismiss the complaint for failure to state a claim on which relief can be granted. The Court held a hearing on the motions and gave counsel substantial additional time to submit post-hearing briefs. After exhaustive review, the Court will grant the banks' motions and dismiss the complaint as to them for several reasons.

Since these are motions to dismiss under FED.R.CIV.P. 12(b)(6), the Trustee's allegations will be taken as true.

However, "[i]n order to avoid dismissal for failure to state a claim, a plaintiff must

P:\DRAFTS\972146 Opinion Dismissing Case.wpd
990325.1452
Page 5

plead specific facts, not mere conclusory allegations . . . 'And, [c]onclusory allegations and unwarranted deductions of fact are not admitted as true' by a motion to dismiss."[3]

## Lack of Standing:

The Trustee's meandering, inflammatory, verbose pleadings mask a very simple defect. The Trustee (as bankruptcy trustee for the Debtors, bank depositors) is suing the banks for honoring the Debtor's instructions to transfer funds that were on deposit in the Debtor's name. The transfers were made prepetition, so there was no bankruptcy impediment to the transfer. The funds had been collected and were on deposit. The contract between the Debtors and the banks required the banks to honor transfer orders given by the Debtors. The transfer orders were given in proper form by authorized persons. The Trustee does not allege that the transfers were not properly authorized by the Debtor. The Trustee is not alleging that the transfers were not made to the party to whom the Debtor ordered the funds to be transferred. The Trustee is not alleging that the banks received any of the funds, only that they honored checks and wire transfers.

A trustee in bankruptcy may pursue all claims that belong to the bankruptcy estate.[6] Even assuming that the banks are liable to the creditors of the bankruptcy estate, that does not mean that the trustee of the estate in bankruptcy may assert these claims against the banks on behalf of the creditors. The Court of Appeals for the Fifth Circuit in *In re Educators Group Health Trust (Schertz-Cibolo Universal Independent Schools District v. Wright)*[7] announced the test for determining whether a bankruptcy trustee may bring an action on behalf of the estate or whether the claim belongs exclusively to the creditors of the estate who must bring the claim (against the banks) directly.

This case requires that we decide whether the bankruptcy court erred in determining whether certain causes of action are property of the estate. For our purposes, property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1) (1988). The term "all legal or equitable interests" has been defined broadly to include causes of action. *See Louisiana World Exposition v. Federal Ins. Co.*, 858 F.2d 233, 245 (5th Cir. 1988) ("Section 541(a)(1)'s reference to 'all legal or equitable interests of the debtor in property' includes causes of action belonging to the debtor at the time the case is commenced."); *In re Mortgage America Corp.*, 714 F.2d 1266, 1274

---

[5] *Guidry v. Bank of LaPlace*, 954 F.2d 278 (5th Cir. 1992) (citations omitted).

[6] 11 U.S.C. § 323.

[7] 25 F.3d 1281, 1283-25 (5th Cir. 1994).

(1983) (noting that the meaning of the term "all legal or equitable interests" includes, at the very least, rights of action). If a cause of action belongs to the estate, then the trustee has exclusive standing to assert the claim. *See Matter of S.I. Acquisition, Inc.*, 817 F.2d 1142, 1153-54 (5th Cir. 1987) (observing that the "general bankruptcy policy of ensuring that all similarly-situated creditors are treated fairly" requires that the trustee have the first opportunity to pursue estate actions without interference from individual creditors); *see also In re E.F. Hutton Southwest Properties II, Ltd.*, 103 B.R. 808, 812 (Bankr.N.D.Tex. 1989) ("If an action belongs to the estate, the trustee has the power and duty to prosecute the action for the benefit of all creditors and shareholders in the estate."). If, on the other hand, a cause of action belongs solely to the estate's creditors, then the trustee has no standing to bring the cause of action. *See Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 433-34, 92 S.Ct. 1678, 1688, 32 L.Ed.2d 195 (1972) (holding that a trustee does not have standing to sue a third-party on behalf of debenture holders); *In re Rare Coin Galleries of America, Inc.*, 862 F.2d 896, 900 (1st Cir. 1988) ("The trustee, however, has no power to assert any claim on behalf of the creditors when the cause of action belongs solely to them.").

Whether a particular state cause of action belongs to the estate depends on whether under applicable state law the debtor could have raised the claim as of the commencement of the case. *See S.I. Acquisition*, 817 F.2d at 1142 (examining the cause of action premised on alter ego under Texas law); *Mortgage America*, 714 F.2d at 1275-1277 (examining the causes of action based on the Fraudulent Transfers Act and "denuding the corporation" theory under Texas law). As part of this inquiry, we look at the nature of the injury for which relief is sought. *See E.F. Hutton*, 103 B.R. at 812 ("The injury characterization analysis should be considered as an inseparable component of whether an action belongs to the [estate] or individual [creditor]."). If a cause of action alleges only indirect harm to a creditor (i.e., an injury which derives from harm to the debtor), and the debtor could have raised a claim for its direct injury under the applicable law, then the cause of action belongs to the estate. *See, e.g., S.I. Acquisition*, 817 F.2d at 1152-53 (concluding that an action based upon alter ego property belongs to the estate, where (1) the debtor could have pierced its own corporate veil under Texas law; and (2) the debtor was unable to meet its corporate obligations due to the misuse of the corporate form, causing a derivative injury to the individual creditor); *Mortgage America*, 714 F.2d at 1275 (concluding that an action under the Fraudulent Transfers Act properly belongs to the estate, where (1) the debtor could have brought the action to recover its assets; and (2) the debtor is stripped of assets, causing a derivative injury to the individual creditor). Conversely, if the cause of action does not explicitly or implicitly allege harm to the debtor, then the cause of action could not have been asserted by the

debtor as of the commencement of the case, and thus is not property of the estate.[6]

In this case, the Trustee has asserted no direct harm to the Debtors. The Debtors were the parties who allegedly perpetuated the fraud. The Debtors were not harmed by the alleged conduct. It is the Debtors' creditors who were harmed. The Trustee has cited no authority for the proposition that the Debtors, prepetition, had a claim against the banks. Under those facts, the Fifth Circuit test would reserve the claim to the creditors, not to the Trustee. Therefore, the Trustee has no right to assert any claims against the Banks whether the claims are asserted for fraud, assisting a breach of fiduciary duty, breach of contract, civil RICO, or anything else relating to this Ponzi scheme.

The Trustee has cited authority for the proposition that a trustee in bankruptcy has the authority to recover fraudulent transfers. That proposition is beyond cavil. The Trustee is not alleging that any funds were transferred to the banks. The Trustee is alleging that the banks merely cleared wire transfers and checks by which the Debtor transferred money to Sanchez.

Since the Trustee has no right to assert any claim against the banks based on the alleged facts, the Court need not address the substantive issues in the various actions asserted. However, for completeness, the Court will address those issues.

### Failure to State a Claim for Fraud, Breach of Contract, or Breach of Fiduciary Duty:

The Trustee has alleged simply that transfers of funds were processed by banks. There is no allegation that the banks had any knowledge of wrongdoing. There is no allegation that there was any relationship between the banks and the Debtors except for a generic depositor/bank relationship. There is no allegation of any relationship (social, business, or other) between the Debtors and the bank or between the Debtors and any bank personnel. There is no allegation of any lending, trust, or other relationship (other than the deposit relationship) between the banks and Debtors or between the banks and the creditors of the estate. Indeed, there is no allegation that the banks even suspected that these Debtors had any creditors. There is no allegation that the banks directly benefitted in any way from the transfers. There is no allegation that any of the money allegedly fraudulently obtained from Mexican nationals was used to pay any of the Debtors' loans to the bank or to pay any obligation of any kind to the banks or to any party related to the banks. The best argument that the Trustee can muster is that the banks should have known that wrongdoing was involved because large amounts of money were involved.

The Trustee contends that a bank has a duty to investigate all large transactions and that a bank has something approaching strict liability if it does not. Despite repeated requests from the Court to cite authority for that position, the principal authority cited by the Trustee is the expertise of its own counsel. Counsel attached to his memorandum his own thirty five page law review article

---

[6]*Id.* at 1283-25.

entitled "The Scientific Method in Legal Thought: Legal Realism and the Fourteen Principles of Justice." The Court was unable to find in that attachment any authority that is persuasive on the issues at hand. The Trustee's counsel also states in his memorandum:

> Trustee's counsel is a former law professor and taught banking law for twelve years, and is aware that the FDIC insists that banks examine all large transactions in which a large deposit is made and in a short period of time the money is withdrawn from the bank. Last time Counsel looked, a year or two ago, transactions of $25,000 or more were sufficiently 'large' to call for such scrutiny.

The memorandum cited no more persuasive authority: nothing in the statutes, Federal Register, or reported decisions. The Court is not persuaded by the memorandum.

The Trustee relies on *Federal Sav. & Loan Ins. Corp. v. Kearney Trust Co.*[9] for the propositions (i) that a bank "pays at its peril" if the institution is shown as the payee on a writing but someone else is actually intended to get the credit, and (ii) that this is a federal rule applicable to all banking institutions connected with the FDIC. The case does not stand for the propositions cited. First, in *Kearney*, the court did not apply a federal rule of substantive law because the payee bank was a member of the FDIC. The court in *Kearney* applied a federal rule because the maker of the check was a savings and loan association (S&L) chartered under an act of Congress. (There is no allegation that Cantu or his d/b/a's were federally chartered.) Second, the facts in *Kearney* are significantly different from any alleged in this case. In *Kearney*, the savings and loan association was small, operated by only two people, but it was a federally chartered institution, owned by its depositors. The officers of the S&L (Wilson) and his sister-in-law were the only officers and employees. The officers of the defendant bank, Kearney Trust, knew that Wilson personally owned farms near their town and that Wilson needed personal bank accounts and funds to operate those farms. Wilson told Kearney's officers that he was going to write checks on the S&L, payable to the defendant (Kearney Trust), but that the checks should be deposited into Wilson's personal account, not into an account for the S&L. After direct discussion of these facts, officers of Kearney agreed to handle the transactions in this way.

These facts are quite different from the allegations in this case. The court in *Kearney* did not hold that a bank pays at its peril. The *Kearney* court held that, after being told by the president of the S&L that association money was to be deposited in his personal account, Kearney Trust was under a duty to investigate whether the president of the association was indeed authorized to appropriate these funds to himself. The bank had this obligation because the representation was suspicious on its face.

> [D]efendant relied solely upon Wilson's representations at its peril, because although

---

[9]151 F.2d 720 (8ᵗʰ Cir. 1945).

Wilson was president of the association he was acting outside the ostensible scope of his agency in directing that checks made payable to the defendant should be credited to his personal account.[10]

The *Kearney* court did not impose strict liability on the defendant bank. The *Kearney* court merely held that, in these suspicious circumstances, the defendant bank should have asked the board of directors of the S&L whether Wilson (president of the S&L) had authority to pay these funds into his personal account. The clear indication is that if Wilson had such authority, the bank would have had no liability. In fact, in a virtually identical case involving the same S&L and its president, Wilson, the 8th Circuit found that the defendant bank had no liability on the same fact pattern because Wilson had authority to make the checks payable to himself.[11] Obviously, *Kearney* does not stand for the strict liability principle for which Trustee cites it.

In the case at bar, there is no allegation that the Debtor did not have the authority to transfer the funds or that the banks did not transfer the funds as directed. There is no allegation that the funds belonged to a federally chartered corporation for whom the Debtors were merely agents. There is no allegation that the banks had actual notice of probable lack of authority to transfer funds. Therefore *Kearney* is simply not on point.[12]

There is no allegation in the Trustee's Original Complaint or in the First Supplemental Complaint that the funds in the bank accounts were not collected and available for transfer merely upon order of Cantu. There is no allegation that the transfers were not properly authorized. There is no allegation that these were corporate funds misappropriated by an officer. There is no allegation that there was some authority such as a board of directors of whom the defendant banks had notice and opportunity to inquire.

The Court has, on its own, attempted to locate authority for the proposition that banks are strictly liable for processing transfers of funds that are in some way related to the depositor's improper conduct. Although the Court cannot represent that it has thoroughly researched the issue, the only authority that the Court could find involves transactions in which the bank made a profit on the transaction (beyond mere transaction fees and/or deposit benefits) or had some relationship to the transaction beyond simply being a depository bank.[13] There is no allegation in Trustee's

---

[10]151 F.2d at 727.

[11]*Fed. Sav. & Loan Ins. Corp. v. First Nat. Bank, Liberty, Mo.*, 164 F.2d 929 (8th Cir. 1948).

[12]*See also Pettigrew v. Citizens Bank Trust*, 229 B.R. 39 (N.D. Ga. 1998).

[13]The Trustee has cited *Grebe v. First State Bank of Bishop*, 150 S.W.2d 64 (Tex. 1941) for the proposition that banks have a duty not to assist other persons in violation of fiduciary

pleadings of any such facts.

In fact, the Trustee seems to concede that he has no indication that the banks had any hint of wrongdoing. The Trustee's memorandum makes it clear that he is simply hoping that if he is allowed enough discovery, he might find something incriminating in a deposition or in the bank's files.

> Why wouldn't Trustee be entitled to see if maybe Del Río's sticking its head into the sand was ineffectual? Maybe its officers read the newspaper, or listened to the television news. Maybe it discovered UNOFFICIALLY what it claims it never had a duty to look at officially. Actual knowledge can be acquired other than just by looking at the face of a negotiable instrument (or a bankwire record). Some people live in a community, and hear what is going on.[14]

FED.R.CIV.P. 9(b) requires that fraud be pleaded with particularity. Despite the verbosity and histrionics in the Trustee's pleadings, the principal arguments on which the Trustee rests are: (i) the bank should have been suspicious, and (ii) the Trustee is entitled to extended discovery to find some germ of evidence that might convince someone that the banks had constructive knowledge of wrongdoing. That is not enough to meet the requirements of the federal rules.[15]

Our reverential treatment of the large achievements of the 1938 rules may not have

---

duties to third parties. *See* Plaintiff's First Supplemental Complaint and Application for Writs of Sequestration, Attachment, and Garnishment at 13 (Docket # 12). However, the *Grebe* court made clear that actual knowledge was required to trigger this duty. Indeed, the court stated the rule in Texas is as follows: "If the bank has notice or knowledge that a breach of trust is being committed by an improper withdrawal of funds, or if it participates in the profits or the fruits of fraud, then it will be undoubtedly liable." *Id.* at 68. *See also Mauriceville Nat. Bank v. Zernial*, 892 S.W.2d 858 (Tex. 1995) (per curium)(recognizing that when a depositor deposits funds into a bank account, the funds remain unrestricted and holding that absent an express creation of a trust, a bank is entitled to utilize the funds to set off debts of the depositor despite banks knowledge of claims to the funds asserted by third parties). *Dinagan v. Bushey*, 263 S.W.2d 148, 153 (Tex. 1953) only finds liability when the bank appropriates the funds to itself ("where a bank receives the proceeds the rule of law is that the bank is liable if it permits the depositor to withdraw funds held in trust and to apply such funds to the payment of such depositor's obligations to the bank").

[14]Trustee's Original Brief Answering Del Rio Bank & Trust's Motion and Brief to Dismiss (docket # 29) P. 6.

[15]*Williams v. WMX Technologies*, 112 F.3d. 175.

fully counted its price, or at least the price over time seems to have gone up as pretrial process dwarfs actual trials. We do not fully understand the extent of these difficulties or their cause. It does remain clear that ready access to the discovery engine all the while has been held back for certain types of claims. An allegation of fraud is one. Rule 9(b) demands a larger role for pleading in the pre-trial defining of such claims.

That said, the requirement for particularity in pleading fraud does not lend itself to refinement, and it need not in order to make sense. Directly put, the who, what, when, and where must be laid out before access to the discovery process is granted. So today we neither set springs for the unwary nor insist on "technical" pleading requirements. We remind that this bite of Rule 9(b) was part of the pleading revolution of 1938. In short, we apply the rule with force, without apology. At the same time, we read Rule 9(b) as part of the entire set of rules, including Rule 8(a)'s insistence upon "simple, concise, and direct" allegations. Relatedly, while 9(b) stands as an exception to an overarching policy of immediate access to discovery, it did not reflect a subscription to fact pleading.

The inferior courts have emphasized that Rule 9(b)'s ultimate meaning is context-specific. When a limitation period looms large and the context strongly suggests that claimed "fraud" walks close to non-actionable expression of opinion, 9(b) takes on especial force. Finally, we must not dim the beacon of Rule 8(f) that "all pleadings shall be construed as to do substantial justice." We must give a fair opportunity to plead.

A complaint can be long-winded, even prolix, without pleading with particularity. Indeed, such a garrulous style is not an uncommon mask for an absence of detail.[16]

With respect to breach of contract, the Trustee does not clearly indicate what contract he is talking about. The Trustee asserts that by clearing negotiable instruments and making wire transfers, the banks warranted that "the transfer was in fact rightful and that no claim or defense or any party was good as against them." The Trustee cites no section of the Uniform Commercial Code as authority. The Court is not sure what a "rightful" transfer is, and the Court is unaware of any defense that is or could be asserted to the transfer. There is no allegation that there were not sufficient funds on deposit in the bank and there is no allegation that the transfers were not properly authorized. The Court has not been cited to any contract between Debtors and the banks that was breached by the banks.

---

[16] *Id.*

The Trustee has alleged a number of other wrongs, including assistance in breach of fiduciary liability, conversion, *etc.* It is never quite clear whether the Trustee is making these allegations as to Cantu and Sanchez, or as to the banks, or both. Regardless, the pleadings are not sufficient. The Trustee does not allege that the banks even knew that the Debtors had creditors, nor is there any allegations that fiduciary obligations existed between the Debtors and their creditors or between the banks and Debtors' creditors. Much less is there any allegation that the banks consciously assisted the Debtor in violating fiduciary duties or converting assets of the Debtors' creditors.

Therefore, the Trustee has failed to state a claim for fraud or breach of contract, fraud, or assistance in breach of fiduciary duties and conversion.

## Violations of Racketeer Influenced Corrupt Organizations Act (RICO)[17]

The allegations with respect to Falcon Bank and Del Rio Bank are, essentially, that they processed wire transfers and payment of checks for the Debtor and Sanchez, who were operating an illegal Ponzi scheme.

RICO[18] prohibits: (i) investment of proceeds of racketeering activities in interstate commerce; (ii) obtaining control of activities in interstate commerce through racketeering activities; (iii) any person employed by or associated with an interstate commerce activity to conduct that activity through a pattern of racketeering activity; and (iv) conspiracy to violate the first three proscriptions. Civil redress for violation of RICO is the authority of any person injured by a RICO violation to sue for damages.[19]

There are any number of reasons why the Trustee fails to state a RICO claim on which relief can be granted. First, as noted earlier, the Trustee has no authority to assert claims that belong to creditors of the estate. The Trustee can only bring claims that belong to the estate itself. Therefore, whatever claim the Trustee is trying to assert, the Trustee is representing the Debtors. But Debtors were the wrongdoers. They were not the victims. Perpetrators of a RICO crime may not sue their colleagues for RICO civil damages.[20]

---

[17] 18 U.S.C. § 1961 *et seq.*

[18] 18 U.S.C. § 1962.

[19] § 1964.

[20] *In re Hunt*, 149 B.R. 96 (Bkrtcy.N.D.Tex. 1992); *Lopez v. Dean Witter Reynolds, Inc.*, 591 F.Supp. 581 (N.D. Cal. 1984); *See also, Loren E. Kalish, Plaintiffs in Complicity: Should There Be An Innocent Party Requirement for Civil RICO Actions?*, 47 Emory Law Journal 785 (1998).

Second, the Trustee has alleged no damages to the Debtors estates. The Debtors allegedly were the felons, not the victims. The Debtors were enriched by their alleged crime, not impoverished.

Third, none of the RICO proscriptions have been alleged. There is no allegation that the Banks received any proceeds of racketeering activities, much less invested them or controlled racketeering activities. There is no allegation of a conspiracy involving the banks. The only conceivable relationship of the banks to a RICO claim would be that the banks were somehow associated with the racketeering activity because they executed wire transfers and cleared checks on order of the enterprise. But the Fifth Circuit has held that this allegation, without more, is not enough.[21]

Therefore, the Trustee has failed to state a claim under civil RICO.

Opportunity to Amend the Pleadings:

There are a number of reasons why the Trustee will not be given an opportunity to amend his complaint to attempt to cure its defects as set forth above:

1.     First, the Trustee has not requested such an opportunity and apparently does not want one. The Court has held a number of hearings in this matter, and has suggested at several of them that the Trustee should carefully respond to the 12(b)(6) motions. On November 5, 1998, in particular, upon granting the Trustee's motion to employ special counsel in this matter, the Court advised special counsel that a 12(b)(6) motion was pending, that the Court had reviewed the motion, and that counsel should treat the motion seriously because it appeared to have merit. In the four months since then, the Trustee has not asked for permission to amend. In fact, the Trustee has cavalierly dismissed any suggestion that the complaint could or should be amended:

> They got all the data we have! Do we have to INVENT things to plead fraud with particularity? Are we supposed to speculate on Mr. . . . Sanchez's thoughts and put them down verbatim? . . . [W]e haven't even alleged the BANKS were the ones committing the fraud, just that they should have known these guys were committing fraud, and not lent their facilities to them for doing it.[22]

---

[21]*Guidry v. Bank of LaPlace*, 954 F.2d 278 (5th Cir. 1992).

[22]Trustee's Original Response Answering Falcon National Bank's Motion and Brief To Dismiss (docket # 30) p. 4.

Finally, in his Trustee's Third Brief Concerning Motions to Dismiss . . . " (docket #40), the Trustee states: "Nothing would really be improved by requiring a repleading."

2.      Second, the Court concludes, as a matter of law, that the Trustee cannot amend to cure the deficiencies in the complaint because the Trustee does not have a right to bring the claim. The Trustee does not have the right to assert actions that belong to the creditors and that are not property of the estate. The claims asserted in this adversary proceeding against the banks (if they are valid) belong to the creditors of the estate.

3.      Third, these bankruptcy cases were filed 3½ years ago. The Trustee has had access to all of the Debtors documents, such as they are, for 3½ years. The Trustee has also had access to FRBP 2004 for 3½ years to discover any facts known by third parties (including banks). This adversary proceeding was filed over 1½ years ago. The Trustee has had access to federal rules of discovery since then to find facts indicating liability. The Trustee will not be allowed additional time.

4.      Finally, after careful consideration of the pleadings filed by the Trustee, the Court will use its inherent authority over the Trustee to deny him the authority to prosecute what appears to be frivolous actions against the banks.

## Conclusions:

By separate order issued this date, the claims against Falcon Bank and Del Rio Bank are dismissed for failure to state a claim on which relief can be granted.

## Warning of Possible Future Imposition of Sanctions:

The Court recognizes the right of counsel to argue nuances and multiple interpretations of existing law. The Court further recognizes the right of counsel to make nonfrivolous arguments for the extension, modification, or reversal of existing law or the establishment of new law. Finally, the Court recognizes counsel's right and duty to provide zealous and effective advocacy.

Nevertheless, the proper functioning of the legal system requires a certain degree of civility and respect for opposing counsel and for the adjudicatory process. In addition, FRBP 9011 prohibits assertion of frivolous or unsubstantiated claims. The Court is hereby warning Colin Kaufman, counsel for the Trustee, that he has crossed the line in this case. In the following paragraphs, the Court will address separately the issues of (i) respect for the process and for opposing counsel, and (ii) frivolous claims.

Civility and respect are demanded by this Court simply as proper conduct before a federal court. From time to time, if counsel appear to cross the line, the Court usually does nothing more than verbally to remind counsel to act appropriately. However, the Trustee's pleadings in this case

cross the line in a more egregious way. The Court finds Trustee's counsel's pleadings (especially his memoranda of authorities) in this case to be dissembling, inflammatory, sophomoric, and generally inappropriate.

These defects cause (at least) two serious consequences. First, the Court wastes time trying to understand the dissembling argument in the pleading and is distracted from the true nature of the controversy. This Court has read and reread the complaint. The Court is still not sure exactly what Complainant is alleging. The Court has done the best it can to synthesize a "shotgun blast" of allegations in order to determine whether a claim has really been stated. In addition, counsel cites authorities as standing for propositions far beyond their reasonable interpretation. While this kind of verbal repartee might have worked well for counsel in his career as a law professor, more candor is appropriate in legal memoranda.

Second, and much more important, inflammatory comments directed at opposing counsel inevitably result in an escalation of hostilities, a result that is injurious to all. In its Order of Adoption of the Texas Lawyer's Creed—A Mandate for Professionalism,[23] the Supreme Court of Texas wrote: "These rules are primarily aspirational. Compliance with the rules depends primarily upon understanding and voluntary compliance, secondarily upon re-enforcement by peer pressure and public opinion, and finally when necessary by enforcement by the courts through their inherent powers and rules already in existence." This Court believes that it has the inherent authority to reprimand a lawyer whose pleadings are so dissembling and disrespectful to his adversary that the sarcasm and invective distract from the proper business of the Court.

The following examples are found in the Trustee's Original Brief Answering Del Rio Bank & Trust's Motion and Brief to Dismiss (docket #29) and Trustee's Original Response Answering Falcon National Bank's motion and Brief to Dismiss (docket #30). However, the Court would characterize virtually all of Trustee's counsel's pleadings as similar.

Del Rio Bank's motion to dismiss made a very straightforward argument: that the Trustee had alleged illegal activity by Cantu and Sanchez, but had alleged no wrongdoing by Del Rio and no breach of any legal duty applicable to Del Rio. Del Rio's memorandum discussed at some length the statutory and jurisprudential definitions of duties applicable to the claims that Trustee was purporting to assert, concluding that there was no allegation of a breach of any duty applicable to Del Rio. Therefore, Del Rio argued, the complaint against Del Rio should be dismissed for failure to state a claim on which relief could be granted.

The Trustee's response was sarcastic, inflammatory and grossly mischaracterized Del Rio's motion. The Trustee asserted that Del Rio had argued: "... [E]ven if their customers are criminals,

---

[23]Adopted by Order of the Supreme Court of Texas November 7, 1989, *reprinted in* TEXAS RULES OF COURT-STATE, 505 (West 1998).

they don't owe anyone a duty to stop helping these criminals take advantage of innocent members of the public . . .. They can offer their services as a facility for people who are doing money laundering, and defrauding innocent members of the public, and no matter what, nobody can stop them."[24] Del Rio never suggested any such thing. In addition, although this specific example is merely a waste of time for the Court to read, other similar (but less obvious) incorrect characterizations by Trustee's counsel required hours for the Court to examine, analyze, and interpret.

Falcon Bank's motion placed its emphasis more on the Trustee's failure to state fraud and RICO claims with sufficient specificity. To this, the Trustee again replied with sarcasm, gross overstatement, and inflammatory rhetoric.

"Falcon National Bank . . . makes its motion to dismiss based on a simple proposition: The theory of "notice pleading" followed in federal courts for the last fifty years doesn't apply to them. They are not governed by little things like the rules of pleading that apply to everyone else. It doesn't matter what we plead. It doesn't matter what we told them. It doesn't matter . . . [and the diatribe goes on *ad nauseam*] . . . They still get to dismiss the claims because they didn't like the way RICO was pled. That's it. No motion for more definite statement. No nothing. They get to go home because, even though they know exactly what happened, and why *it is allegedly a civil wrong* for which they owe damages, some alleged technical requirements for recovery (quite obviously met and satisfied on the FACTS) are not sufficiently set out in the PLEADINGS."[25]

It is not fair to opposing counsel to subject them to this kind of invective and to expect them to respond with civility, respect, and professionalism.

Therefore, Colin K. Kaufman, counsel for the Trustee, is hereby admonished to conduct himself in all future litigation before this Court in accordance with the civility and respect for opposing counsel generally required for conduct in federal courts and as articulated in The Texas Lawyer's Creed–A Mandate for Professionalism, paragraph III, including, but not limited to the requirement of courtesy in III(1), III(9), and III(10). Counsel is admonished that any repetition of such conduct will result in more severe sanctions.

In addition to uncivil posturing, Trustee's counsel appears to have admitted that his

_____

[24]Trustee's Original Brief Answering Del Rio Bank's Trust's Motion and Brief to Dismiss (docket # 29) p.1.

[25]Trustee's Original Response Answering Falcon National Bank's Motion and Brief to Dismiss (docket # 30) pgs. 1-2.

supplemental complaint was just an attempt to find a deep pocket. Counsel has made it reasonably clear that he has no evidence that the banks engaged in any conduct that makes them liable to the estate. Counsel even made it fairly clear that what he wanted was either: (i) an opportunity to find something in a deposition or discovery document that _might_ suggest suspicion, or (ii) get a settlement from the banks. In the Trustee's Third Brief, counsel wrote:[26]

> 9. <u>Offer to Do Equity.</u> "As this Court is aware, Trustee's counsel believes in settling any case that can be settled . . . [s]o they could probably pay a toe or two and get out now, if they feel the costs of trying the case are too high."

Although the Court has some concern that the allegations against the banks were filed with insufficient investigation and evidentiary support and possibly with improper motives, the Court will not consider other FRBP 9011 sanctions _sua sponte_. If such sanctions are to be considered, they will be considered only on motion of the defendant banks, after notice and hearing, and upon proper showing of the elements required for such sanctions.[27]

SIGNED March 25, 1999.

WESLEY W. STEEN
UNITED STATES BANKRUPTCY JUDGE

The Clerk shall notice:
Anthony Juarez, Chapter 7 Trustee
Colin K. Kaufman
James A. Hoffman
Don Kranse

---

[26] Trustee's Third Brief Concerning Motions to Dismiss Filed by Falcon National Bank and Del Rio Bank & Trust (docket # 40) p. 14.

[27] A motion for sanctions under Rule 11 shall be made separately from other motions or requests. The motion must be served on the opposing party at least 21 days before filing with the Court. In order to afford the opposing party notice and opportunity to withdraw or correct the challenged pleading. _Elliot v. Tilton_, 64 F.3d 213, 215-216 (5th Cir. 1995).

P:\DRAFT\972146 Opinion Dismissing Case.wpd
990325.1452
Page 18

**Exhibit A--Analysis of Allegations Specific to Falcon Bank and Del Rio Bank**

The principal part of this opinion addresses the Trustee's Complaint and Supplemental Complaint in general terms. The Court did so because attempting to address both the Trustee's overall argument and the allegations specific to Falcon Bank and Del Rio Bank made the opinion just too complicated. However, the Court has taken considerable time to analyze the allegations specific to these movant banks, and presents the following analysis of those allegations. The essential allegations with respect to the Banks are actually quite minimal, at best. The Original Complaint and First Supplemental Complaint, taken together allege:

1. The names and corporate status of the Banks;
2. That the Debtor maintained one or more accounts at the Banks;
3. That $6.544 million was "held in or passed through" those bank accounts;
4. That banks are "not permitted to assist other persons in their violation of their fiduciary duties to third persons";[28]
5. "This obligation not to assist in the breach of fiduciary duties comes . . . from membership in the FDIC or any similar scheme of federal deposit insurance";[29]
6. That
    a. "It is well-known that any institution which takes a check payable to that institution in payment of satisfaction of the obligation of someone else is ON NOTICE (sic) of any breach of fiduciary duty of other such wrongdoing being committed by that person submitting the check."[30]
    b. "It is also well-known that the mere relative size of a particular transaction can be so unusual in relation to the financial power of the transferror as to put a bank on notice that the transaction is fishy (sic), not in the ordinary course of business, and prevent it from obtaining the safe harbor of being a holder in due course."[31] The Complaint continues to allege that the Debtor was "lightly-asseted (sic) and basically broke". The Complaint does not assert that the Banks knew the Debtors' financial status. Nor does the Complaint assert that the Debtors' deposits in the Banks were not honored in accordance with ordinary banking practices. The Complaint merely alleges that "When the lightly-asseted and basically broke Jesus M. Cantu decided to transfer $4.675113 million from . . . [one of the corporate entities] to Banco Serfin for the benefit of Reginaldo Ramon Sacbeez, this was many times greater than any human being could basically have believed to be an

---

[28]First Supplemental Complaint, ¶12.

[29]Id.

[30]Id. ¶ 13.

[31]Id. ¶14.

honest transfer."

c.   There are no specific allegations of "fishy" transfers with respect to Del Rio Bank. However, the original complaint, filed in 1997, in which Del Rio Bank was not a defendant, asserts that one or more of the Debtors made a total of 26 transfers to the account of defendant Sanchez at Del Rio Bank. These transfers allegedly occurred over a period of approximately 6 months. The transfers ranged from a low of $2,630 to a high of $287,500. The average transfer was $71,120.48.[32] As noted below with respect to Falcon Bank, the Trustee asserts that these transfers were so large that they should have alerted Del Rio Bank to a pattern of illegal behavior.

d.   The only allegations with respect to "fishy" transfers related to Falcon Bank[33] are that

i.   One of the Debtors made a transfer of $4.080128 million with the notation "wire transfer". Plaintiff asserts that this was "fishy" because the legend on the check did not say "to whom" or "why" the money was to be transferred by wire. Similar allegations are made with respect to other transfers by Falcon Bank to other banks.

ii.   Although the statement of the allegation in the Complaint is verbose, the essence of the complaint is:

(1)   The document indicates a transfer to another bank but does not indicate the identity of the ultimate beneficiary of the transfer, and

(2)   "[T]he relatively enormous size of other writings[34] put the banks involved on notice that something strange was happening with the money, and they might be assisting wrongdoers."

There are no other specific allegations of activity by the Banks. From this activity (maintaining accounts and making transfers as directed by the depositor) the Complaint then alleges certain conclusions, including: (i) that the Banks were cooperating with the Debtor in certain criminal schemes, (ii) that the Banks were positively eager "to assist the wrongdoers in carrying out their schemes to defraud the public, and (iii) that accepting deposits and making transfers as directed by their depositor constituted participation in a

---

[32] See Exhibit B.

[33] Id. ¶ 14. (All of the following subparagraphs related to subparagraphs of this paragraph in the First Supplemental Complaint.)

[34] Presumably the Complaint is referring to the amount of money involved, not the actual "size of . . . writings" themselves.

racketeering activity within the purview of the RICO Act.[35]

The Trustee makes no allegation that the Debtors did not have sufficient funds on deposit to make the transfers in question. The Trustee makes no allegation that the transfers in question were not properly documented and directed by the depositor. The Trustee makes no allegation that the bank accounts were documented as trust accounts or that the Banks had any indication that any party other than the Debtor depositor had any interest in the accounts. The Trustee makes no allegation that the Banks benefitted in any way, other than the usual benefit that a bank derives from having funds on deposit.

The Trustee makes no other allegations with respect to knowledge, intent, motive, or criminal activity by the Banks. The sole sum and substance of the Trustee's allegation is that the Banks must have known that criminal activity was involved because the transactions were so large and because the ultimate beneficiary of wire transfers was not disclosed in some circumstances. The Court prepared the attached chart from the allegations of the complaint. Obviously, except for the alleged $4.6 million transfer to a Swiss Bank account, the transfers are really not that large, averaging only $71,000, and occurring over a period of about 6 months: a period too short to constitute a RICO pattern of racketeering and too long to constitute a "quick withdrawal."

---

[35] The original complaint, filed in 1997, does not name the Banks as defendants. The defendants in the original complaint are the Debtor and Reginaldo Sanchez, the Debtor's alleged partner in crime. The original complaint does, however, allege several crimes.

| | Date | Amount |
|---|---|---|
| | 10/3/94 | $251,753.00 |
| | 10/28/94 | $287,500.00 |
| | 11/4/94 | $200,000.00 |
| | 11/4/94 | $10,250.00 |
| | 11/7/94 | $50,000.00 |
| | 11/8/94 | $250,000.00 |
| | 11/8/94 | $250,000.00 |
| **Exhibit B** | 11/9/94 | $15,000.00 |
| | 11/14/94 | $150,000.00 |
| | 11/15/94 | $10,250.00 |
| **Alleged** | 11/17/94 | $2,650.00 |
| **Transfers From** | 11/17/94 | $2,650.00 |
| **Falcon Bank to** | 11/18/94 | $5,262.00 |
| **Account In Del** | 11/21/94 | $50,937.50 |
| **Rio Bank** | 11/21/94 | $2,645.00 |
| | 11/23/94 | $50,937.00 |
| | 12/20/94 | $2,932.00 |
| | 12/13/94 | $30,973.00 |
| | 12/29/94 | $23,229.00 |
| | 1/5/95 | $30,000.00 |
| | 1/5/95 | $39,689.00 |
| | 2/10/95 | $50,000.00 |
| | 2/13/95 | $25,000.00 |
| | 2/21/95 | $20,000.00 |
| | 3/15/95 | $30,015.00 |
| | 3/29/95 | $7,500.00 |
| | Total | $1,849,152.50 |
| | Number of transactions | 26 |
| | Average Amount Per Transaction | $71,120.48 |

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JAN - 6 2003

MICHAEL N. MILBY, CLERK

| | |
|---|---|
| IN RE: | In Bankruptcy Case # 90-01254-B-11 |
| Charles B. FELDMAN dba | |
| Charles B. Feldman Investments | |
| Debtor | In Chapter 11 |

Font: Korinne

## COLIN KELLY KAUFMAN'S PROFFER OF EVIDENCE
## AT MIKE BOUDLOCHE'S MOTION TO APPROVE COMPROMISE AND SETTLEMENT

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

NOW COMES Colin Kelly Kaufman, the Former Plan Trustee, and for his Proffer of

Evidence at Mike Boudloche's Motion to Approve Compromise and Settlement, respectfully

shows the Court as follows:

STATE OF    TEXAS          |

COUNTY OF NUECES           |

Now comes Colin Kelly Kaufman, Affiant, and makes this statement under penalty of

perjury as authorized by the Federal Rules of Bkcy. Procedure:

1. Affiant. My name is Colin Kelly Kaufman. I have personal knowledge of the

things mentioned in this writing, unless I state something on information and belief in which

case I have information and do believe. I am over 21 years of age and competent to make

an affidavit.

2. Proposed Final Report. I ask that the Court take judicial notice of the Proposed

Final Report and its amendments filed herein, and the rest of the record in the main

bankruptcy case, the adversary, and in the appeal and civil action in federal district court,

including the income tax returns and other financial information concerning Mr. Feldman

and the Feldman Group. I prepared the Proposed Final Report and its amendments, and

the information stated therein is true and correct.

-1-

*L-XD*

3. <u>Adversary</u>. An adversary proceeding exists in which the causes of action expressed in the Proposed Final Report were brought, plus additional claims based on the income tax returns that were produced subsequent to the Proposed Final Report. The adversary proceeding was meritorious, and was susceptible of being prosecuted on a motion for summary judgment. The complaint claims amounts cerca $1 million.

4. <u>Civil Action</u>. A civil action is pending in the federal district court in Brownsville in which I asserted my personal causes of action arising out of the failures of the debtor and the Feldman Group entities to make the payments discussed in the Proposed Final Report That action is meritorious.

5. <u>Can Prosecute on Contingent Fee</u>. I have offered to find someone to prosecute the Feldman and Feldman Group claims on a contingent fee basis, or do it myself. In my opinion, based on over 32 years experience dealing with claims of bankruptcy estates, it would be possible for the bankruptcy estate to realize a lot more than $25,000 if one of these paths were followed.

6. <u>Steen Opinion</u>. The following is a summary of the facts related to the Judge Steen opinion which Replacement Plan Trustee places so much reliance:

A. Judge Steen has seen me in court three times (the third time was December 19 of 2002). The first time I appeared in front of Judge Steen, I was assisting Louis LaVaude in the case of the Hachar department store bankruptcy (George, Sr. is his uncle, and the younger Hachars are cousins of his). A plan had been confirmed in front of Judge Schmidt. Later, a controversy arose. It was settled, with a little help from me. We decided to seek bankruptcy court approval, as the plan permitted us to. So we reopened

-2-

the case (which put it in front of Judge Steen) and moved unopposed to approve the settlement (which had a term setting how much fees the Hachars would pay me for working on it), and reclose again. Judge Steen denied the unopposed motion.[1] He denied the Hachar department store settlement. He denied my fees. But the parties did not want to litigate. They still wanted to settle. And post-confirmation settlements normally can be done without court approval, so that's what the parties agreed to. We noticed the creditors and filed with the Court a writing pointing out that the settlement was being made, anyway. Mr. Hachar paid my fees, anyway. And the case was reclosed again.

B. The second time I appeared in front of Judge Steen, it was in <u>Cantu</u>, a civil RICO case. A low-paid clerk ran some $6.55 million through a couple of local banks to a well-known Mexican businessman ("import-export broker") at his account in Mexico, $4 million in a single bankwire. The clerk was convicted of criminal securities fraud and sentenced to 12 years in prison in state court. We did an amended complaint which alleged the two banks were liable under civil RICO for knowingly aiding and abetting the laundering of the money wrongfully taken from the Mexican citizens to whom it had belonged. Judge Steen issued an order to dismiss the case or he would sanction us $30,000, writing the opinion which Mike Schmidt contends proves Appellant is unworthy of a fair hearing. The client said that Appellant should dismiss the case. So the opinion stood.

---

[1] This was the first time nearly 30 years of practice that I had ever lost an unopposed motion, so it made quite an impression on me. Now I've practiced over 32 years, and it is still the only one.

-3-

C.  Our response to the Appellee's motion points out some of the things that are wrong with the opinion in the <u>Cantu</u> case, and explained we had never had an opportunity to respond to that opinion, so we were willing to let a higher court look at the matter.

D.  Suppose the bankruptcy court really thought the problem with the Cantu case was that Appellant was writing "innuendos" he shouldn't.  Then it should have approved Louis LaVaude's motion to replace me as counsel for the bankruptcy trustee.  If the lawyer is really the problem, change lawyers.  (And for that matter, why threaten only the Appellant, when two other attorneys also went over the pleading and approved it?  But the bankruptcy court refused to allow the substitution in <u>Cantu</u>.

E.  We also pointed out that "inflammatory" is merely a conclusion, and not true; since no effort was made to show any possible way of saying the same underlying idea that would be less emotional.  If a relevant fact is stated in the least emotional way possible, it is not "inflammatory" unless the statement should never have been made at all.  Something that has to be said is not "inflammatory" just because the facts are unusual.  "Inflammatory" is just a label and a conclusion.

F.  And the same thing can be said about "innuendo."  An innuendo is what someone calls an offered inference when one wants to sanction someone.  No principled basis has ever been given for distinguishing real innuendos from ordinary inferences.  But we will offer one now:  An inference is offered when facts are stated, which tend to increase the likelihood of a certain relevant event or condition being true or having occurred.  The offered facts do not become "innuendo" unless they tend only to show an irrelevant but

-4-

prejudicial circumstance. In other words, Appellee's motion was innuendo, because the Steen opinion was not proof of any issue actually before the court. Appellee wanted to use the Steen opinion to persuade the court that Appellant was not a nice person -- something not an element of a defense or cause of action. What the Steen opinion called "innuendo" was an inference that the plaintiff had to persuade the finder of fact of the truth of, in order to gain a judgment. So an inference which supports the finding of a fact that someone lawfully could testify about directly to make out his cause of action is not an improper "innuendo." A requested inference is "innuendo" only where the underlying fact that was sought to be inferred from the evidence is not itself admissible on the claim in question.

G. With that distinction in mind, Appellee is offering innuendos when he says "I want you to infer that Mr. Kaufman is a bad guy, because Judge Steen didn't like him." Appellant was not, when he said, "I want you to infer that Defendant X is affiliated with a criminal enterprise as required by RICO to impose liability on the banks, because the kinds of things that happened to his brother are the kinds of things that happen to people running criminal enterprises." The latter was a proper inference and should not have been mislabeled. Perhaps Judge Steen could have concluded, "that is not enough data, to support the inference you want us to draw."[2] But the cited event did tend to show exactly a necessary issue in the case; and the motion was to dismiss, not for summary judgment.

H. A brief comment on the enclosed Judge Tagle opinion. The caselaw is

---

[2] Or perhaps he might have said, "We don't believe it is good public policy to infer anything improper about someone just because of what his brother did," citing the comment of Cain in the Bible, after the Abel's death, "Am I my brother's keeper?"

clear that people who make substantial contributions to bankruptcy estates may collect fees up to the amount of the substantial contribution. We cited cases so stating. In re Zupancic, 3 F.3d 34 (9th Cir. 1995) (creditor whose litigation on behalf of estate produced $10,000 in asset recovery could recover $10,000 in attorneys fees for the work); In re Taxman Clothing Co., 49 F.3d 310, 316 (7th Cir. 1995); and In re Senior-G&A Operating Co., Inc., 957 F.2d 1290 (5th Cir. 1992). They cited no cases contra. And the plan was clear that the APPELLANT could determine what the fees ought to be, and pay himself; and this could only be set aside if there was proof of such bad faith or malice as would make an intentional tort. The plan did not say the bankruptcy judge had unlimited discretion to set fees. The plan gave Appellant such discretion as anyone might have in the matter. And the judge's review was only for such bad faith or malice as would be an intentional tort – he reviewed only for abuse.

I. Nobody ever proved bad faith or malice on Appellant's part; so the bankruptcy court could not properly set aside Appellant's determination that his fees and expenses ought to be allowed for $450,000, as set out in his fee application, less than half the value of the claim established against Mr. Feldman and the Feldman group. And it ought to be even simpler to see that the mere $270,000 for fees and expenses for ten years work ($27,000 a year), that Appellant actually got, was a reasonable charge. This is particularly true since the uncontroverted evidence was that Appellant's billable time spent exceeded the amount, and that Appellant at all times had conferred benefits on the estate exceeding the amount, of the fees he charged. Yet the opinion never discusses the Plan's standard of review. Nor does it mention that Appellant followed the caselaw as it existed at

-6-

the time, and still exists. Nor does it discuss that Appellant was given the discretion, not the bankruptcy judge.

        J.  If the rules of law are not to apply, then what we are working with here are civil rights cases, not merely fee applications.  Can a defined group (bankruptcy attorneys) have and defend their constitutionally-protected right to practice their profession with any degree of independence?  Why can't they?  Because discretion is more important?  That should never be the law.  Look what things the judges control with the discretion claimed for them here: Who can file cases, and what kinds of cases can they file.[3]  Which attorneys can file them.  Do clients pick their own attorneys, or do judges get to say which attorneys can practice.[4]  Can attorneys get paid if the judge did not want them to file that kind of case.  Will the rule of law apply to the work they do, or will it all be discretion that determines their payment.  Is there any effective appellate judicial review of any bankruptcy court fee decision.  Will procedural devices like "sanctions" be used as grounds to prevent things from being said at all in the first place.  Are certain kinds of substantive claims off limits as sanctionable.  If Mike Schmidt tells our clients not to hire us, because he will see us disbarred, is it okay; but if we report to the federal courts that he and his clients are abusing the bankruptcy bar, and invading our clients' confidences, are our First Amendment rights of freedom of expression gone because he says that is sanctionable conduct; and is our First Amendment right to petition the government for relief gone

--------

    [3] Is it not clear that one cannot file civil RICO cases in bankruptcy court in the Laredo division at this time?

    [4] Louis LaVaude could not represent the bankruptcy trustee in <u>Cantu</u>.

because he says it is sanctionable conduct to state these issues.  It should not be true that people can be forced out of the practice because others find them uncomfortable, or don't want them looking at or complaining about what the others are doing.  This is not the vision of America that one gets in high school, nor in college, nor in law school.

     7.  Expert Data Sheet.  Attached hereto as an Exhibit is Former Plan Trustee's expert witness data sheet, which is true and correct.

     8.  This statement is made under penalty of perjury.

Colin Kelly Kaufman, Affiant

WHEREFORE, PREMISES CONSIDERED, Former Plan Trustee respectfully asks the Court to deny the Motion for compromise and settlement, and let Former Plan Trustee go hence without day free from said motion; and grant Former Plan Trustee such other and further relief granted as may be fair or just.

Respectfully submitted,

Colin Kelly Kaufman, In propria Personam
State Bar of Texas # TN 13000
So. Dist. of Texas ID # 9242

Address of Counsel:

Colin Kelly Kaufman, Attorney at Law
P. O. Box 1662
Corpus Christi, TX. 78403-1662

Telephone (361) 888-8865

-8-

Telecopier (361) 888-8172

Board Certified, Business & Consumer Bankruptcy Law
Texas Board of Legal Specialization

Expert Witness Data Sheet of:

Colin Kelly Kaufman, Esq.
P. O. Box 1662
Corpus Christi, TX. 78403-1662
Telephone (361) 888-8865
Telecopier (361) 888-8172

LAW SCHOOL:

Harvard University Law School, Cambridge, MA 02138: Juris Doctor (JD) cum laude, 1970
(B+ or A- average, ranked top quarter. NOTE: Harvard does not release class standings, but
that year only the top quarter of the class made cum laude).

Harvard University Law School, Cambridge, MA 02138: Master of Laws (LLM), 1976 (A+
average -- rare achievement -- see discussion p. 6, next to last entry).

PERSONAL DATA:

Age 55. Born December 4, 1946, in Tucson, Arizona.

Married to Sharon Kaye Kaufman.

Religious Affiliation, Methodist.

Graduated, University of Texas, Austin, Texas, 1967; BA with honors, special honors in
government; minors in history and economics. Additional languages, Spanish and German.

Areas of Expertise:

Considered an expert in the law of contracts (because of thousands of cases read and
digested during over a decade of work as Revision Editor of Corbin on Contracts, leading
treatise on contract law), having written two-volume supplements to Corbin on Contracts
published in 1980, 1982, 1984 and 1989.

Expert in bankruptcy law from over three decades experience as an attorney in the
field, and from having worked on the current Bankruptcy Code while it was in the drafting
stage, while a teaching fellow at Harvard. Trustee in bankruptcy in about 30 cases, 1972-74

-9-

while employed at the firm which is now Kleberg & Head (Henry Nuss, III, supervisor; E.H. "Ted" Patton, Jr. -- who is now "Of Counsel" at Vinson & Elkins -- was Bankruptcy Judge). Board Certified in Business Bankruptcy Law and in Consumer Bankruptcy Law, in 1988, Texas Board of Legal Specialization. Secretary-Treasurer, Coastal Bend Bankruptcy Assn., 1987-present.

Expert in the Uniform Commercial Code. Assisted the late Robert Haydock, the late Peter Coogan and Professor Martin Aronstein of the University of Pennsylvania in re-writing Article 8 of the Uniform Commercial Code to provide for certificateless securities (adopted by the Permanent Editorial Board of the UCC, 1978). Wrote former Section 9.319 of the Texas Business & Commerce Code. Invited by Prof. Amy Boss of Amy Temple University School of Law to assist in the revision of the Suretyship provisions of the UCC, 1991.

Author of numerous scholarly writings in the Commercial or Banking Law field, including:

1. Case Note, <u>Brown v. Southall Realty</u>, 4 Harvard Civil Rights-Civil Liberties Law Review 204 (Fall 1968).

2. Article, "Eliminating Bureaucracy from the Federal Bankruptcy Administration," 49 American Bankruptcy Law Journal 197 (Summer 1975).

3. Article, "Truth-in-Lending Compliance: Drafting Problems and a Constitutional Defense," 8 UCC Law Journal 34 (Summer 1975).

4. Article, "Reconciling Texas and Federal Disclosures," 2 Caveat Vendor (Newsletter of the State Bar of Texas Consumer Law Section) No. 1, page 1 (Winter 1976).

5. Comment, "Bringing Chaos Out of Order: Truth in Lending in the Courts," 10 Georgia Law Review --- (Summer 1976).

6. Article, "The Resurrection of Contract," 17 Washburn Law Journal 38 (Summer 1977).

7. Article (with Prof. Harold Berman, then of Harvard, but now retired and a professor at Emory University Law School in Atlanta), "The Law of International Commercial Transactions (<u>Lex Mercatoria</u>)," 19 Harvard Intl. Law Journal 221 (winter 1978).

8. Article, "The Nature of Justice: John Rawls and Pure Procedural Justice," 19 Washburn Law Journal 197 (Winter 1980).

9. Article, "The Scientific Method in Legal Thought: Legal Realism and the

Fourteen Principles of Justice," 12 St. Mary's Law Journal 77 (Spring 1980).

        10. Contributor, of the proposal in Caperton & McGee, "Proposed Codification of the Parol Evidence Rule's Procedural Aspects," 45 Texas Bar Journal 1245 (October, 1982).

        11. Contributor, of the explanation of the meaning of the phrase, "And go hence without day" in Judge Jerry Buchmeyer's column, "Etc." in 46 Texas Bar Journal ---- (cerca July, 1983).

        12. 2-Vol. Supplements to Corbin on Contracts, 1980, 1982, 1984, and 1989.

Also wrote 3rd Edition of Vols. 1, 1A, 2, & 2A of Corbin on Contracts cerca 1986, but these were not published when I left teaching and gave up the treatise.

Expert Witness in over thirty cases as of December, 2001. Expert Consultant in many others.

LAW SCHOOL TEACHING EXPERIENCE:

PROFESSOR OF LAW, St. Mary's University Law School, San Antonio, Texas 78284, from 1981-86. Associate Professor of Law, St. Mary's, 1978-81. Voted "Best Professor" by Phi Delta Phi, 1982.

        Subjects: Banking Law, Bankruptcy, Commercial Paper, Contracts, Sales, Secured Transactions. While teaching in San Antonio. I also worked on cases, including such notable bankruptcy cases as Spector Red Ball Trucking, and Handy Andy grocery stores.

ASSISTANT PROFESSOR OF LAW, Washburn University Law School, Topeka, Kansas 66621, 1976-78.

        Subjects: Same as above.

TEACHING FELLOW, Harvard University Law School, Cambridge, MA. 02138, 1974-76.

        Subjects: Banking Law, Commercial Drafting, Legal Methods (introduction to law, and legal analysis, plus legal research and writing) and Trial Practice.

PRE-TEACHING EXPERIENCE:

ASSOCIATE, Kleberg, Mobley, Lockett & Weil (subsequently Kleberg & Head, now the Kleberg Law Firm), Corpus Christi, Texas, 1970, 1972-74. Henry Nuss, III, Supervisor.

Practiced chiefly in banking, bankruptcy, Uniform Commercial Code.  At that time, the firm represented six banks.

LEGAL OFFICER, Assistant Staff Judge Advocate (Chief, Military Affairs, which was essentially "legal aid"), HQ US Air Force Security Service, San Antonio, TX 78242.  Maj. Fred Sims, Supervisor.  Honorable discharge by reason of family hardship.

POST-TEACHING WORK EXPERIENCE:

CANDIDATE, Texas Supreme Court, 1986 (carried two counties in four-person race).

OF COUNSEL, Meredith, Donnell & Abernethy, Corpus Christi, TX. 1987 - 1991, practicing in bankruptcy and banking law.  Notable cases included Clinton Manges-Duval County Ranch Co. bankruptcy (for a well-known West Coast bank); Rosas Computer Co. bankruptcy (for creditors' committee).

SOLE PRACTICE, as Colin Kelly Kaufman, Attorney at Law, Corpus Christi, TX. 1991-present, practicing bankruptcy law.  Notable cases include Greyhound bankruptcy (for workers compensation claimants); Gulf Iron Works (for creditors committee); Hachar Department Stores bankruptcy in Laredo (for the debtor); Heldt Trucking - Alice Leasing Co. bankruptcy case (for the creditors committee); Channel 47 bankruptcy (for debtor's non-profit parent corporation, owned by well-known universal church headquartered in Rome).

BAR RELATED ACTIVITIES:

Admitted:  Supreme Court of Texas, 1970 (3rd highest grade on the Texas bar exam); U.S. Court of Military Appeals, 1971; Supreme Court of Kansas, 1976 (inactive status in Kansas in 1990); U.S. District Court for the Southern District of Texas, 1972 (readmitted 1988, after admission lapsed December 31, 1986); U.S. Court of Appeals for the Fifth Circuit, 1982; U.S. Supreme Court, 1984.

State Bar of Texas, Corpus Christi Bar Association.

Member, Texas Bar Foundation, since 1985.

Founding Member, Board of Directors, and Secretary-Treasurer of the Coastal Bend Bankruptcy Association, 1988 - present.

Harvard Law School Assn. of Texas; President, 1985-86; Vice-President, 1984-85; Secretary, 1983-84; Board of Directors, 1982-1986.

Author and lecturer on commercial law topics for continuing legal education programs, conventions, and bar related groups, including Texas Association of Bank Counsel, Univ. of

-12-

Texas Mortgage Lending Institute, 10th Annual Univ. of Texas Advanced Bankruptcy Conference, Austin, Texas (Nov. 1988).

Speaker, "Basic Bankruptcy in Texas," National Business Institute, Eau Claire, WI., Law Review Series, in Corpus Christi at the Sandy Retreat Motel, on Oct. 4, 1989.

Speaker, "Foreclosure and Repossession in Texas," Lorman Educational Services, in Corpus Christi at the Wyndham Hotel, November 30, 1989.

Speaker, "Fraudulent Conveyances Law in Estate Planning", in McAllen at the Tower Club, July 31, 1997.

Nueces County Christian Lawyers Assn.

Collector, 19th and 18th century antique law books.

Experienced in word processing and legal research computers.

Who's Who in American Law three times, Who's Who in Emerging American Leaders (along with two other Corpus Christi attorneys in 1991.

Inducted into honorary membership, Phi Delta Phi honarary legal society, Summer, 1977.

PRE-PRACTICE ACHIEVEMENTS AND ACTIVITIES:

HIGH SCHOOL:

Graduated from A.N. McCallum High School, Austin, Texas, 1963.

COLLEGE ACHIEVEMENTS AND ACTIVITIES:

Univ. of Texas, Austin, Texas, 1963-67. BA with honors, special honors in government, June, 1967 (B+ average ranked highest quarter).

Arnold Air Society (honorary Air Force ROTC society) 1965-67; Administrative Officer, 1966-67.

Captain, coach and center, Air Force ROTC intermural basketball team, "D" leage (for those 6' tall and under).

Pi Sigma Alpha (honorary political science society) 1965-67; president-elect 1967 (resigned to enter Harvard Law School).

-13-

Dean's list, Fall, 1966 (half A's, half B's; ranked highest 3%).

One of four persons (out of over 600 applicants) gaining UT-Austin Chemistry Department fellowships, 1963-64.

Grading Assistant to two government department professors, Dr. David V. Edwards, and Dr. William S. Livingston (then chairman of the department, later Dean of the Graduate School), 1966-67.

Young Republicans, 1963-66; Young Democrats 1966-67.

## LAW SCHOOL ACHIEVEMENTS AND ACTIVITIES

Harvard Law School, Cambridge, MA 02138, 1967-70; JD cum laude, June, 1970 (B+ - A- average, ranked top quarter).

Harvard Civil Rights-Civil Liberties Law Review, 1968-70; Board of Editors, 1969-70.

Bruce Moot Court Club, 1967-70; Supervisor, Moot Court Team, 1968-69; President 1969-70.

Research Assistant, the late Prof. John P. Dawson, summer, 1968 (for his book, The Oracles of the Law).

Research Assistant, Prof. Vern Countryman, 1969-70. (Prof. Countryman, now deceased, invited me to work for him on his new casebook after I booked the Commercial Transactions course. I read every reported case that had ever been decided under the Uniform Commercial Code, finishing through Vol. 9 of the UCC Reports for him; and continued to read every UCC case up through Volume 15 of the UCC Reports when the case load became too much. Prof. Countryman was kind enough to mention my name in the casebook preface, now published as Countryman, Kaufman & Wiseman -- co-author Prof. Andrew Kaufman of Harvard is no relation).

Harvard Law-Graduate Democratic Club, 1967-70.

Harvard Law School, Cambridge, MA 02138, 1974-76; LLM, June, 1976 (A+ average, and presumably ranked in the highest quarter - even though Harvard does not release class rankings, nor does it maintain summa, magna and cum laude distinctions for the LLM degree - because a study, made when numerical grades were permanently abolished, to determine what letter grade equivalent would be used for a summa cum laude for the JD, published cerca December, 1977 in the Harvard Law Record, showed that out of the some 18,000 or so LLB or JD degrees earned from Harvard since World War II, only 7 persons had

-14-

a numerical A+ average).

Lincoln's Inn Society, 1969-70, 1974-76.

### Certificate of Service

I certify that I had one of the personnel at this law office serve the foregoing writing on the persons who were in court at the hearing on this January 6, 2003.. As required by Local Rule 9013(c), I represent that said list included all persons required to be served.

Colin K. Kaufman

-15-